## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | (CHAPTER 11) |
| | § | |
| DUNE ENERGY, INC.; | § | CASE NUMBER 15-10336 |
| DUNE OPERATING COMPANY; | § | CASE NUMBER 15-105337 |
| DUNE PROPERTIES, INC. | § | CASE NUMBER 15-10338 |
| | § | |
| DEBTORS. | § | (JOINT ADMINISTRATION |
| | § | REQUESTED) |

**DEBTORS' EMERGENCY MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363, AND 365, AND BANKRUPTCY RULES 2002, 6004, AND 6006, FOR ENTRY OF: (I) ORDER (A) APPROVING SALE AND BIDDING PROCEDURES IN CONNECTION WITH SALE OF ASSETS OF THE DEBTORS, (B) APPROVING FORM AND MANNER OF NOTICE, (C) SCHEDULING AUCTION AND SALE HEARING, (D) AUTHORIZING PROCEDURES GOVERNING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) GRANTING RELATED RELIEF; AND (II) ORDER (A) APPROVING PURCHASE AGREEMENT, (B) AUTHORIZING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (C) GRANTING RELATED RELIEF**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED**

Dune Energy, Inc. ("Dune Energy"), Dune Operating Company ("Dune Operating"), and

Dune Properties, Inc. ("Dune Properties"), debtors-in-possession in the above-referenced chapter

11 cases (collectively, the "Debtors"), file this *Debtors' Emergency Motion, pursuant to*

*Bankruptcy Code Sections 105(a), 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006,*

*for Entry of: (I) Order (A) Approving Sale and Bidding Procedures in Connection with Sale of*

*Assets of the Debtors, (B) Approving Form and Manner of Notice, (C) Scheduling Auction and Sale Hearing, (D) Authorizing Procedures Governing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Granting Related Relief; and (II) Order (A) Approving Purchase Agreement, (B) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief* (the "<u>Motion</u>").  In support of the Motion, the Debtors respectfully submit the following:

<u>**JURISDICTION AND VENUE**</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are Sections 105(a), 363(b), (f), and (m), and 365 of the title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

<u>**BACKGROUND**</u>

**A.      The Debtors' Bankruptcy Cases**

2.      Dune Energy is an independent energy company that was formed in 1998 and operates through two wholly owned subsidiaries, Dune Operating and Dune Properties.  Since May 2004, the Debtors have been engaged in the exploration, development, acquisition and exploitation of crude oil and natural gas properties in Texas and Louisiana. The Debtors' interests in their oil and gas properties are held by Dune Properties, and their oil and gas operations are conducted by Dune Operating.  The Debtors sell their oil and gas production primarily to domestic pipelines and refineries.  The Debtors' oil and gas properties cover over 74,000 gross acres across 15 producing oil and natural gas fields.

3.      As of September 30, 2014, the Debtors had outstanding obligations in the principal amount of approximately $37 million of borrowings and $2 million of letters of credit under the Amended and Restated Credit Agreement, dated as of December 22, 2011 (as amended, the "First Lien Credit Agreement") among Dune Energy, as borrower, Bank of Montreal ("BMO"), as administrative agent, CIT Capital Securities LLC, as syndication agent, and the lenders party thereto (the "First Lien Lenders").  The Debtors also had outstanding obligations in the principal amount of approximately $67.8 million under the Floating Rate Senior Secured Notes due 2016 (the "Senior Notes").  The Debtors have granted liens on substantially all of their assets as security for their obligations under the First Lien Credit Agreement and the Senior Notes. The lien and security interests granted to secure the First Lien Credit Agreement are senior to those granted to secure the Senior Notes.

4.      Since early 2014, the Debtors have experienced liquidity constraints due in part to borrowing base reductions under the First Lien Credit Agreement.  In August 2014, the Debtors were in default under the First Lien Credit Agreement due to the failure to meet certain covenant ratios in the First Lien Credit Agreement.  As a consequence, the Debtors and the First Lien Agent entered into a number of amendments and forbearance agreements with respect to the First Lien Credit Agreement.

5.      To attempt to address the Debtors' liquidity constraints and obtain additional working capital to further develop their oil and gas properties, Dune Energy entered into an Agreement and Plan of Merger dated September 17, 2014 (the "Merger Agreement") with Eos Petro, Inc. ("Eos") and Eos Petro Sub, Inc.  On March 4, 2015, the Merger Agreement was terminated because Eos failed to close the tender offer and consummate the merger with Dune Energy.  Eos is obligated to Dune Energy for approximately $5.5 million (the "Merger

Termination Fee") for their failure to perform under the Merger Agreement.  On March 4, 2015 Dune Energy made a demand on Eos for the Merger Termination Fee.

6.      To preserve the value of their assets and restructure their financial affairs, on March 8, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above captioned cases (the "Chapter 11 Cases").  The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      Concurrently with the filing of the Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

8.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Motion and the Debtors' Chapter 11 Cases are set forth in greater detail in the *Declaration of Donald R. Martin, Chief Restructuring Officer of Dune Energy, Inc. and its Subsidiaries in Support of First Day Pleadings*, filed contemporaneously herewith and incorporated herein by reference.

**THE SALE PROCESS**

9.      By this Motion, the Debtors seek authority to sell substantially all of their assets (collectively, the "Assets"), which are defined and described in further detail in the form of Purchase and Sale Agreement (the "Form PSA"), which Form PSA will be filed with the Court prior to the hearing to be held on this Motion.  The Debtors believe that the procedures proposed herein with respect to the sale of the Assets (the "Sale") are the best way to maximize the value

of these assets for the Debtors' estates for their creditors and stakeholders under the circumstances.

A.      **The Prepetition Marketing Process**

10.     For approximately two (2) years, the Debtors have engaged in numerous exploratory discussions with independent exploration and production companies regarding potential joint ventures or other strategic transactions. The Debtors' senior management has had interaction with investment banks and other professional advisors with respect to potential transaction opportunities, from both the acquisition and divestiture perspectives. To date, these discussions have not lead to the consummation of any transactions. The Debtors, with the assistance of their professionals, assembled data and documents in a virtual data room and prepared presentations to assist potential buyers in conducting diligence and evaluating whether to submit an offer to acquire one or more of the Assets.

11.     More specifically, in early 2013, the Debtors began to explore certain strategic alternatives in light of the Debtors' continued need for capital, particularly to meet their liquidity needs, complete their drilling program, and address the fact that the covenants and other provisions in the First Lien Credit Agreement would constrain the Debtors' ability to access sufficient funds to execute their business plan and grow the business, as well as their potential inability to comply with such covenants. The Debtors hired a financial advisor to evaluate the various strategic alternatives to maximize value for their stockholders, including the potential sale of the Debtors, and to evaluate the potential return for stockholders for each strategy. In April, 2013, the Debtors engaged Perella Weinberg Partners LP ("PWP") to act as financial advisor to the Debtors' board of directors in the review of strategic alternatives.

12.     Throughout 2013, the Debtors attempted to negotiate the potential acquisition of a privately-owned E&P company. During this time, PWP also continued discussions with other

prospective buyers.  In addition, the Debtors continued analyzing other strategic alternatives available and whether to pursue one or more of such alternatives.

13.  Beginning in December 2013 and subsequently over the course of several months, PWP contacted a total of forty-five (45) prospective strategic and financial buyers for the Debtors. Thirty (30) of the companies declined to consider an acquisition of or merger with the Debtors.  Fifteen (15) of the companies expressed an interest in considering an acquisition and proceeded with non-disclosure/standstill agreements, one of which was Eos.

14.  During May and June 2014, the Debtors received three (3) preliminary, non-binding indications of interest.  Two (2) of these indications of interest were from potential strategic buyers, who ultimately withdrew their indications of interest.  The third indication of interest was from a prospective acquirer for the partial purchase of assets, however, the Debtors determined not to pursue a partial sale of their assets.

15.  On July 9, 2014, Eos submitted a non-binding indication of interest for the purchase of all of the Debtors' outstanding shares of stock.  The indication of interest was subject to satisfactory completion of due diligence and the negotiation and execution of a definitive purchase agreement.  The Debtors informed Eos that although it was interested in continuing discussions, it was not willing to enter into an exclusivity arrangement at that time.

16.  In July 2014, the Debtors received three (3) additional indications of interests from potential buyers.  After careful review of the indications of interest, the Debtors authorized the continued discussion and negotiation with Eos and one other prospective buyer in an effort to enter into a definitive agreement in connection with a merger transaction.  As discussions continued, Eos lowered its offer price based on the Debtors' enterprise value.  The other interested party continued its due diligence review, but did not provide a formal offer.

17.     On September 17, 2014, the Debtors and Eos entered into the Merger Agreement. The Debtors have continued to receive and review expressions of interest; however, none of the expressions of interest have resulted in proposals superior to the offer made by Eos.  Despite numerous extensions of the expiration of the Merger Agreement, to date, Eos has been unable to complete the financing and consummate the proposed transaction with the Debtors.

18.     Despite the Debtors' extensive prepetition marketing efforts, the Debtors were unable to close on any transaction.  Specifically, the Merger Agreement with Eos was terminated because Eos failed to close the tender offer and consummate the Merger Agreement.  As a result, the Debtors were faced with dwindling liquidity and subsequently prepared for a chapter 11 filing.

19.     Subsequent to termination of the Merger Agreement, the Debtors engaged the investment banking firm of Parkman Whaling, LLC ("Parkman") to assist the Debtors in implementing a marketing and sale process for the Assets in Chapter 11, which may include competitive bidding and an auction (the "Auction").

20.     Based on the marketing process and diligence completed to date, the Debtors, in consultation with Parkman and their other professionals, have concluded that: (a) a prompt and open sale of the Assets in which all interested buyers are encouraged to participate is the best way to maximize value for the estate under the circumstances and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Assets.

**B.      The Bidding Procedures**

21.      The Debtors propose to conduct the sale of their Assets through the sale and bidding process described below (the "Proposed Sale Process") to ensure that their estates realize the maximum value for the Assets.  The Assets shall be sold in the aggregate to one or more purchasers (each, a "Purchaser"), as may be determined by the Debtors in their business judgment.

22.      To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed bid procedures to govern the Sale (the "Bidding Procedures"), which are annexed as Exhibit 1 to the Bidding Procedures Order attached hereto as **Exhibit A** (the "Bidding Procedures Order").  The Bidding Procedures are designed to encourage all entities to put their best bids forward and to maximize the value of the Assets.

23.      The Debtors request that this Court approve the Proposed Sale Process and the Bidding Procedures, the material terms of which are as follows:[1]

_**Provisions Governing Qualifications of Bidders and Bids**_

- Parties who may be interested in purchasing the Assets should contact Debtors' investment banker, Parkman Whaling LLC, 600 Travis Street, Suite 600, Houston, Texas 77002, 713.333.8400, email:  mhanson@parkmanwhaling.com, Attn: Michael Hanson, and request a confidentiality agreement (a "Confidentiality Agreement").  Upon execution of a Confidentiality Agreement, parties will be given access to the Debtors' on-line data room (the "Due Diligence Data Room") and may begin conducting due diligence.

- Identification of Stalking Horse Bid:  In the event the Debtors, with the consent of the Required Lenders (as such term is defined in Debtors' DIP Credit Agreement, and such consent not to be unreasonably withheld), identify a stalking horse bidder (the "Stalking Horse Bidder") who places a bid (the "Stalking Horse Bid")

---

[1] This summary is qualified in its entirety by the Bidding Procedures.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed such term in the Bidding Procedures. To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

to acquire substantially all of the Assets pursuant to a Stalking Horse Purchase and Sale Agreement (the "Stalking Horse PSA") prior to the Bid Deadline, the Debtors shall post the Stalking Horse PSA in the Due Diligence Data Room. The Stalking Horse Bid must qualify and otherwise constitute a Qualified Bid. The Stalking Horse Bid shall be subject to higher and better offers to acquire the Assets.

- Qualified Bids. In order to constitute a Qualified Bid (as defined below), any proposal, solicitation or offer for the Assets (each, a "Bid") submitted by a bidder (each, a "Bidder") must (i) be submitted in writing prior to Friday, June 5 2015 at 12:00 p.m. (Central Time) (the "Bid Deadline") and (ii) satisfy the following requirements, as determined by the Debtors in their reasonable business judgment in consultation with the Required Lenders (collectively, the "Bid Requirements"):

    i.   Contain a signed definitive purchase and sale agreement (together with a copy of the signed agreement that is marked to show changes from the Form PSA) (a "Qualified PSA") and shall: (i) identify the Assets the Bidder seeks to purchase, (ii) contain the form of and total consideration to be paid by such Bidder, including the amount of proposed cash consideration and the liabilities to be assumed, with such consideration allocated on an asset by asset basis, (iii) provide for the assumption of all plugging and abandonment and other obligations as set forth in section 12.01 of the Form PSA (the "Assumed Obligations"), (iv) provide for the performance of the bonding obligations required by section 6.04 of the Form PSA, (v) in the event there is a Stalking Horse PSA, be on terms no less favorable (in the Debtors' reasonable business judgment in consultation with the Required Lenders) than the Stalking Horse PSA, including after consideration of any break-up or expense reimbursement payable thereunder, if any, and (vi) not be subject to any: (a) financing contingency, (b) contingency relating to due diligence after the Bid Deadline, (c) contingency relating to the approval of the Bidder's board of directors or other internal approvals or non-governmental third-party consents or approvals, or (d) any conditions precedent to the Bidder's obligation to purchase the Assets other than those included in the Form PSA.

    ii.  Be accompanied by the provision of a certified or bank check or wire transfer in the amount of at least 10% of the purchase price proposed in the Qualified PSA as a good faith deposit (the "Good Faith Deposit"). The Good Faith Deposit shall be held in escrow and credited to the closing payment if the Bidder is ultimately determined to be the Successful Bidder (as defined below), if any closing payment is due, or to be returned to the Bidder in whole or in part as applicable if the Bidder is not the Successful Bidder or the Backup Successful Bidder. In the event that a Bidder is selected as the Backup Successful Bidder, the Good Faith Deposit shall be returned to the Backup Successful Bidder within three (3) business days following the closing of a Sale to the Successful Bidder.

iii.    Contain a written statement that the Bidder agrees to be bound by the terms of the Bidding Procedures and the Bidding Procedures Order and include a commitment that the Bidder shall (i) commence and complete all filings with respect to necessary government and other approvals within three (3) days following the entry of the Sale Order (as defined below) with respect to the relevant Assets and (ii) consummate the purchase of the relevant Assets within ten (10) days following entry of the Sale Order.

iv.    Identify, with particularity, each and every executory contract and unexpired lease it intends to assume; provided, however, that such list of contracts may be later modified to the extent permitted under the Qualified PSA.

v.    Be accompanied by evidence satisfactory to the Debtors that the Bidder is willing, authorized (including by such Bidder's board of directors or comparable governing body), capable and qualified financially, operationally, legally and otherwise, of unconditionally performing all obligations under the Qualified PSA, including, without limitation, (1) all Assumed Obligations with respect to the relevant Assets and (2) the ability to provide adequate assurance of future performance under contracts and leases to be assumed pursuant to Section 365 of the Bankruptcy Code.

vi.    Provide (i) that the Bidder agrees to serve as the Backup Successful Bid (as defined herein) if it is selected as the next highest and best bid for any particular Assets after the Successful Bid is determined in accordance with the Bidding Procedures and (ii) that the Bidder's Bid shall remain open and irrevocable until at least thirty (30) days after the entry of an order by the Court approving a definitive agreement providing for the Sale of those Assets.

vii.    Fully disclose the identity of each entity that will be bidding in any Auction scheduled by the Debtors.

viii.    Be submitted to (i) counsel for the Debtors, Kourtney P. Lyda, Haynes and Boone LLP, 1221 McKinney, Suite 2100, Houston, TX 77025, kourtney.lyda@haynesboone.com and (ii) counsel for the Agent: Mayer Brown LP, 700 Louisiana Street, Suite 3400, Houston, TX 77002, Attn: Charles Kelley, ckelley@mayerbrown.com, so as to be received not later than the Bid Deadline, Friday, June 5, 2015 at 12:00 p.m. (Central Time). The Debtors, with the consent of the Required Lenders (not to be unreasonably withheld), may extend the Bid Deadline until the start of any Auction for one or more bidders without further notice, but shall not be obligated to do so.

- <u>Notice of Qualified Bidders</u>.  A Bid that satisfies each of the Bid Requirements, as determined in the Debtors' reasonable business judgment after consultation with the Required Lenders, shall constitute a "<u>Qualified Bid</u>," and such Bidder shall be

a "Qualified Bidder."  The Debtors shall notify each Qualified Bidder that such party is a Qualified Bidder within two (2) days after the Bid Deadline.

- Credit Bidding. In the event the Debtors receive more than one Qualified Bid and determine, in the exercise of their sound business judgment and in consultation with the Required Lenders, to schedule an Auction, the Agent or its designee shall be entitled to credit bid all or a portion of the outstanding obligations under the DIP Facility and the First Lien Credit Agreement in accordance with Section 363(k) of the Bankruptcy Code, and it shall be deemed to be a "Qualified Bidder" for all purposes herein and any such bid shall be deemed to be a "Qualified Bid" for all purpose herein.

- Evaluation of Competing Bids. The Bidding Procedures set forth various factors that will be considered by the Debtors in evaluating each Qualified Bid. The Debtors may evaluate competing bids in a manner that will maximize the aggregate value to their estates rather than maximize value from individual Assets.

- Auction.  In the event the Debtors receive more than one Qualified Bid, the Debtors may determine, in the exercise of their sound business judgment and in consultation with the Required Lenders, to schedule an Auction to request additional competitive bids from Qualified Bidders.  In the event there is a Stalking Horse PSA, the Stalking Horse PSA shall serve as the "Baseline Bid" at the commencement of the Auction.  In the event there is no Stalking Horse PSA, the Debtors, in consultation with the Required Lenders, shall determine which Qualified Bid shall constitute the Baseline Bid. The Debtors shall notify each Qualified Bidder of the contents of the Baseline Bid.  The Baseline Bid shall be subject to higher and better Bids at the Auction, as described further below.

- No Qualified Bids.  If the Debtors do not receive any Qualified Bids with respect to any or all of the Assets, other than the Stalking Horse Bid, the Debtors shall report the same to the Court, and shall promptly proceed to seek entry of the appropriate orders approving the Stalking Horse PSA, to the extent there is a Stalking Horse PSA.  If the Debtors do not receive any Qualified Bids with respect to any or all of the Assets other than a credit bid by the Agent or its designee, the Debtors shall report the same to the Court, and shall promptly proceed to seek entry of the appropriate orders approving such credit bid by the Agent or its designee.

### Notice Procedures

- Notice of Auction and Sale Hearing. After entry of the Bidding Procedures Order, the Debtors will cause the Notice of Auction and Sale Hearing, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice"), to be served by first-class mail, postage prepaid, facsimile, electronic transmission, or  overnight mail upon: (i) all entities known by the Debtors to have expressed an interest in a transaction with respect to the Assets during the

past eighteen (18) months, including all Qualified Bidders; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) all non-debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; and (vi) upon all parties set forth in the Debtors' Master Service List maintained in these cases (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (v) above).

- <u>Assumption and Assignment Notice</u>. As soon as is practicable after entry of the Bidding Procedures Order, the Debtors will serve the Assumption and Assignment Notice, substantially in the form attached as Exhibit 3 to the Bidding Procedures Order (the "<u>Assumption and Assignment Notice</u>"), by first class mail, facsimile, electronic transmission, or overnight mail on (a) each counterparty under each potential Assumed and Assigned Contract (as defined below) (a "<u>Contract Counterparty</u>") and (b) its attorney, if known, in each case, at the last known address available to the Debtors. The Assumption and Assignment Notice shall set forth the following information: (i) the Contract(s) and/or Lease(s) that may be assumed by the Debtors and assigned to the Successful Bidder(s); (ii) the name and address of the Contract Counterparty thereto; (iii) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "<u>Cure Amount</u>"); and (iv) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Assumed and Assigned Contract, provided, however, that the presence of any Contract or Lease on an Assumption and Assignment Notice does not constitute an admission that such Contract or Lease is an executory contract or unexpired lease.

## *Auction*

- <u>Auction</u>. In the event that the Debtors determine to conduct an Auction, the Auction will start on <u>Tuesday, June 9, 2015 at 10:00 a.m.</u> (Central Time) at the offices of Haynes and Boone LLP, 1221 McKinney, Suite 2100, Houston, TX 77025. To participate in the Auction, each prospective purchaser must be a Qualified Bidder. Each Qualified Bidder must have at least one (1) individual representative with authority to bind the Qualified Bidder attend the Auction in person. Only Qualified Bidders and their legal and financial advisors shall be entitled to attend and/or bid at the Auction. By attending the Auction, each party present at the Auction agrees to keep the Auction, the Bids at the Auction, and all details concerning the Auction confidential. The Auction shall be conducted in the presence of a certified court reporter who shall transcribe the Auction.

  i. A Qualified Bidder wishing to submit a bid higher than the Baseline Bid at the Auction must bid an amount greater than the total consideration contained in the Baseline Bid (the "<u>Minimum Overbid</u>").

ii. Subject to the Minimum Overbid, Qualified Bidders shall submit successive bids in increments to be determined by the Debtors at the Auction (the "<u>Incremental Bid Amount</u>") for the purchase of the Assets for which it is bidding on until there is only one offer that the Debtors determine, subject to Court approval, is the highest and/or best offer for such assets (a "<u>Successful Bid</u>" and such Bidder, the "<u>Successful Bidder</u>"). The second highest bid, to the extent determined to be acceptable to the Debtors, in consultation with the Required Lenders, shall be deemed to be the backup bid (the "<u>Backup Successful Bid</u>" and such Bidder, the "<u>Backup Successful Bidder</u>"), provided, however, that the Agent shall not be required to serve as the Backup Successful Bidder in connection with a credit bid. In the event that the Agent makes a determination not to serve as the Backup Successful Bidder (whether before or after submitting any credit bid or other bid), the Agent shall provide notice to the Debtors no later than one (1) business day after the Auction, and the third highest bidder, to the extent determined to be acceptable to the Debtors, in consultation with the Required Lenders, shall be deemed to be the Backup Successful Bidder.

iii. All Bids made at the Auction shall remain open until the earlier of (i) if the Bidder submits the Successful Bid or is deemed to be the Backup Successful Bidder, thirty (30) days after the entry of an order by the Court approving a definitive agreement providing for the Sale of those Assets to which it relates, and (ii) if the Qualified Bidder is not selected as a Successful Bidder or the Backup Successful Bidder, three (3) days after the end of the Auction with respect to the relevant Assets it has bid on.

iv. The Debtors shall have the right to choose the order in which the Assets are put up for Auction.

- <u>Highest and/or Best Bid</u>. At all times during the Proposed Sale Process, the Debtors, in consultation with the Required Lenders, shall retain full discretion and right to determine which Bid or Bids constitutes the highest or otherwise best offer for the purchase of the Assets (whether in an aggregate sale to a single buyer or on an asset by asset basis), and which bid or bids should be selected as the Successful Bid(s), if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. The Debtors, with the consent (not to be unreasonably withheld) of the Required Lenders, may adopt rules, may adopt rules for the Auction that, in their judgment, will better promote the goals of the Auction and that are not inconsistent in any material respect with any of the other material provisions hereof or of any Court order.

- <u>Proceeds</u>. All valid and properly perfected liens against the Debtors' Assets shall attach to the proceeds of the Sale of such Assets.

- <u>Reservation of Rights</u>. The Debtors with the consent (not to be unreasonably withheld) of the Required Lenders, reserve the right to modify these Bidding

Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth herein with respect to any or all Potential Bidders and Bidders, imposing additional terms and conditions with respect to any or all Potential Bidders and Bidders, adjourning or cancelling the Auction at or prior to the Auction and/or adjourning the Sale Hearing.

### *Sale Hearing*

- *Sale Hearing*. As soon as is practicable following the conclusion of the Auction, the Debtors will file the definitive purchase and sale agreement for the Successful Bid. The Debtors intend to present the Successful Bid(s) for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code at the final hearing to approve the Motion (the "Sale Hearing") to be scheduled by the Court and requested to be held on or before Friday, June 12, 2015. The Debtors shall be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a Sale of the Assets after the Sale Hearing because of the occurrence of a breach or default by the proposed purchaser under the terms of the Successful Bid, the Backup Successful Bid shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Backup Successful Bid.

- *Sale Implementation*. Following the approval of the Successful Bid(s) at the Sale Hearing, the Debtors will be authorized to take any and all actions necessary and appropriate to facilitate the closing of the Sale (the "Closing") and implement the transactions contemplated by the Successful Bid(s).

### C.    **Assumption and Assignment of Leases and Contracts**

24.    In addition, to facilitate the sale, assumption, and assignment of the Leases and Contracts to be assumed and assigned to the Successful Bidder(s) (the "Assumed and Assigned Contracts"), the Debtors propose to serve the Assumption and Assignment Notice as soon as practicable after the entry of the Bidding Procedures Order and request that the Court approve the following procedures for fixing any cure amounts owed on the Leases and Contracts (the "Assumption and Assignment Procedures"). The Assumption and Assignment Notice shall set forth the following information: (i) the Contract(s) and/or Lease(s) that may be assumed by the Debtors and assigned to the Successful Bidder(s); (ii) the name and address of the Contract Counterparty thereto; (iii) the Cure Amount, if any, determined by the Debtors necessary to be

paid to cure any existing default in accordance with Sections 365(b) and 365(f)(2) of the Bankruptcy Code; and (iv) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Assumed and Assigned Contract.

25.     All objections to any assumption and assignment of any Lease or Contract, including without limitation any objection to the Debtors' proposed Cure Amount or the provision of adequate assurance of future performance under any Lease or Contract pursuant to Section 365 of the Bankruptcy Code ("Adequate Assurance"), must: (a) comply with the General Objection Procedures (as defined in paragraph 30 below); (b) identify the Lease or Contract to which the objector is party; (c) describe with particularity any cure the claimant contends is required under Section 365 of the Bankruptcy Code (the "Cure Claim") and identify the basis(es) of the alleged Cure Claim under the Contract or Lease; (d) attach all documents supporting or evidencing the Cure Claim; and (e) if the response contains an objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance (collectively with the General Objection Procedures, the "Assigned Contract Objection Procedures").

26.     If no objection is timely and properly filed and served in accordance with the Assigned Contract Objection Procedures, (a) the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling notwithstanding anything to the contrary in any Contract or Lease or other document and the non-debtor party to the Contract or Lease shall be forever barred from asserting any other claim arising prior to the assignment against the Debtors or Purchaser as to such Contract or Lease if it is an Assumed and Assigned Contract, and (b) the Purchaser's promise to perform under the Contract or Lease shall be deemed Adequate Assurance under the Contract or Lease.  To the extent the Debtors dispute any Cure Claim, such

dispute shall be presented to the Court at the Sale Hearing, or such earlier or later date and time as the Debtors and the objector may agree or the Court may order, but such dispute shall not affect in any way the effectiveness of any assumption and assignment of a Contract or Lease. All Cure Amounts shall be paid by the Purchaser.

27.     While the Debtors have made a good faith effort to identify all Contracts and Leases to be assumed and assigned in connection with the Sale, they may discover additional Contracts and/or Leases that the Debtors and the Purchaser desire to assume and assign in connection therewith.  Accordingly, if at any time after the entry of the Bidding Procedures Order the Debtors identify additional prepetition executory Contracts and/or Leases to be assumed and assigned to the Purchaser as Assumed and Assigned Contracts (whether before or after closing of any Sale(s) of relevant Assets), the Debtors shall serve a supplemental Assumption and Assignment Notice by first class mail, facsimile, electronic transmission, or overnight mail on the Contract Counterparty (and its attorney, if known) to each supplemental Assumed and Assigned Contract at the last known address available to the Debtors by no later than ten (10) days before the proposed effective date of the assignment.  Each supplemental Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Contract Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtors and Purchaser to withdraw such request for assumption and assignment of the Assumed and Assigned Contract prior to the Closing), (iii) identification of the Assumed and Assigned Contract, and (iv) the Cure Amount, if any.

28.     Unless the Contract Counterparty or any other entity properly files an objection to the supplemental Assumption and Assignment Notice in accordance with the General Objection Procedures (as defined below) within ten (10) days of the date of the Assumption and

Assignment Notice, the Debtors may assume and assign the Assumed and Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing.  If an objection is filed and served in accordance with the General Objection Procedures within ten (10) days of the date of the supplemental Assumption and Assignment Notice, and the objection cannot be resolved consensually, then the Debtors will request that the Court schedule a hearing to consider the objection.

**D.      Notice**

29.      The Debtors propose to give notice, immediately after the entry of the Bidding Procedures Order, of the Bidding Procedures, the Form PSA, the Assumption and Assignment Notice, the time and place of the Auction, the Sale Hearing, and the Objection Deadline to all entities known by the Debtors to have expressed an interest in a transaction with respect to the Assets during the past eighteen (18) months and upon all parties set forth in the Debtors' Master Service List maintained in these cases.  After entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice and the Assumption and Assignment Notice substantially in the form attached as Exhibit 3 to the Bidding Procedures Order to be served by first-class mail, postage prepaid, facsimile, electronic transmission, or  overnight mail upon: (i) all entities known by the Debtors to have expressed an interest in a transaction with respect to the Assets during the past eighteen (18) months, including all Qualified Bidders; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) all non-debtor parties to relevant contracts or leases (executory or otherwise); (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; and (vi) upon all parties set forth in the Debtors' Master Service List maintained in these cases (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (v) above).

**E.     Objections**

30.     All objections to the Sale of the Assets, the assumption and assignment of the Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief granted by this Court in the Bidding Procedures Order must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules of the Court; (d) filed with the Bankruptcy Court, by no later than 5:00 p.m. (Central Time) on Friday, June 5, 2015 (the "General Objection Deadline"); provided, however, that any party may object based on events occurring at the Auction until 3:00 p.m. (Central Time) on the day prior to the Sale Hearing; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following (collectively, the "Objection Notice Parties"): (i) counsel for the Debtors, Haynes and Boone LLP, 1221 McKinney, Suite 2100, Houston, TX 77025, Attn: Kourtney P. Lyda (ii) counsel for the Agent: Mayer Brown LP, 700 Louisiana Street, Suite 3400, Houston, TX 77002, Attn: Charles Kelley; and (iii) Office of the United States Trustee for the Western District of Texas, 230 Homer Thornberry Judicial Building, 903 San Jacinto Blvd, Austin, TX 78701.  These procedures are collectively referred to as the "General Objection Procedures".  Each objection shall state the legal and factual basis of such objection and may be orally supplemented at the relevant hearing.

## RELIEF REQUESTED AND BASIS THEREFOR

31.     By this Motion, the Debtors request the entry of two orders concerning sales of the Assets.  First, to provide for the orderly sale of the Assets, the Debtors seek the immediate entry of the Bidding Procedures Order approving the Bidding Procedures summarized above. This relief requested by the Debtors is intended to provide for a competitive bidding and auction procedure for the Assets to maximize value for their estates, creditors and other stakeholders as expeditiously as possible.

32.     Following the entry of the Bidding Procedures Order, the Debtors will solicit Bids according to the Bidding Procedures in hopes of receiving acceptable offers for the Assets.  In the event that more than one Qualified Bid is received prior to the Bid Deadline, the Debtors will hold an Auction at which they will choose the Successful Bidder(s) with the highest and best Bid(s) for the Assets.

33.     Following the Bid Deadline and after the Auction, if any, the Debtors will  request the entry of an order to be negotiated with the Successful Bidder and filed with the Court two (2) 2 days prior to the Sale Hearing (the "Sale Order") approving the Sale or Sales of the Assets free and clear of (i) all Liens (as defined in the Form PSA) relating to, accruing, or arising any time prior to the Closing Date, including, without limitation, any such Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination of, the Debtors' or the Purchaser's interests in the Assets (as such terms are defined in the Sale Order), or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of

ownership) (with such Liens attaching to the proceeds of the sale or sales) and (ii) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in Section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise relating to, accruing or arising any time prior to the Closing Date (collectively in this clause (ii), the "Claims" and together with the Liens, the "Claims and Interests"), with the exception of any Assumed Obligations, as defined in the Form PSA, to the Successful Bidder(s) and (b) authorizing the Debtors to assume and assign the Assumed and Assigned Contracts.

## A.    The Bidding Procedures Are Appropriate Under the Circumstances

34.    A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. *See, e.g.*, *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

35.    The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return

for a debtor's estate. The Debtors submit that the foregoing Bidding Procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Assets and should, therefore, be approved by this Court.

36.     Given the Debtors' current liquidity constraints and its obligations under the First Lien Credit Agreement, the Debtors believe that a prompt sale process is the best way to maximize the value of the Assets for the benefit of the Debtors' estates, creditors and other stakeholders.  The Debtors marketed their Assets for a possible sale extensively prior to the Petition Date, contacting dozens of parties who may be interested in acquiring some or all of the Assets.  Following this extensive marketing process, the Debtors are well positioned to conduct an auction of their Assets on the timetable set forth herein to avoid any further decline in the value of their Assets.  Because the Debtors' Assets are oil and gas properties that deplete over time, any delay in the sale process will continue to reduce the potential value that the Debtors can obtain for their Assets.  The Debtors believe that the value of the Assets and, therefore, the consummation of the Sale or any alternative transaction, will be seriously jeopardized unless they can begin the sale process contemplated herein as expeditiously as possible.

37.     Accordingly, in the exercise of their reasonable business judgment, the Debtors have concluded that: (a) a prompt sale of the Assets is the best way to maximize value for their estates, and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Assets.

**B.      Sale of the Assets is An Exercise of the Debtors' Reasonable Business Judgment**

38.      Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

39.      Courts have held that approval of a proposed sale of substantially all of the assets of a debtor under Section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. *See In re Abbotts Dairies of Pa.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non- exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value."); *In re Stroud Ford, Inc.*, 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a Section 363 sale in a chapter 11 case are "that the proposed sale is

fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

40.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good faith. *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.*, 82 B.R. at 335-36; *see also Stephens Indus.*, 789 F.2d at 390; *In re Lionel Corp.*, 722 F.2d at 1071.

41.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a debtor outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 143; *In re Lionel Corp.*, 722 F.2d at 1063 (passim); *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir. 1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the Debtors' property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets").

42.     The proposed procedures for sales of the Debtors' assets meet the "sound business reason" test.  First, sound business purposes justify the sales.  The Debtors believe that a prompt sale of the Assets by auction presents the best opportunity to realize the maximum value of the estates' assets for distribution to creditors and is required under the terms of the Debtors' proposed DIP Facility.  The Debtors further believe that the net benefit to their creditors may be adversely affected absent an immediate sale, as a result of the Debtors' declining production.

Furthermore, the Debtors continue to incur costs that, if a sale is not consummated promptly, likely will erode the proceeds that can be realized for creditors from a sale of the Assets, including such costs as maintenance, utility charges, and overhead expenses. *See In re Lionel Corp.*, 722 F.2d at 1071 (of factors for court to evaluate on motion under Section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value"). The Assets include oil and gas reserves that are continuing to be extracted and are, by their very nature, depleting assets whose prompt sale is justified under the circumstances.

43. The proposed procedures for Sale(s) of the Assets also meet the other factors of the "sound business reason" test. As part of this Motion, the Debtors have sought to establish procedures for notice to creditors, other prospective bidders, and other parties in interest. Under the circumstances of these cases, particularly the Debtors' extensive prepetition marketing process, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, including Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

44. Finally, the Debtors submit that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sales of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

45. As set forth above, the Debtors have determined, in the exercise of their sound business judgment, that the sale of the Assets to the highest and best bidder at the Auction is appropriate and in the best interests of their estates and creditors. The sale of the Assets at the Auction will afford the Debtors' estates an opportunity to maximize the recoveries to creditors. Accordingly, the Debtors request that the Court approve the proposed procedures for sales of the

Assets to the highest or otherwise best bidder at the Auction and approve the sale presented to

the Court at the Sale Hearing.

**C.      The Successful Bidder Should Be Granted the Protections of Section 363(m) of the Bankruptcy Code**

46.      As will be set forth in further detail at the Sale Hearing, the Debtors also maintain

Successful Bidder should be entitled to the protections afforded by Bankruptcy Code Section

363(m).

47.      Specifically, Bankruptcy Code Section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

48.      While the Bankruptcy Code does not define "good faith," "[t]he requirement that

a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale

proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a

judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or

an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*,

788 F.2d 143, 147 (3d Cir. 1986) (citations omitted); *see generally Marin v. Coated Sales, Inc.,*

*(In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13,

1990) (holding that a party, to show lack of good faith, must demonstrate "fraud, collusion, or an

attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90

B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir.

1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each

case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

49.     As the Debtors will demonstrate at the Sale Hearing, any Successful Bidder shall have negotiated and dealt with the Debtors at arm's length. Under these circumstances, this Court should find in the order approving the sale of the Assets that Successful Bidder is entitled to all of the protections of Bankruptcy Code Section 363(m).

**D.      The Purchase and Sale Agreement is Not the Result of Collusive Bidding Under Section 363(n) of the Bankruptcy Code.**

50.     As set forth above, the Debtors will select the Successful Bidder for the sale of the Assets at arm's length and in good faith.  Moreover, the Debtors do not believe that any such sale will be the result of collusion or other bad faith between bidders or that the sale price under a definitive purchase and sale agreement of a Successful Bidder will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code Section 363(n).

51.     As the Debtors will demonstrate at the Sale Hearing, the Stalking Horse PSA or a definitive purchase and sale agreement of a Successful Bidder will be negotiated, proposed, and entered into by the Debtors and the Stalking Horse Bidder or such Successful Bidder, as applicable, without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor the Stalking Horse Bidder or a Successful Bidder will have engaged in any conduct that would cause or permit the Stalking Horse PSA or a definitive purchase and sale agreement of a Successful Bidder, as applicable, to be avoided under Bankruptcy Code Section 363(n).

**E.      Sale of the Assets Should Be Free and Clear of Claims and Interests**

52.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Assets to all Purchasers free and clear of all Claims and Interests, with such

Claims and Interests to attach to the proceeds of the sale of the Assets, subject to any rights and

defenses of the Debtors and other parties in interest with respect thereto.  Section 363(f) of the

Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that because

Section 363(f) is written in the disjunctive, a court may approve a sale "free and clear" if at least

one of the requirements is met).

53.    A sale free and clear of all Claims and Interests is necessary to maximize the

value of the Assets.  A sale subject to Claims and Interests would result in a lower purchase price

and be of substantially less benefit to the Debtors' estates. A sale free and clear of Liens is

particularly appropriate under the circumstances because any Lien in, to or against the Assets

that exists immediately prior to the closing of any sales will attach to the sale proceeds with the

same validity, priority, force and effect as it had at such time, subject to the rights and defenses

of the Debtors or any party in interest. The Debtors submit that holders of Liens will be

adequately protected by the availability of the proceeds of the Sale to satisfy their Liens.  Thus,

the proposed sales satisfy Sections 363(f) of the Bankruptcy Code.  Moreover, any holder of a

Claim or Interest that receives notice of the sales and which fails to object to the sales of the

Assets free and clear of Claims and Interests should be deemed to consent to the sales, thereby complying with Section 363(f)(2) of the Bankruptcy Code.

**F.**     **Notice of the Proposed Sale is Reasonable Under the Circumstances**

54.     In order to receive the highest and best price in return for the Assets under the circumstances, the Debtors have filed this Motion seeking to conduct the Auction and hold the Sale Hearing within ninety-seven (97) days from the Petition Date. The Debtors continue to incur costs associated with preserving the value of the Assets. In order to yield the greatest possible return for the benefit of creditors and to minimize potential administrative expenses, the Debtors believe that the proposed timing of the auction and sale process is not only reasonable, but is warranted and necessary in light of the terms of the Debtors' proposed DIP Facility and proposed use of Cash Collateral.

55.     Accordingly, the Debtors submit that the notice to be provided is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Assets and/or to object to the proposed Sale of the Assets.

**G.**     **The Assumption and Assignment of Executory Contracts Should Be Authorized**

56.     Under Bankruptcy Code Section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code Section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor. This subsection provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or

lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if --

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

57. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992).

58. Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

59. To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment as set forth in this Motion. If necessary, the

Debtors will submit facts prior to or at the Sale Hearing to show the financial capability of the Purchaser and willingness and ability to perform under the Assumed and Assigned Contracts. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under Section 365(b)(1)(C) of the Bankruptcy Code.

60.     In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption, assignment, and sale of Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser are an integral part of the Assets being purchased by Purchaser, and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates. The Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned Contracts as set forth herein.

## H.     Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)

61.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See*

Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

62.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally* 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

63.     Because of the potentially diminishing value of the Assets and consistent with the Debtors' proposed DIP Facility and use of Cash Collateral, the Debtors must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

WHEREFORE, the Debtors respectfully request that this Court (i) enter an order substantially in the form of the Bidding Procedures Order attached hereto as **<u>Exhibit A</u>**: (a) authorizing and approving the Bidding Procedures attached as Exhibit 1 thereto; (b) approving the form and manner of the Sale Notice; (c) scheduling the Auction and Sale Hearing; (d) approving the Assumption and Assignment Procedures and the Assumption and Assignment Notice; and (e) granting such other and further relief as it deems just and proper; and (ii) at the conclusion of the Sale Hearing, enter an order (or orders): (a) approving the Sale(s) of all or substantially all of the Assets free and clear of all liens, encumbrances, claims and other interests pursuant to one or more Qualified PSAs; (b) authorizing the assumption and assignment of any

Assumed and Assigned Contracts; and (c) granting such other and further relief as it deems just and proper.

Dated: March 8, 2015                             Respectfully submitted,

                                                 **HAYNES AND BOONE, LLP**

                                                 */s/ Charles A. Beckham, Jr.*
                                                 Charles A. Beckham, Jr.
                                                 Texas Bar No. 02016600
                                                 Kenric D. Kattner
                                                 Texas Bar No. 11108400
                                                 Kourtney Lyda
                                                 Texas Bar No. 24013330
                                                 Kelli Stephenson
                                                 Texas Bar No. 24070678
                                                 1221 McKinney Street, Suite 2100
                                                 Houston, Texas 77010
                                                 Telephone: (713) 547-2000
                                                 Fax: (713) 547-2600
                                                 Email:  charles.beckham@haynesboone.com
                                                 Email:  kenric.kattner@haynesboone.com

                                                 **PROPOSED COUNSEL TO**
                                                 **DEBTORS-IN-POSSESSION**