## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | (CHAPTER 11) |
| | § | |
| DUNE ENERGY, INC.; | § | CASE NUMBER 15-10336 |
| DUNE OPERATING COMPANY; | § | CASE NUMBER 15-10337 |
| DUNE PROPERTIES, INC. | § | CASE NUMBER 15-10338 |
| | § | |
| DEBTORS. | § | (JOINT ADMINISTRATION |
| | § | REQUESTED) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Dune Energy, Inc. ("Dune Energy"), Dune Operating Company ("Dune Operating"), and Dune Properties, Inc. ("Dune Properties"), debtors-in-possession in the above-referenced chapter 11 cases (collectively, the "Debtors"), file this *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Parties, (iii) Scheduling a Final Hearing, and (iv) Granting Related Relief* (the "Motion"), and respectfully represent:

### Jurisdiction

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   The bases for the relief requested herein are sections 105(a), 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## **Background**

2.      Dune Energy is an independent energy company that was formed in 1998 and operates through two wholly owned subsidiaries, Dune Operating and Dune Properties.  Since May 2004, the Debtors have been engaged in the exploration, development, acquisition and exploitation of crude oil and natural gas properties in Texas and Louisiana. The Debtors' interests in their oil and gas properties are held by Dune Properties, and their oil and gas operations are conducted by Dune Operating.  The Debtors sell their oil and gas production primarily to domestic pipelines and refineries.  The Debtors' oil and gas properties cover over 74,000 gross acres across 15 producing oil and natural gas fields.

3.      As of September 30, 2014, the Debtors had outstanding obligations in the principal amount of approximately $37 million of borrowings and $2 million of letters of credit under the Amended and Restated Credit Agreement, dated as of December 22, 2011 (as amended, the "First Lien Credit Agreement") among Dune Energy, as borrower, Bank of Montreal ("BMO"), as administrative agent, CIT Capital Securities LLC, as syndication agent, and the lenders party thereto (the "First Lien Lenders").  The Debtors also had outstanding obligations in the principal amount of approximately $67.8 million under the Floating Rate Senior Secured Notes due 2016 (the "Second Lien Notes").  The Debtors have granted liens on substantially all of their assets as security for their obligations under the First Lien Credit Agreement and the Second Lien Notes. The lien and security interests granted to secure the First Lien Credit Agreement are senior to those granted to secure the Second Lien Notes.

4.      The Debtors have experienced liquidity constraints due in part to borrowing base reductions under the First Lien Credit Agreement, and in August 2014, the Debtors were in default under the First Lien Credit Agreement due to the failure to meet certain covenant ratios in the First Lien Credit Agreement.  As a consequence, the Debtors and the First Lien Agent

entered into a number of amendments and forbearance agreements with respect to the First Lien Credit Agreement.

5. To address the Debtors' liquidity constraints and obtain additional working capital to further develop their oil and gas properties, Dune Energy entered into an Agreement and Plan of Merger dated September 17, 2014 (the "Merger Agreement") with Eos Petro, Inc. ("Eos") and Eos Petro Sub, Inc. On March 4, 2015, the Merger Agreement was terminated because Eos failed to close the tender offer and consummate the merger with Dune Energy. Eos is obligated to Dune Energy for approximately $5.5 million (the "Merger Termination Fee") for their failure to perform under the Merger Agreement. On March 4, 2015 Dune Energy made a demand on Eos for the Merger Termination Fee.

6. To preserve the value of their assets and restructure their financial affairs, on March 8, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above captioned cases (the "Chapter 11 Cases"). The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. Concurrently with the filing of the Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

8. A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Motion and the Debtors' Chapter 11 Cases are set forth in greater detail in the *Declaration of Donald R. Martin, Chief Restructuring Officer of Dune Energy, Inc.*

*and its Subsidiaries, in Support of First Day Pleadings*, filed contemporaneously herewith and incorporated herein by reference.

**Relief Requested**

9.      By this motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **<u>Exhibit C</u>** (the "<u>Interim Order</u>"), and a final order (the "<u>Final Order</u>") to be submitted to the Court for approval in connection with the final hearing on the motion (the "<u>Final Hearing</u>"):

(i)      authorizing the Debtors to obtain postpetition financing pursuant to sections 363 and 364 of the Bankruptcy Code, by entering into a secured, postpetition, debtor-in-possession credit facility on a superpriority and priming basis to be executed after the entry of this Interim Order (as may be amended, supplemented or otherwise modified from time to time, the "<u>DIP Facility</u>") providing for a multiple-draw, term loan facility in an aggregate principal amount not to exceed $10 million to be utilized for operating costs in accordance with the DIP Budget attached hereto as **<u>Exhibit B</u>** (as defined in the Interim Order) (the "<u>DIP Loans</u>");

(ii)      authorizing the Debtors to execute and enter into the Post Petition Superpriority Loan Agreement substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>DIP Credit Agreement</u>"), among the Debtors, Bank of Montreal, as agent (the "<u>DIP Agent</u>") and postpetition lender, and those certain lender institutions that are signatories to the DIP Credit Agreement (collectively with the DIP Agent, the "<u>DIP Lenders</u>," and all documents, agreements or instruments in connection with the DIP Loans or related thereto, including the DIP Credit Agreement, this Interim Order, any Final Order and all other agreements, documents, notes or instruments related to the DIP Loans, the "<u>DIP Loan Documents</u>") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(iii)      authorizing the Debtors upon the written consent of the DIP Lenders to enter into certain interest rate protection and hedging arrangements (the "<u>Hedging Arrangements</u>") by and among Dune Energy, the DIP Agent or one or more DIP Lenders (or any of their affiliates) from time to time in accordance with the terms of the DIP Facility;

(iv)      granting priming liens and superpriority claims to and on behalf of and for the benefit of the DIP Lenders in all DIP Collateral (as defined in the Interim Order) in accordance with the DIP Loan Documents, this Interim Order and the Final Order to secure any and all of the Postpetition Obligations (as defined in the Interim Order);

(v)      granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral,

including, without limitation, all property constituting Cash Collateral (as defined in the Interim Order), which liens shall be subject to the priorities set forth herein;

(vi)     authorizing the Debtors to use, on an interim basis, the Cash Collateral of (a) Bank of Montreal, as administrative agent (the "First Lien Agent") for the lenders (the "First Lien Lenders")[1] party to the First Lien Credit Agreement (as defined below) and (b) U.S. Bank National Association, as indenture trustee and collateral agent (the "Second Lien Trustee" and, together with the First Lien Agent, the "Prepetition Agents"), for the benefit of holders of the Floating Rate Senior Secured Notes due 2016 (the "Second Lien Lenders" and, together with the First Lien Lenders, the "Prepetition Lenders"), pursuant to Section 363(c) of the Bankruptcy Code, and providing adequate protection to the (1) First Lien Agent and First Lien Lenders for any diminution in value of their interests in the Prepetition Collateral (as defined below), including Cash Collateral; and (2) Second Lien Trustee and Second Lien Lenders for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral for such interim use;

(vii)    approving certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Liens;

(viii)   pending a final hearing on the Motion (the "Final Hearing"), approving the DIP Loans under the DIP Facility in the principal amount not to exceed $3 million to and including the date on which the Final Order is entered;

(ix)     modifying the automatic stay, under section 362 of the Bankruptcy Code, to permit the DIP Lenders to accelerate the repayment of amounts due and to terminate all commitments under the DIP Facility following the DIP Remedies Notice Period (as defined in the Interim Order);

(x)      subject to, and only effective upon the entry of, a final order granting such relief, limiting the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code; and

(xi)     scheduling the Final Hearing within 30 days of the entry of the Interim Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2).

---

[1] As of the Petition Date, the First Lien Lenders were Bank of Montreal and CIT Bank.

## Concise Statement of the Material Terms of the DIP Credit Agreement and Interim Order[2]

10.     Pursuant to, and in accordance with, Bankruptcy Rule 4001(b), the following is a concise statement of the material provisions of the DIP Facility:

| Summary of Material Terms | | Location |
|---|---|---|
| **DIP Credit Agreement Parties** | Borrower:  Dune Energy<br><br>Guarantors: Dune Operating and Dune Properties<br><br>Administrative Agent and Collateral Agent:  BMO<br><br>DIP Lenders: BMO and CIT Bank | Agreement: Preamble; Recitals, ¶ D |
| **Borrowing Limit and Availability** | The DIP Facility provides for loans to the Debtors under a multiple-draw, term loan facility in an aggregate principal amount not to exceed $10 million (the "Commitment").<br><br>Upon entry of the Interim Order, the Debtors shall be authorized to immediately borrow, pursuant to the DIP Credit Agreement, an aggregate amount not to exceed $3.0 million in accordance with the DIP Budget and the terms of the Interim Order.  Upon entry of the Final Order, the Debtors shall be authorized to borrow, pursuant to the DIP Credit Agreement, an aggregate amount not to exceed the Commitment in accordance with the DIP Budget and the terms of the Final Order. | Agreement: §§ 2.01, 2.03<br><br>Interim Order: Preamble: ¶ 9 |
| **Use of Proceeds** | The proceeds of loans made under the DIP Facility shall be used (a) for working capital and general corporate purposes of the Debtors and (b) to pay fees and expenses related to the DIP Credit Agreement and the Chapter 11 Cases.  The proceeds of the DIP Facility shall only be used in accordance with the DIP Budget, the Interim Order, and the DIP Credit Agreement. | Agreement: Recitals, ¶ F<br><br>Interim Order: ¶ 9 |
| **Termination Date** | The earliest to occur of: (a) 130 days after the Petition Date; (b) 5 business days after the Petition Date if the Interim Order has not been entered; (c) 30 days after the Petition Date if the Final Order has not been entered; (d) the occurrence of an Event of Default under the DIP Credit Agreement; (e) the effective date of any plan filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by this Court; (f) the date which is the closing date of any sale of all or substantially all of the Company's assets.  The date on which the | Agreement: § 1.02<br><br>Interim Order: ¶ 24 |

---

[2] This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents or the Interim Order, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents, the provisions of the DIP Loan Documents shall control and the Interim Order shall control over the DIP Credit Agreement.  Any capitalized terms used but not defined in the concise statement shall have the meanings ascribed to such terms in the DIP Credit Agreement or the Interim Order, as applicable.

| Summary of Material Terms | | Location |
|---|---|---|
| | earliest of clauses (a) through (f) above occurs being referred to hereinafter as the "Termination Date." | |
| | On the Termination Date, (i) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, and (ii) all authority to use Cash Collateral shall cease, except as set forth in the Carve-Out Expenses provisions in paragraph 29 of the Interim Order. | |
| **Interest Rates** | The Loans shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate. | Agreement: § 3.02(a), (b) |
| | "Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the LIBO Rate for commencing on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.0%, provided that, for the avoidance of doubt, the LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 (or any successor or substitute page) at approximately 11:00 a.m., New York time, on such day (or the immediately preceding Business Days if such day is not a day on which banks are open for dealings in dollar deposits in the London interbank market). Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, respectively. | |
| | "Applicable Margin" means 2.75%. | |
| | If an Event of Default has occurred and is continuing, or if any principal of or interest on any Loan or any fee or other amount payable by the Debtors under the DIP Credit Agreement or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then all Loans outstanding, in the case of an Event of Default, and such overdue amount, in the case of a failure to pay amounts when due, shall bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) plus the rate applicable to the Loans as provided in Section 3.02(a) of the DIP Credit Agreement, but in no event to exceed the Highest Lawful Rate. | |
| **Fees** | The DIP Credit Agreement requires the Debtors to pay certain fees to the DIP Lenders, including (i) a Commitment Fee which shall accrue at a rate per annum of 0.50% on the average daily amount of the unused amount of the Commitment of each of the DIP Lenders during the period from and including the date of the DIP Credit Agreement to but excluding the Termination Date, and (ii) a Facility Fee in the amount of $100,000. | Agreement: § 3.04 |
| **Liens** | In order to secure the DIP Obligations, effective immediately upon | Interim Order: |

| Summary of Material Terms | | Location |
|---|---|---|
| | entry of the Interim Order, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (the "DIP Liens"), on all of the DIP Collateral. | ¶ 5 |
| **Priority of Liens** | The DIP Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral, provided however, that the DIP Liens shall be subject to the Permitted Liens and the Carve-Out Amount.<br><br>Other than as set forth in the Interim Order, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. | Interim Order: ¶ 6 |
| **Superpriority Claim** | Upon entry of the Interim Order, the DIP Agent and the DIP Lenders shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed Superpriority Claim against each of the Debtors in the Chapter 11 Cases and any Successor Cases for all DIP Obligations.  The Superpriority Claim shall be subordinate only to the DIP Liens, Permitted Liens, and the Carve-Out Amount.  The Superpriority Claim (a) shall otherwise have priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth in the Interim Order), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.<br><br>The Interim Order further provides that the Debtors (nor any trustee or examiner) shall not obtain credit or incur any indebtedness in these Chapter 11 Cases or any Successor Case that is (i) secured by a security, mortgage, collateral interest or lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens or (ii) entitled to priority administrative status that is equal to or senior to the DIP Superpriority Claim; *provided, however*, that nothing in the Interim Order shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) | Interim Order: ¶ 7 |

| Summary of Material Terms | | Location |
|---|---|---|
| | above, all of the Prepetition Obligations and all of the post-petition indebtedness incurred under the DIP Loan Documents must be indefeasibly paid in full, in cash from the proceeds of such credit or indebtedness. | |
| **Adequate Protection** | The Debtors propose to provide the following primary forms of adequate protection (the "Adequate Protection Package"):<br><br>As adequate protection of the interests of the Prepetition Agents and Prepetition Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors shall grant to the Prepetition Agents, for the benefit of themselves and the Prepetition Lenders, continuing, valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order, the "Adequate Protection Liens"). The First Lien Adequate Protection Liens shall be junior only to: (A) the Carve-Out Amount; (B) the DIP Liens; and (C) the Permitted Liens. The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. The Second Lien Adequate Protection Liens shall be junior only to: (A) the Carve-Out Amount; (B) the DIP Liens; (C) the Permitted Liens; (D) the First Liens; and (E) the First Lien Adequate Protection Liens. The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.<br><br>As further adequate protection of the interests of the First Lien Agent and First Lien Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, to the extent any First Lien Obligations are outstanding, the First Lien Agent and First Lien Lenders shall be granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Cases (the "Adequate Protection Claim"). The Adequate Protection Claim shall be junior to (A) the Carve-Out Amount and (B) the Superpriority Claim. The Adequate Protection Claim shall otherwise have priority over all administrative expense claims and unsecured claims against each of the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code. | Interim Order: ¶¶ 12, 13, 14 |
| **Events of Default** | The DIP Credit Agreement provides that one or more of the following events shall constitute an "Event of Default":<br><br>(a)  the Borrower shall fail to pay any principal or interest on any Loan or any fee or any other amount of any Loan when and as the same shall become due and payable, whether at the due date thereof or | Agreement: § 10.01<br><br>Interim Order: ¶ 25 |

| Summary of Material Terms | Location |
|---|---|
| at a date fixed for prepayment thereof, by acceleration or otherwise.<br><br>(b)     any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made (unless such representation or warranty was already qualified by materiality, in which case such representation or warranty shall simply have been true and correct).<br><br>(c)     the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.02, Section 8.03, Section 8.20 or in Article IX of the DIP Credit Agreement.<br><br>(d)     the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in the DIP Credit Agreement (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d) of the DIP Credit Agreement) or any other Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier to occur of (A) notice thereof from the DIP Agent to the Borrower (which notice will be given at the request of any DIP Lender) or (B) a Responsible Officer of the Borrower or such Subsidiary otherwise becoming aware of such default.<br><br>(e)     except as a result of the commencement of the Bankruptcy Cases, and to the extent the relevant holders remain subject to the automatic stay imposed thereby, the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable.<br><br>(f)     except as a result of the commencement of the Bankruptcy Cases, and to the extent the relevant holders remain subject to the automatic stay imposed thereby, any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any Subsidiary to make an offer in respect thereof provided that this clause (g) shall not apply to secured Debt that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Debt.<br><br>(g)     the Bankruptcy Court shall enter, or the Borrower shall seek or support the entry of, any order (i) amending, supplementing, | |

| Summary of Material Terms | Location |
|---|---|
| altering, staying, vacating, rescinding or otherwise modifying the Interim Financing Order, the Final Financing Order, the Sales Procedure Order or any other order in any manner which could reasonably be expected to result in a Material Adverse Effect, (ii) appointing a Chapter 11 trustee that is not appointed as a result of a motion filed by the Required Lenders, a responsible officer or an examiner pursuant to Section 1104 of the Bankruptcy Code with enlarged powers relating to the operation of the business of the Borrower (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Bankruptcy Cases, (iii) dismissing the Bankruptcy Case or converting the Bankruptcy Case to a Chapter 7 case, (iv) granting relief from the automatic stay under Section 362 of the Bankruptcy Code to the holder of any claim against the Borrower or any Guarantor, which order enables the holder of such claim to exercise any right or remedy against any property of the Borrower or any Guarantor, or (v) except with respect to the Proposed 363 Sale, approving the sale, transfer, lease, exchange, alienation or other disposition of all or substantially all of the assets, properties or Equity Interests of the Borrower and its Subsidiaries pursuant to Section 363 of the Bankruptcy Code or otherwise, without the consent of the Required Lenders and approval of the Bankruptcy Court.<br><br>(h)       The Borrower or any Subsidiary shall seek to, or shall support (in any such case by way of motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Borrower or any Subsidiary) any other Person's motion to, disallow in whole or in part any DIP Lender's claim in respect of the Pre-Petition Indebtedness owed to such Lender or to challenge the validity and enforceability of the Liens in favor of the DIP Agent or any DIP Lender (including the Liens securing Pre-Petition Indebtedness owed to such DIP Lender), excluding challenges by Persons (other than the Borrower or the Guarantors) that are not inconsistent with the Interim Order or Final Order, as applicable.<br><br>(i)       An application shall be filed by the Borrower for the approval of, or there shall otherwise arise, any other Superpriority Claim in the Bankruptcy Cases (other than the Carve Out Amount) which is *pari passu* with or senior to the claims of the DIP Agent and DIP Lenders against the Borrower or any Guarantor unless after giving effect to the transactions contemplated by such application, all Secured Obligations (whether contingent or otherwise) shall be paid in full in cash. The entry of an order authorizing the obtaining of credit or the incurrence of Debt by the Borrower or any Guarantor that is secured by a Lien on any or all of the Collateral, which is senior to or *pari passu* with the security interests and liens against the Collateral that is granted to the DIP Lenders.<br><br>(j)       From and after the date of entry thereof, the Interim Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five (5) days, reversed, modified or amended), in each case without the consent of the Required Lenders, and the Final Order shall not have been entered prior to such cessation | |

| Summary of Material Terms | Location |
|---|---|
| (or vacatur, stay, reversal, modification or amendment).<br><br>(k)      The Final Order shall not have been entered by the Bankruptcy Court on or before thirty (30) days after the Petition Date; or from and after the date of entry thereof, the Final Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of five (5) days, reversed, modified or amended), in each case without the consent of the Required Lenders.<br><br>(l)      The Borrower shall make any payment on any Debt incurred before the Petition Date, other than as permitted under the Financing Orders, the DIP Budget or as permitted hereunder and other than any payment of any Debt owing to the Borrower and any payment approved by the Bankruptcy Court of any Debt.<br><br>(m)      The Borrower or the Guarantors shall fail to comply with the terms of the Financing Orders.<br><br>(n)      Any final judgments shall be entered against the Borrower or any Subsidiary after the Petition Date and shall not have been paid, discharged or vacated or had execution thereof stayed pending appeal within thirty days after entry or filing of such judgments; or there shall be entered against the Borrower or any Subsidiary a non-monetary judgment, order or decree with respect to any claim or liability that accrued after the Petition Date which has or could be reasonably expected to have a Material Adverse Effect, and there shall be any period of thirty consecutive days during which a stay of enforcement of such judgment, decree or order, by reason of a pending appeal or otherwise, shall not be in effect.<br><br>(o)      The Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of the DIP Credit Agreement, or the Borrower or any Subsidiary or any of their Affiliates shall so state in writing.<br><br>(p)      The commencement of any action against the DIP Agent or any DIP Lender by or on behalf of the Borrower or any of its Subsidiaries or any of their respective agents.<br><br>(q)      (i) The Debtors' retention of Donald Martin as CRO shall not have been approved by the Bankruptcy Court within thirty (30) days of the Petition Date; or (ii) Donald Martin shall cease to serve as the CRO of the Borrower and each of the Guarantors and is not replaced within seven (7) days by a Person acceptable to the Required Lenders.<br><br>(r)      Parkman Whaling LLC shall cease to serve as the Borrower's and each of the Guarantors' investment banker and is not replaced within seven (7) days by a Person acceptable to the Required | |

| Summary of Material Terms | Location |
|---|---|
| Lenders.<br><br>(s)     The entry of an order authorizing recovery by any Person from the Collateral or any Prepetition Collateral owing to any Lender or any adequate protection Liens granted with respect thereto for any costs of preservation or disposition thereof under Section 506(c) of the Bankruptcy Code or (except as provided in the Final Order) authorizing the use of cash collateral without consent in writing by the DIP Agent.  The entry of an order granting adequate protection with respect to Pre-Petition Indebtedness (other than as provided in the Interim Order or the Final Order, or as otherwise approved by the DIP Agent and the Bankruptcy Court).<br><br>(t)     The filing by the Borrower or any Subsidiary of any motion or proceeding which could reasonably be expected to result in material impairment of the DIP Lenders' rights under this Agreement; or a final determination by the Bankruptcy Court (or any other court of competent jurisdiction) with respect to any motion or proceeding brought by any other party which results in any material impairment of the DIP Lenders' rights under the DIP Credit Agreement.<br><br>(u)     The Borrower or the Guarantors shall file, support, or seek confirmation of a plan of reorganization or liquidation, or such plan of reorganization or liquidation shall be confirmed in any of the Bankruptcy Cases, which does not provide for both termination of the Commitment and payment in full of the Secured Obligations in cash on the effective date of such plan, without the prior written consent of the DIP Agent.<br><br>(v)     The entry of an order dismissing any of the Bankruptcy Cases that does not provide for the termination of the Commitment and payment in full of the Secured Obligations in cash prior to dismissal, without the prior written consent of the DIP Agent; and<br><br>(w)     Any motions to sell the Collateral or approve procedures regarding the same, any plan or disclosure statement or supplements or amendments thereto, or any orders approving or amending any of the foregoing, are not in form and substance reasonably acceptable to the Required Lenders. | |
| **Rights and Remedies Upon Event of Default** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent, upon the direction of the Required DIP Lenders, may declare (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains, (iii) the termination of the DIP Credit Agreement and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and/or (iv) the termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, except as provided in and in accordance with paragraph 10 of the Interim Order (any such declaration is referred to in the Interim | Agreement: § 10.02<br><br>Interim Order: ¶ 26 |

| Summary of Material Terms | Location |
|---|---|
| Order as a "<u>DIP Termination Declaration</u>"). The DIP Termination Declaration shall be given by facsimile (or other electronic means) to counsel to the Debtor, counsel to the Statutory Committee, if any, and the U.S. Trustee (and the earliest date any such DIP Termination Declaration is made shall be the Termination Date). <br><br> The Interim Order further provides that any automatic stay otherwise applicable to the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Lenders is modified so that five (5) days after the Termination Date (the "<u>DIP Remedies Notice Period</u>"), (A) the DIP Agent, with the consent of the Required DIP Lenders, shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim Order and shall be permitted to satisfy the Superpriority Claim and all DIP Obligations, subject to the Carve-Out Amount, and (B) to the extent any First Lien Obligations are outstanding, the First Lien Agent (but subject to the rights, remedies and actions taken by the DIP Agent upon the consent of the Required DIP Lenders) shall be entitled to exercise its rights and remedies to satisfy the First Lien Obligations and the Adequate Protection Claim, subject to the Carve-Out Amount and the terms of the Interim Order; provided, however, the DIP Agent's and the DIP Lenders' liens, claims and security interests in the DIP Collateral and the Superpriority Claim, and the Prepetition Agents' and Prepetition Lenders' liens, claims and security interests in the Prepetition Collateral (including Cash Collateral), and the Replacement Collateral and the Adequate Protection Claim shall, in each instance, be subject to the right of payment of the Carve-Out Amount. <br><br> During the DIP Remedies Notice Period, the Debtors and/or the Statutory Committee shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred. Unless the Court determines during the DIP Remedies Notice Period that an Event of Default has not occurred, the automatic stay, as to all of the DIP Lenders and the First Lien Lenders, shall automatically be terminated at the end of the DIP Remedies Notice Period without further notice or order. Upon the expiration of the DIP Remedies Notice Period, the DIP Agent, with the written consent of the Required DIP Lenders and the First Lien Agent (but subject to the rights, remedies and actions taken by the DIP Agent upon the consent of the Required DIP Lenders), shall be permitted to exercise all remedies set forth in the Interim Order, in the DIP Credit Agreement, the DIP Loan Documents, the First Lien Credit Agreement and the First Lien Loan Documents, and as otherwise available at law without any further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest or any other rights and remedies granted to any of the DIP Agent, the DIP Lenders, the First Lien Agent and the First Lien Lenders pursuant to the DIP Credit Agreement, the DIP Loan Documents, the First Lien Credit Agreement, the First Lien Loan Documents, or the Interim Order. | |
| **Carve Out Expenses** | Upon delivery of a Carve-Out Trigger Notice (as defined in the DIP Credit Agreement), the DIP Lenders shall fund, and the Debtors shall | Agreement: §§ 1.02, 8.17 |

| Summary of Material Terms | Location |
|---|---|
| deposit in a segregated account, the amount of $500,000 plus the Carve-Out Expenses and (b) if no Carve-Out Trigger Notice has been delivered, upon the earlier of the (i) payment in full, in cash of the DIP Obligations and (ii) the closing of a sale of all or substantially all of the Debtors' assets, the DIP Lenders shall fund, and the Debtors shall deposit in a segregated account in the amount of $100,000 plus the Carve-Out Expenses plus an additional amount to cover accrued but unused and unpaid vacation of employees in an amount not to exceed $60,000.  Amounts on deposit in such segregated account shall be used solely to satisfy the Carve-Out Expenses and expenses that would have constituted Carve-Out Expenses but for the occurrence of the Termination Date ("Post-Termination Expenses"), and the balance in that segregated account specified above shall not be available to pay the principal amount of the DIP Facility or to pay any prepetition or other postpetition obligations until such time as the Carve-Out Expenses and the Post-Termination Expenses shall have been paid in full, notwithstanding any purported or asserted lien, claim or right to such balance.<br><br>As used in the Interim Order, the term "Carve-Out Expenses" means (i) those accrued, but unpaid, statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (ii) those accrued, but unpaid, fees payable to the Clerk of the Court; (iii) the lesser of (A) the amount of the unpaid and outstanding reasonable fees, costs and expenses actually incurred by the Debtors' professionals (including ordinary course professionals) and (B) the budgeted and unpaid amount of the fees, costs and expenses of the Debtors' professionals (including ordinary course professionals) as set forth in the DIP Budget, in each case ( e.g., (i), (ii) and (iii)) for the period from and after the Petition Date through the Termination Date, minus the amounts of the retainers or any other unapplied funds held by the Debtors' professionals (including ordinary course professionals) or any set-offs available to Debtors as of the Termination Date ("Allowed Professional Fees"); provided, that such fees, costs and expenses with respect to Debtors' non-ordinary course professionals are ultimately allowed by a final order of the Court pursuant to Section 330 of the Bankruptcy Code within sixty (60) days of the Termination Date; (iv) in an amount not to exceed $235,000, all employee payroll, benefits, taxes, and employee expenses that have been accrued since the last post-petition funded payroll period through and including the Termination Date and which remain unpaid; (v) all compensation and expense reimbursement for the Debtors' Chief Restructuring Officer that have accrued from and after the Petition Date through and including the Termination Date and remain unpaid and that are allowed by final order pursuant to Section 330 of the Bankruptcy Code not later than sixty (60) days following the Termination Date; (vi) any severance taxes and royalty interest payments that have become due and owing as a result of production after the period corresponding to the last receipt of proceeds by Debtors through the Termination Date or effective date of any sale, whichever is earlier and which remain unpaid or unsegregated in the separate royalty and trust accounts; and (vii) in an amount not to exceed $30,000, any and all claims for health care services provided on or before Termination Date pursuant to any of the Debtors' self-funded insurance from the Petition Date through and including the | Interim Order: ¶ 29 |

| Summary of Material Terms | | Location |
|---|---|---|
| | Termination Date and which remain unpaid and have not been separately segregated in the account designated for such payment of such amounts, and the sum of the Carve-Out Expenses is referred to in the Interim Order as the "<u>Carve-Out Amount</u>." | |
| | Any payment or reimbursement made on or after the occurrence of a Termination Date in respect of any Allowed Professional Fees (exclusive of the application of any retainers by any of the Professionals) shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis or, if in excess of such amount to which such party should be entitled under the Carve-Out Amount, shall be refunded to the DIP Agent. Any funding of the Carve-Out Expenses may be reserved by the DIP Agent against the Commitment as provided in paragraph 2 of the Interim Order, shall not increase the Commitment and shall be part of the DIP Obligations secured by the DIP Collateral and otherwise entitled to the protections granted under the Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law. On the Maturity Date, the Commitment shall be deemed terminated (except in the case of a Maturity Date that occurs under clauses (a), (b) or (e) of paragraph 24 of the Interim Order, in which case the Commitment shall terminate 5 days after the Maturity Date, unless the Bankruptcy Court orders otherwise, or the Required Lenders agree to rescind the related Carve-Out Trigger Notice), and the DIP Lenders shall have no further obligation to provide financing pursuant to the DIP Facility; provided, however, notwithstanding any other provision of the Interim Order or the DIP Loan Documents, following an Event of Default or Maturity Date and subject to the limitations on and not to exceed the total amount of the DIP Facility, the DIP Lenders shall only be obligated to advance additional funds to the Debtors under the DIP Facility to fund the Carve-Out Expenses but the obligation to fund such Carve-Out Expenses shall terminate with respect to any Carve-Out Expenses that require Bankruptcy Court approval as provided above and are not approved by a final order of the Bankruptcy Court within sixty (60) days of the Termination Date. | |
| **Conditions** | The DIP Credit Agreement contains certain conditions precedent to the Effective Date of the DIP Credit Agreement (contained in Section 6.01 of the DIP Credit Agreement) and certain conditions precedent to the obligation of each Lender to make a Loan on the occasion of any Borrowing under the DIP Credit Agreement (contained in Section 6.02 of the DIP Credit Agreement). | Agreement: §§ 6.01, 6.02 |
| **Budget and Reporting Provisions** | The proceeds of loans made under the DIP Facility may only be used to pay those costs and expenses contained in the DIP Budget, at the times and for the purposes identified in such DIP Budget. The DIP Budget, and any modification to or amendment or update of the DIP Budget, shall be in form and substance acceptable to the Required Lenders, in their sole and absolute discretion. The DIP Budget may be amended or modified in writing from time to time only with the written consent of the Required Lenders, in their sole and absolute discretion, and such amendment or modification shall not require the consent of the Statutory Committee (or any subsequent trustee of the | Agreement: § 8.01(k)<br><br>Interim Order: ¶ 18 |

| Summary of Material Terms | | Location |
|---|---|---|
| | Debtors' estates) or the U.S. Trustee or approval of the Court. The Debtors shall update the DIP Budget from time to time (provided that any update shall be in form and substance acceptable to the Required Lenders in their sole and absolute discretion, and shall be only deemed to be amended or modified based on their written consent), in accordance with the DIP Loan Documents. Any such modification of the DIP Budget, other than regular updates, shall be filed with the Court<br><br>The DIP Credit Agreement contains requirements for the provision of a DIP Budget for the Initial Budget Period and certain updated DIP Budgets, plus weekly Variance Reports, as more fully described in the DIP Credit Agreement. | |
| **Covenants** | The DIP Credit Agreement includes certain Affirmative Covenants, as more fully described in Article VIII of the DIP Credit Agreement. The DIP Credit Agreement also includes certain Negative Covenants, as more fully described in Article IX of the DIP Credit Agreement. | Agreement: Arts. VIII, IX |
| **Sale Milestones** | The DIP Credit Agreement requires the Debtors to comply with the following milestone deadlines:<br><br>1. On the Petition Date (or such later date as the DIP Agent shall agree, in its sole discretion), the Debtors shall have filed the motion seeking approval of bidding procedures for the Proposed Section 363 Sale through the entry by the Bankruptcy Court of the Sale Procedures Order and shall seek a hearing thereon as soon as practicable after such filing.<br><br>2. On or before the 30th day after the Petition Date (or such later date as the Required Lenders shall agree, in their sole discretion), (i) the Borrower shall have (x) updated and completed a data room for access to potential bidders, (y) completed a confidential information memorandum for the Proposed Section 363 Sale, which they shall share with the DIP Lenders and (z) provided access to bidders who have entered into acceptable confidentiality and non-disclosure agreements and other documentation of suitability acceptable to the Borrower, in reasonable consultation with the Required Lenders, and (b) the Bankruptcy Court shall have entered the Sales Procedure Order.<br><br>3. A bid deadline (the "<u>Bid Deadline</u>") for the receipt of qualified bids from qualified bidders shall have occurred on or before the 90th day after the Petition Date (or such later date as the Required Lenders shall agree, in their sole discretion).<br><br>4. On or before seven (7) days following the Bid Deadline (or such later date as Required Lenders shall agree), the Bankruptcy Court shall have entered an order approving the Proposed Section 363 Sale, which shall be in form and substance acceptable to the Required Lenders. | Agreement: § 8.20 |

| Summary of Material Terms | | Location |
|---|---|---|
| **Stipulations of the Debtors** | The Interim Order provides that the Debtors (a) acknowledge, (b) admit and (c) agree not to contest the following (without prejudice to the rights of parties in interest as set forth in paragraph 31 of the Interim Order but subject to the limitations with respect to such rights contained in paragraph 17 of the Interim Order)):<br><br>(i)    *First Lien Facility.*  The First Lien Agent, the First Lien Lenders and Dune Energy are parties to that certain Amended and Restated Credit Agreement, dated as of December 22, 2011 (as amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "<u>First Lien Credit Agreement</u>").  Pursuant to that certain Amended and Restated Guarantee and Collateral Agreement (the "<u>First Lien Guarantee and Collateral Agreement</u>"), Debtors Dune Operating and Dune Properties (the "<u>Debtor Guarantors</u>") have guaranteed the obligations of Dune Energy pursuant to the First Lien Credit Agreement (the First Lien Credit Agreement, the First Lien Guarantee and Collateral Agreement, and any collateral and ancillary documents executed in connection therewith, collectively, the "<u>First Lien Loan Documents</u>").<br><br>(ii)    *First Lien Obligations*.  As of the Petition Date, the outstanding amount under the First Lien Credit Agreement was not less than approximately $37 million in principal and $2 million of letters of credit plus accrued interest, fees, costs and other amounts due and owing pursuant to the Debtors' obligations under the First Lien Loan Documents, (together with any additional amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the First Lien Loan Documents, including, without limitation, accrued and unpaid interest (including at applicable default rates), any fees, expenses and disbursements (including, without limitation, attorneys' and other professionals' fees, related expenses and disbursements), reimbursement obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations pursuant to the First Lien Loan Documents relating solely to the loans provided thereunder (the "<u>First Lien Obligations</u>"). | Interim Order: ¶ E |
| **Challenge Provisions** | The Interim Order provides that nothing in the Interim Order or the DIP Loan Documents shall prejudice the rights of the Statutory Committee, if granted standing by the Court, or any other party in interest granted standing by the Court (other than the Debtors and/or their successors), to seek, solely in accordance with the provisions of paragraph 31 of the Interim Order, to initiate an adversary proceeding or contested matter to challenge the amount, validity, enforceability, perfection or priority of the Prepetition Obligations or the Prepetition Liens or to otherwise assert any claims or causes of action against the Prepetition Agents, First Lien Lenders or Second Lien Lenders (a "<u>Challenge</u>").  Any Challenge must be asserted no later than:  (a) if by a Statutory Committee (if such has been appointed and if granted standing), sixty (60) days after the date of the initial appointment of the Statutory Committee; and (b) if by any other party in interest (if | Interim Order: ¶ 31 |

| Summary of Material Terms | Location |
|---|---|
| granted standing), seventy-five (75) days after the entry of the Interim Order (the "Challenge Period"). The Challenge Period shall not be extended without the written consent of the Required Lenders (as that term is defined in the First Lien Credit Agreement) as constituted immediately prior to the Petition Date.  Only those parties in interest (including, without limitation, the Statutory Committee) that have properly initiated a Challenge challenging the Prepetition Obligations, the Prepetition Liens, or any liability of the First Lien Agent or the First Lien Lenders prior to the expiration of the Challenge Period shall be permitted to participate in the prosecution of such Challenge.  As to (i) any parties in interest, including the Statutory Committee, who fail to file a Challenge within the Challenge Period, or, if any such Challenge is filed and overruled or (ii) any and all matters that are not expressly the subject of a timely Challenge:  (A) any and all such Challenges by any party (including, without limitation, any Statutory Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived and barred, (B) all unchallenged matters, findings, Debtors' Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to the Prepetition Agents' and each First Lien Lender's claims, liens, and interests shall be of full force and effect and forever binding upon the Debtor, the Debtors' bankruptcy estate and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any Successor Cases, and (C) any and all claims or causes of action against the Prepetition Agents, First Lien Lender and/or Second Lien Lender relating in any way to the Debtors shall be released by the Debtors' estates, all creditors, interest holders and other parties in interest in this Case and any Successor Cases.  The Challenge procedures provided for in the Interim Order, however, shall not apply to any action by the holders of statutory liens to seek a determination from the Court regarding the validity or priority of the liens of the holders of statutory liens vis-à-vis the liens of the DIP Lenders and the Prepetition Lenders. | |
| **Modification of Automatic Stay** | The Interim Order provides that the automatic stay imposed under Bankruptcy Code section 362(a) shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, Superpriority Claim, and the Adequate Protection Claim, and to grant liens thereon as described in the Interim Order; (b) permit the Debtors to perform such acts as the DIP Agent, the DIP Lenders, the First Lien Agent or the Second Lien Trustee each may request in its sole discretion to assure the perfection and priority of the liens granted in the Interim Order; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders under the DIP Loan Documents, the DIP Facility and the Interim Order; and (d) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders to retain and apply, all payments made in accordance with the terms of the Interim Order. | Interim Order: ¶ 19 |

**Basis for Relief**

I.    **The Debtors' Prepetition Secured Indebtedness**

11.    On December 22, 2011, Dune Energy, as borrower, the First Lien Agent, and the First Lien Lenders entered into First Lien Credit Agreement, pursuant to which the First Lien Lenders made certain credit available to and on behalf of Dune Energy (the "First Lien Credit Facility").  As of the Petition Date, the principal amount of approximately $38 million in borrowings and $2 million of letters of credit are currently outstanding under the First Lien Credit Facility (the "First Lien Obligations").

12.    In connection with the First Lien Credit Agreement, the Debtors entered into that certain Amended and Restated Guarantee and Collateral Agreement dated as of December 11, 2011 (the "First Lien Guarantee and Collateral Agreement") and the Amended and Restated Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of December 11, 2011 (the "First Lien Mortgage and Security Agreement").[3] To secure the obligations under the First Lien Credit Agreement, the Debtors granted first priority liens and security interests (the "First Liens") on substantially all of the Debtors' assets as described in the First Lien Credit Facility Documents (collectively, the "Prepetition Collateral").[4]

13.    Dune Energy and the Second Lien Trustee are party to that certain Indenture (as amended, restated, supplemented, modified and/or refinanced from time to time, the "Second

---

[3] In this Motion and the Interim Order attached hereto as Exhibit C, the First Lien Credit Agreement, the First Lien Mortgage and Security Agreement, the First Lien Guarantee and Collateral Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement) are referred to as the "First Lien Loan Documents".

[4] As security for its obligations under the First Lien Credit Agreement, the Debtors have granted to the First Lien Agent (for the benefit of the First Lien Lenders) a first priority lien on substantially all of their assets, including liens on not less than 85% of the total value of proved oil and gas reserves and not less than 90% of the total value of proved developed and producing reserves.

Lien Indenture"), dated as of December 22, 2011, pursuant to which Dune Energy issued $49,503,991 of its Second Lien Notes.

14.     In connection with the Second Lien Indenture, the Debtors entered into that Second Lien Collateral Agreement dated as of December 11, 2011 (the "Second Lien Collateral Agreement") and the Second Lien Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of December 11, 2011 (the "Second Lien Mortgage and Security Agreement").[5]

15.     Pursuant to the Second Lien Loan Documents, the Debtors granted second priority liens and security interests (the "Second Liens" and together with the First Liens, the "Prepetition Liens") on substantially all of the Prepetition Collateral.[6]  The priorities between the First Lien Lenders and the Second Lien Lenders are governed by that certain Intercreditor Agreement, dated December 22, 2013, by and among the Debtors, BMO in its capacity as administrative agent under the First Lien Credit Agreement and U.S. Bank in its capacity as collateral agent under the Second Lien Indenture (the "Intercreditor Agreement").  The Second Liens are junior and subordinate to the First Liens.

## II.     Status of the Prepetition Secured Indebtedness

16.     During 2014, as a result of a significant decline in oil prices, the Debtors' revenues fell sharply.  Although the Debtors were able to reduce expenses, the significant decline in revenue imposed a strain on the Debtors' liquidity.  The Debtors continued to service their debt, making all scheduled interest installment payments on the First Lien Credit Facility and

---

[5] In the Motion and the Interim Order attached hereto as Exhibit C, the Second Lien Indenture, the Second Lien Mortgage and Security Agreement, the Second Lien Collateral Agreement and the other Loan Documents (as defined in the Second Lien Indenture) are referred to as the "Second Lien Loan Documents", and together with the First Lien Loan Documents, the "Prepetition Loan Documents").

[6] As security for its obligations under the Second Lien Credit Agreement, the Debtors have granted to the Second Lien Trustee (for the benefit of the Second Lien Lenders) a second priority lien on substantially all of their assets, including liens on not less than 85% of the total value of proved oil and gas reserves and not less than 90% of the total value of proved developed and producing reserves.

Second Lien Credit Facility.  At the end of the second quarter of 2014, the Debtors were in default of the First Lien Credit Agreement due to the failure to meet certain covenant ratios in the First Lien Credit Agreement.  In addition, on July 15, 2014, the First Lien Agent notified the Debtors that effective July 1, 2014, the Debtors' borrowing base, which was $47.5 million at that time, would be reduced by $2.5 million and would be further reduced by $2.5 million each month until October 2014, resulting in a borrowing base of $37.5 million.  The reduction in the borrowing base under the First Lien Credit Facility significantly restricted the Debtors' liquidity.

17.     To address the Debtors' liquidity constraints and obtain additional working capital to further develop their oil and gas properties, the Debtors engaged in numerous exploratory discussions with independent exploration and production companies regarding potential joint ventures or other strategic transactions.  Prior to the Petition Date, the Debtors contacted a total of forty-five (45) prospective strategic and financial buyers. Thirty (30) of the companies declined to consider an acquisition of or merger with the Debtors.  Fifteen (15) of the companies expressed an interest in considering an acquisition and proceeded with non-disclosure/standstill agreements, one of which was Eos.

18.     From May through July 2014, the Debtors received seven (7) indications of interest from potential buyers, including a non-binding indication of interest from Eos for the purchase of all of the Debtors' outstanding shares of stock, with an estimation of the Debtors' enterprise value at $140 million.  After careful review of the indications of interest, the Debtors' board of directors authorized the continued discussion and negotiation with Eos and one other prospective buyer in an effort to enter into a definitive agreement in connection with a merger transaction.   As discussions continued, Eos lowered its offer price based on the Debtors'

enterprise value.  The other interested party continued its due diligence review, but did not provide a formal offer.

19.     On September 17, 2014, Dune Energy, Eos, and Eos Sub entered into the Merger Agreement.  The Merger Agreement provided for Eos Sub to commence a cash tender offer (the "Tender Offer") for all of the issued and outstanding shares of the Company's common stock for $0.30 per share payable to the holder in cash, without interest and less any applicable withholding taxes (the "Offer Price"), upon the terms and subject to the conditions set forth in the Offer to Purchase, dated October 9, 2014 (as amended or supplemented from time to time, the "Offer to Purchase"), and in the related Letter of Transmittal (the "Letter of Transmittal," which, together with the Offer to Purchase and any amendments or supplements from time to time thereto, constitute the "Offer").  In addition to the Offer Price, Eos agreed to provide Dune Energy with sufficient funds to pay in full and discharge all of Dune Energy's outstanding indebtedness and assume liability for all of Dune Energy's trade debt, as well as fees and expenses related to the Merger Agreement and the transactions contemplated therein.

20.     The Debtors also pursued alternative sources of financing to address their liquidity constraints.  During the third quarter of 2014, the Debtors had executed non-disclosure agreements with five (5) potential financing sources and received four (4) term sheets from potential lenders for a new first lien debt facility that could replace the First Lien Credit Facility. In spite of this initial interest from potential financing sources, the Debtors' negotiations with the potential financing sources proved unsuccessful.

21.     During the third quarter of 2014, the Debtors also engaged in discussions with the First Lien Agent regarding the reduction of the borrowing base and the default that occurred in the second quarter of 2014.  The Debtors also informed the First Lien Agent that it would be

unable to comply with certain covenant ratios in the First Lien Credit Agreement for the third quarter of 2014. The First Lien Agent indicated a willingness to grant the Debtors a forbearance under the First Lien Credit Facility if the Debtors entered into a strategic transaction.

22. Following Dune Energy's entry into the Merger Agreement with Eos, Dune Energy entered into the Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement (the "First Forbearance Agreement") with the First Lien Agent and the First Lien Lenders. Under the First Forbearance Agreement, the First Lien Agent and First Lien Lenders agreed to a limited forbearance from exercising their rights and remedies with respect to the defaults under the First Lien Credit Agreement until December 31, 2014, unless earlier terminated in accordance with the terms of the First Forbearance Agreement. The First Lien Agent and First Lien Lenders also agreed to forego the October 1 reduction to the borrowing base and agreed to maintain the Debtors' borrowing base at $40,000,000 until the next scheduled redetermination period.

23. Following entry into the Merger Agreement, Eos commenced the Offer on October 9, 2014. On November 5, 2014, Eos informed Dune Energy that Eos Sub would not be able to complete the financing and consequently, would not be prepared to consummate the Offer, by the original expiration date of 12:00 midnight, New York City time, on November 6, 2014. Dune Energy, Eos, and Eos Sub then entered into a series of amendments to the Merger Agreement to extend the Offer to allow Eos Sub to complete the financing in order to fund the Offer and merger.

24. On December 16, 2014, Eos informed Dune Energy that it could not complete the merger and Offer on the terms originally set forth in the Merger Agreement due to the recent severe decline in the price of oil. Due to such decline, Eos' potential sources of financing for the

merger and Offer were withdrawn. On December 22, 2014, Dune Energy, Eos, and Eos Sub agreed to extend the Offer's expiration date to January 15, 2015 and the "End Date" set forth in the Merger Agreement to January 31, 2015 to allow the parties additional time to negotiate revised terms.

25.    In light of ongoing negotiations related to the Merger Agreement, on January 2, 2015, Dune Energy, the First Lien Agent, and the First Lien Lenders entered into the Amended and Restated Forbearance Agreement and Fifth Amendment to the Amended and Restated Credit Agreement dated effective as of December 31, 2014 (the "Second Forbearance Agreement"). Under the terms of the Second Forbearance Agreement, the First Lien Agent and the First Lien Lenders agreed to extend the limited forbearance until January 31, 2015, unless earlier terminated in accordance with the terms of the Second Forbearance Agreement.  In addition, the First Lien Agent and the First Lien Lenders agreed to maintain the Debtors' borrowing base at $40,000,000 during the forbearance period.  The Debtors agreed to begin making monthly, rather than quarterly, interest payments to the First Lien Agent. The Second Forbearance Agreement also provided that all commitments of the First Lien Lenders under the First Lien Credit Agreement would terminate on January 31, 2015 without further notice.

26.    During January 2015, the Debtors continued to negotiate the revised terms of the Merger Agreement.  Dune Energy, Eos, and Eos Sub entered into additional amendments to the Merger Agreement during this time to facilitate further negotiations.  In addition, on January 30, 2015, the Debtors, the First Lien Agent, and the First Lien Lenders entered into the Second Amended and Restated Forbearance Agreement dated effective as of January 31, 2015 (the "Third Forbearance Agreement").  Under the terms of the Third Forbearance Agreement, the

First Lien Agent and First Lien Lenders agreed to further extend the limited forbearance.  The forbearance period under the Third Forbearance Agreement terminated on February 25, 2015.

27.     Despite numerous extensions of the expiration of the Offer, Eos was unable to complete the financing and consummate the proposed transaction with the Debtors.  Facing a liquidity crisis in February 2015, the Debtors were unable to agree to any further extensions of the Offer.  On March 4, 2015, the Merger Agreement was terminated.

**III.     The Debtors' Prepetition Restructuring Initiatives and Financing Alternatives**

28.     In the weeks leading up to the Petition Date, the Debtors have been engaged in constructive discussions with their prepetition secured creditors and have taken steps to prepare for a restructuring.  Although the Debtors continued to negotiate revised terms of the merger with Eos, the Debtors also recognized the need to prepare for a restructuring of their affairs in the event the merger was unable to be consummated.  The Debtors hired Deloitte Transactions and Business Analytics LLP ("Deloitte") to serve as their financial advisors and assist with analyzing restructuring alternatives.

29.     The Debtors and Deloitte began a search for potential sources of DIP financing.  Naturally, the Debtors asked the First Lien Agent whether the First Lien Lenders would be willing to extend DIP financing in a chapter 11 case.  As part of the DIP financing discussions, the Debtors also asked the First Lien Agent whether the First Lien Lenders would agree to allow a priming DIP loan provided by a third party lender.  The First Lien Agent advised the Debtors that the First Lien Lenders would not agree to a priming DIP facility.  Under the Intercreditor Agreement, the Second Lien Lenders are not permitted to provide a DIP loan that primes the First Lien Lenders or to which the First Lien Lenders have not otherwise agreed.

30.     In addition to their negotiations with the First Lien Agent, the Debtors and Deloitte sought to obtain DIP financing from other sources.  During their efforts to identify

potential DIP lenders, the Debtors and Deloitte contacted eighteen (18) potential DIP lenders.  Of those parties, six (6) potential DIP lenders executed non-disclosure agreements with the Debtors and were provided access to an electronic data room with diligence materials.  The Debtors did not receive any DIP financing term sheets from third parties.

31.     In the course of the Debtors' and Deloitte's efforts to seek out alternative financing, the Debtors gauged whether parties would be willing to provide postpetition financing on a non-superpriority, unsecured, or non-priming basis.  The Debtors and Deloitte were unable to obtain financing, or even identify any indicative offers to provide such financing, on such terms.   In particular, the Debtors' significant prepetition secured debt precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior secured and superpriority basis.  Moreover, and in light of potential financiers' unwillingness to provide financing on a priming basis, the Debtors believe potential lenders were unwilling to engage in a protracted priming fight with the First Lien Lenders — particularly within the available timeframe — thus deterring such parties from submitting financing offers.

32.     The Debtors and their advisors considered a variety of potential transactions, including refinance and sale options.  Based on that diligence, the Debtors have determined that the DIP Facility presents the only viable mechanism for providing the liquidity that the Debtors require to continue their operations.  Based on all of the factors described herein, the Debtors deemed that it was in the best interests of their business to commence these Chapter 11 Cases and effectuate a comprehensive restructuring.

## IV.    The Proposed DIP Facility

### A.     Summary of Proposed DIP Facility

33.     After extended good faith, arm's-length negotiations, the First Lien Lenders, as proposed DIP Lenders, agreed to provide the DIP Facility on the terms provided in the DIP Loan

Documents, which are summarized above.  The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to finance these Chapter 11 Cases, will be used (a) for working capital and general corporate purposes of the Debtors and (b) to pay fees and expenses related to the DIP Credit Agreement and the Chapter 11 Cases.

34.     Importantly, the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the extensive negotiations that took place, the Debtors believe that these are the only terms on which the DIP Lenders will provide the financing.  As the DIP Facility proceeds are necessary and the only financing available at this time, the Debtors believe that sufficient justification exists for agreeing to these provisions. Moreover, the Debtors and their advisors understand that the DIP Lenders would not have been amenable to providing financing without these heavily bargained-for protections.

**B.      Use of Cash Collateral**

35.     In addition to the DIP Facility, the Debtors require the continued use of their existing Cash Collateral.  The requisite prepetition secured parties have consented to the Debtors' continued use of Cash Collateral subject to the terms of the Interim Order.  In particular, the First Lien Lenders have agreed to the terms of the proposed use of Cash Collateral.  Given the consent of the First Lien Lenders, the Intercreditor Agreement provides that the Second Lien Lenders are deemed to have consented and have agreed not to raise any objection to the Debtors' use of Cash Collateral.  The Debtors therefore have the requisite consent to use Cash Collateral.

36.     The DIP Loan Documents ensure the Debtors' continued access to Cash Collateral.  Continued access to Cash Collateral will (a) ensure that the Debtors have access to sufficient working capital to, among other things, pay their employees, vendors, and suppliers, (b) enable the Debtors to continue honoring their prepetition obligations under and in accordance

with other "first-day" orders entered by the Court, and (c) satisfy administrative expenses incurred in connection with the commencement of these Chapter 11 Cases.

### C. Adequate Protection Package

37. The Debtors and the First Lien Lenders have agreed on the Adequate Protection Package described above that will adequately protect the Prepetition Lenders' interests in the Prepetition Collateral from diminution in value caused by the Debtors' use of the Cash Collateral, as well as for any decline in, or diminution of, the value of the Prepetition Lenders' liens or security interests under the Prepetition Loan Documents.

38. In addition to the Adequate Protection Package itself, and as noted in the First Day Declaration, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection. Indeed, the Debtors' secured creditors will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent diminution of the value of the Prepetition Collateral and enhance the likelihood of preserving and maximizing the Debtors' overall going concern value.

### Supporting Authority

## I. The Debtors Should be Authorized to Obtain Postpetition Financing

### A. Entering into the DIP Loan Documents is an Exercise of the Debtors' Sound Business Judgment

39. The Court should authorize the Debtors to enter into the DIP Loan Documents and obtain access to the DIP Facility and the Cash Collateral as an exercise of the Debtors' sound business judgment.

40. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and

policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . .").

41.     Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

42.     The Debtors' execution of the DIP Loan Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of any chapter 11 case, and determined that the Debtors would require postpetition financing to support their operational and restructuring activities.  Accordingly, after significant marketing efforts by the Debtors and their advisors, the Debtors negotiated the DIP Facility with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtors.

43.     The Debtors believe that the Court's consideration of non-economic factors, as permitted by *ION Media*, is especially appropriate here.  Absent the DIP Lenders' willingness and ability to fund the DIP Facility, the Debtors would likely run out of cash and would be forced to shut down their operations.  Moreover, as set forth in the First Day Declaration, it is unlikely any third party lenders would be in a position to provide as certain a financing arrangement as currently available under the DIP Facility.  The Debtors submit that the certainty afforded by the DIP Facility — with respect to both its consensual nature as well as the likelihood of closing and the DIP Lenders' support of the Debtors' restructuring efforts — provides additional and ample reason to authorize it.

44.     Accordingly, the Debtors and their advisors determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  As noted above, the DIP Facility will provide the Debtors with access to the necessary liquidity, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and reorganization activities through the pendency of these Chapter 11 Cases.  Additionally, the DIP

Facility provides the Debtors with access to existing Cash Collateral, which preserves the status quo and relieves the Debtors of the cost of borrowing additional amounts to replace that cash. Thus, the Debtors submit that entering into the DIP Loan Documents constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

### B.     The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured, Priming and Superpriority Basis

45.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

46.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the more favorable of the two offers it received).

47.     As described above and in the First Day Declaration, the Debtors and Deloitte identified and solicited offers from numerous potential postpetition lenders other than the First Lien Lenders in the weeks prior to the Petition Date.  In spite of their efforts, the Debtors did not receive any proposals for DIP financing from third parties.  Notwithstanding the Debtors' efforts, the Debtors were simply unable to obtain sufficient, or any, postpetition financing in the form of unsecured credit, solely as an administrative expense, or secured by a junior lien.  The Debtors' significant secured debt precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis.

48.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets.  Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

- whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).

49.     Here, the Debtors seek authority to enter into the DIP Loan Documents, which will provide the DIP Lenders priming liens on the Collateral currently secured by the Prepetition Liens.  The DIP Loan Documents satisfy each of these factors.  First, as described above and in the First Day Declaration, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the Debtors require the DIP Facility.  The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing.  No alternative financing at the favorable terms offered in the DIP Facility was available to the Debtors, and the Debtors are not able to obtain financing from the DIP Lenders other than financing secured by first priority priming liens.  In light of the unavailability of other financing with which to fund their ongoing operations and preserve the value of their assets, the Debtors determined that accessing the DIP Facility from the DIP Lenders would best maximize estate value.

50.     Second, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute these Chapter 11 Cases, which will threaten the Debtors' significant going concern value. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

51.     Third, the terms of the DIP Loan Documents are reasonable and adequate to ensure the Debtors' ongoing ability to operate in Chapter 11 and ultimately emerge as a stronger enterprise. Indeed, the DIP Facility will provide the Debtors with access to up to $10 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations and their relationships with key constituents during these Chapter 11 Cases. Accordingly, the terms of the DIP Facility are reasonable and the DIP Loans and the Cash Collateral are sufficient to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

52.     Fourth, the Debtors and the DIP Lenders negotiated the DIP Facility in good faith and at arm's-length, and the Debtors' entry into the DIP Loan Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

53.     Finally, as described below, the Debtors will provide adequate protection for the Prepetition Lenders' liens on and security interests in the Prepetition Collateral as well as any

decline in, or diminution of, the value of the Prepetition Lenders' liens or security interests under the Prepetition Loan Documents.

54.     Moreover, under the terms of the Intercreditor Agreement, the requisite Prepetition Lenders have consented to the terms of the DIP Facility.  In particular, the First Lien Lenders have consented to the terms of the DIP Facility subject to the terms and conditions of the Interim Order.  Pursuant to the Intercreditor Agreement, the Second Lien Lenders are deemed to have consented to the terms of the DIP Facility and have agreed to be primed on the same basis as the First Lien Lenders.

55.     The Court should therefore (a) authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, senior liens on the Collateral as provided in section 364(d)(1) of the Bankruptcy Code; and (b) grant the DIP Obligations superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

### C.     The Interests of the Prepetition Lenders Are Adequately Protected

56.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B).  By requiring debtors to provide adequate protection to those creditors whose liens are being primed, the Bankruptcy Code seeks to protect a secured creditor from diminution in the value of its interest in the particular collateral.  *See In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539–40 (Bankr. D. Del. 1992) (secured creditor only entitled to adequate protection to the extent the collateral declined in value); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (if there is no diminution in the value of the secured creditor's collateral and the debtor can operate profitably postpetition, the secured creditor is adequately protected against the use of cash collateral); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y.

1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization.").

57.     What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Monroe Park*, 17 B.R. 934 (D. Del. 1982) (concept of adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in collateral pending the outcome of the bankruptcy proceedings); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).

58.     Here, the Prepetition Lenders are adequately protected. The adequate protection provided by the Adequate Protection Package is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code. Further, the requisite Prepetition Lenders have consented to the terms of the DIP Facility, including the Adequate Protection Package. Accordingly, the Court should approve the Adequate Protection Package.

## II.     The Debtors Should be Authorized to Use the Cash Collateral

59.     The requisite Prepetition Lenders have consented to the Debtors' use of Cash Collateral under the terms of the DIP Loan Documents. The Debtors submit that their request to use Cash Collateral complies with applicable Bankruptcy Code requirements.

60.     The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part, as follows:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

61.    Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party.  Alternatively, section 363(c)(2)(B) of the Bankruptcy Code permits the Bankruptcy Court, after notice and a hearing, to authorize a debtor in possession's use of cash collateral without the consent of the secured party so long as the use is consistent with the provisions of section 363 of the Bankruptcy Code.

62.    The Debtors have the requisite Prepetition Lenders' consent to use Cash Collateral subject to the terms and conditions set forth in the Interim Order.  The First Lien Agent, on behalf of the First Lien Lenders, has agreed to the terms of the DIP Credit Agreement and the Interim Order.  In addition, given the consent of the First Lien Lenders, the Intercreditor Agreement provides that the Second Lien Lenders are deemed not to oppose the Debtors' use of Cash Collateral and the proposed Adequate Protection Package.  Intercreditor Agreement, § 6.1. Accordingly, because the Debtors have the requisite Prepetition Lenders' consent for the use of Cash Collateral under the DIP Loan Documents, the Debtors' use of Cash Collateral should be approved under Section 363(c)(2)(A) of the Bankruptcy Code.

63.    Second, the Debtors' proposed adequate protection is consistent with the requirements of Section 363 of the Bankruptcy Code and, therefore, the Debtors' use of Cash Collateral — in addition to the requisite Prepetition Lenders' having consented to it — meets the standard for approval under Section 363(c)(2)(B) of the Bankruptcy Code.  As described above, the Debtors are providing the Prepetition Lenders with the Adequate Protection Package, which is fair and reasonable, and adequately protects the Prepetition Lenders' interests in the collateral securing the Debtors' prepetition obligations from diminution during these Chapter 11 Cases, including by the Debtors' use of the Cash Collateral pursuant to the terms hereof.

64.     In addition to the Adequate Protection Package itself, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of "adequate protection." Indeed, the Debtors' secured creditors will inherently benefit from the Debtors' proposed use of the Cash Collateral which, as set forth in the First Day Declaration, will prevent avoidable diminution of the value of the Collateral and enhance the likelihood of increasing or preserving the Debtors' overall going concern value.   This in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *Cf. 495 Cent. Park*, 136 B.R. at 631 (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *Sky Valley*, 100 B.R. at 114 ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *In re Salem Plaza Ass'n*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).   Accordingly, the Court should authorize the Debtors to use the Cash Collateral under Section 363(c)(2) of the Bankruptcy Code.

## III.     The Debtors Should be Authorized to Pay the Fees Associated with the DIP Facility

65.     As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their providing the DIP Facility.  Specifically, the Debtors will pay to the DIP Lenders (a) a Commitment Fee which shall accrue at a rate per annum of 0.50% on the average daily amount of the unused amount of the Commitment of each of the DIP Lenders during the period from and including the date of the DIP Credit Agreement to but excluding the Termination Date, and (b) a Facility Fee in the amount of $100,000.

66.     As explained in the First Day Declaration, the fees, taken together with the other provisions of the DIP Loan Documents, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their Chapter 11 Cases.  The Debtors believe that paying these fees to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Credit Agreement in connection with entering into those agreements.

## IV.     The DIP Lenders Should be Deemed Good Faith Lenders under Section 364(e) of the Bankruptcy Code

67.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

68.     As explained herein and in the First Day Declaration, the DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length,

good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## V.   The Debtors Require Immediate Access to the Cash Collateral and DIP Facility

69.   The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2) and (c)(2).

70.   The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow up to $3.0 million under the DIP Facility, is not granted promptly. The Debtors believe that the commencement of these Chapter 11 Cases has already and will continue to significantly increase the demands on their free cash as a result of, among other things, the costs of administering these Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases. Indeed, as explained in the First Day Declaration, unless the Court approves the Debtors' interim access to the DIP Facility funds, it is likely that the Debtors will run out of cash in the near term. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of their business, to make payroll, and to satisfy other working capital and operation needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

71.     Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).  In addition, to implement the terms of the DIP Facility, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), or otherwise.

**<u>Request for Final Hearing</u>**

72.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

WHEREFORE, for the reasons set forth herein and the First Day Declaration, the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other relief as may be appropriate under the circumstances.

Dated: March 8, 2015

Respectfully submitted,

**HAYNES AND BOONE, LLP**

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.
Texas Bar No. 02016600
Kenric D. Kattner
Texas Bar No. 11108400
Kourtney Lyda
Texas Bar No. 24013330
Kelli Stephenson
Texas Bar No. 24070678
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Fax: (713) 547-2600
Email:  charles.beckham@haynesboone.com
Email:  kenric.kattner@haynesboone.com

**PROPOSED COUNSEL TO**
**DEBTORS-IN-POSSESSION**