## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | (CHAPTER 11) |
| | § | |
| DUNE ENERGY, INC. | § | CASE NUMBER 15-10336 |
| DUNE OPERATING COMPANY | § | CASE NUMBER 15-10337 |
| DUNE PROPERTIES, INC. | § | CASE NUMBER 15-10338 |
| | § | |
| DEBTORS. | § | (JOINT ADMINISTRATION |
| | § | REQUESTED) |

### DECLARATION OF DONALD R. MARTIN, CHIEF RESTRUCTURING OFFICER OF DUNE ENERGY, INC. AND ITS SUBSIDIARIES, IN SUPPORT OF FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, Donald R. Martin, hereby submit this declaration (the "Declaration") under penalty of perjury:

1. I am the Chief Restructuring Officer of Dune Energy, Inc. ("Dune Energy"), a corporation organized under the laws of the state of Delaware and a debtor and debtor in possession in the above-captioned Chapter 11 cases of Dune Energy and its affiliates as debtors and debtors in possession (collectively, "Dune" or the "Debtors"). In such capacity, I am familiar with Dune's business, day-to-day operations and financial affairs.

2. On the date hereof (the "Petition Date"), Dune Energy and its two wholly owned subsidiaries, Dune Operating Company ("Dune Operating") and Dune Properties, Inc. ("Dune Properties"), commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court"). The Debtors also filed the motions and applications described herein for related relief (collectively, the "First Day Pleadings"). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. None of the Debtors is a small business

within the meaning of section 101(51)(D) of the Bankruptcy Code.  Concurrently with the filing

of this Declaration, the Debtors have requested procedural consolidation and joint administration

of these Chapter 11 cases (the "Chapter 11 Cases").

3.      I have reviewed and am familiar with the contents of each of the First Day

Pleadings, and I believe that the approval of the relief requested therein is necessary to minimize

disruption to Dune's business operations so as to permit an effective transition into chapter 11,

preserve and maximize the value of the Debtors' estates and, ultimately, achieve a successful

reorganization.  I also believe that, absent immediate access to encumbered cash collateral and

additional funding and authority to make certain essential payments and otherwise continue

conducting ordinary course business operations as sought and described in greater detail in the

First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment

of the Debtors' estates.

4.      Except as otherwise indicated, the facts set forth in this Declaration are based

upon my personal knowledge of Dune's business operations, my review of relevant documents,

information provided to me or verified by other executives or employees, Dune's professional

advisors, including Haynes and Boone, LLP ("Haynes and Boone") and Deloitte Transactions

and Business Analytics LLP ("Deloitte"), and upon my experience, knowledge and information

concerning Dune's operations, financials and the oil and gas industry generally.  Unless

otherwise indicated, the financial information contained in this Declaration is presented on a

consolidated basis and is unaudited and subject to change.  I am authorized to submit this

Declaration on behalf of Dune, and if called upon to testify, I would testify competently to the

facts set forth herein.

**Preliminary Statement**

5.      Dune Energy is an independent energy company that was formed in 1998 and operates through two wholly owned subsidiaries, Dune Operating and Dune Properties.  Since May 2004, the Debtors have been engaged in the exploration, development, acquisition and exploitation of crude oil and natural gas properties in Texas and Louisiana. The Debtors' interests in their oil and gas properties are held by Dune Properties, and their oil and gas operations are conducted by Dune Operating.  The Debtors sell their oil and gas production primarily to domestic pipelines and refineries.  The Debtors' oil and gas properties cover over 74,000 gross acres across 15 producing oil and natural gas fields.

6.      As of September 30, 2014, the Debtors had outstanding obligations in the principal amount of approximately $37 million of borrowings and $2 million of letters of credit under the Amended and Restated Credit Agreement, dated as of December 22, 2011 (as amended, the "First Lien Credit Agreement") among Dune Energy, as borrower, Bank of Montreal ("BMO"), as administrative agent, CIT Capital Securities LLC, as syndication agent, and the lenders party thereto (the "First Lien Lenders").  The Debtors also had outstanding obligations in the principal amount of approximately $67.8 million under the Floating Rate Senior Secured Notes due 2016 (the "Senior Notes").  The Debtors have granted liens on substantially all of their assets as security for their obligations under the First Lien Credit Agreement and the Senior Notes. The lien and security interests granted to secure the First Lien Credit Agreement are senior to those granted to secure the Senior Notes.

7.      The Debtors have experienced liquidity constraints due in part to borrowing base reductions under the First Lien Credit Agreement, and in August 2014, the Debtors were in default under the First Lien Credit Agreement due to the failure to meet certain covenant ratios in

the First Lien Credit Agreement. As a consequence, the Debtors and the First Lien Agent entered into a number of amendments and forbearance agreements with respect to the First Lien Credit Agreement.

8.     To address the Debtors' liquidity constraints and obtain additional working capital to further develop their oil and gas properties, Dune Energy entered into an Agreement and Plan of Merger dated September 17, 2014 (the "Merger Agreement") with Eos Petro, Inc. ("Eos") and Eos Petro Sub, Inc. ("Eos Sub"). On March 4, 2015, the Merger Agreement was terminated because Eos failed to close the tender offer and consummate the merger with Dune Energy. As a result, Eos is obligated to Dune Energy for approximately $5.5 million (the "Merger Termination Fee") for their failure to perform under the Merger Agreement. On March 4, 2015, Dune Energy made a demand on Eos for the Merger Termination Fee. Following the termination of the Merger Agreement and facing dwindling liquidity, the Debtors determined that restructuring their affairs in Chapter 11 was in the best interests of their creditors and other stakeholders.

9.     To familiarize this Court with Dune, its business, and the initial relief sought by the Debtors to stabilize operations facilitate their restructuring, this Declaration is organized as follows. Section I provides an overview of Dune's corporate history, prepetition organizational structure, capital structure, and current operations. Section II describes the events and circumstances leading to the commencement of these Chapter 11 Cases. Section III describes the proposed DIP Facility (as defined below) to obtain the necessary liquidity for these Chapter 11 Cases. Section IV summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings.

**Background**

I.     **Dune's Prepetition Organizational and Capital Structure**

10.     Dune Energy was incorporated under the laws of the State of Delaware.  Dune Operating and Dune Properties are wholly-owned subsidiaries of Dune Energy and were each incorporated under the laws of the State of Texas.  The Debtors oversee their operations from their offices in Houston, Texas.

A.     **Dune's Prepetition Capital Structure**

11.     On December 22, 2011, Dune Energy, as borrower, BMO, as administrative agent (the "First Lien Agent"), and the First Lien Lenders entered into First Lien Credit Agreement, pursuant to which the First Lien Lenders made certain credit available to and on behalf of Dune Energy (the "First Lien Credit Facility").  As of September 30, 2014, the principal amount of approximately $37 million in borrowings and $2 million of letters of credit were outstanding under the First Lien Credit Facility (the "First Lien Obligations").

12.     In connection with the First Lien Credit Agreement, the Debtors entered into that certain Amended and Restated Guarantee and Collateral Agreement dated as of December 11, 2011 (the "First Lien Guarantee and Collateral Agreement") and the Amended and Restated Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of December 11, 2011 (the "First Lien Mortgage and Security Agreement").[1]  To secure the obligations under the First Lien Credit Agreement, the Debtors granted first priority liens and security interests (the "First Liens") on substantially all of

---

[1] The First Lien Credit Agreement, the First Lien Mortgage and Security Agreement, the First Lien Guarantee and Collateral Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement) are referred to as the "First Lien Loan Documents".

the Debtors' assets as described in the First Lien Credit Facility Documents (collectively, the "Prepetition Collateral").[2]

13.     Dune Energy and U.S. Bank National Association ("U.S. Bank"), as trustee and collateral agent ("the Second Lien Trustee" and together with the First Lien Agent, the "Prepetition Agents"), are party to that certain Indenture (as amended, restated, supplemented, modified and/or refinanced from time to time, the "Second Lien Indenture"), dated as of December 22, 2011, pursuant to which Dune Energy issued $49,503,991 of its floating rate senior secured notes due 2016 (the "Second Lien Notes").  Holders of the Second Lien Notes (the "Second Lien Note Holders") and the First Lien Lenders are collectively referred to herein as the "Prepetition Lenders".  As of September 30, 2014, the principal amount of approximately $67.8 million was outstanding under the Second Lien Notes (the "Second Lien Obligations"). The First Lien Obligations and the Second Lien Obligations are collectively referred to herein as the "Prepetition Debt Obligations").

14.     In connection with the Second Lien Indenture, the Debtors entered into that Second Lien Collateral Agreement dated as of December 11, 2011 (the "Second Lien Collateral Agreement") and the Second Lien Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of December 11, 2011 (the "Second Lien Mortgage and Security Agreement").[3]

15.     Pursuant to the Second Lien Loan Documents, the Debtors granted second priority liens and security interests (the "Second Liens" and together with the First Liens, the

---

[2] As security for its obligations under the First Lien Credit Agreement, the Debtors have granted to the First Lien Agent (for the benefit of the First Lien Lenders) a first priority lien on substantially all of their assets, including liens on not less than 85% of the total value of proved oil and gas reserves and not less than 90% of the total value of proved developed and producing reserves.

[3] The Second Lien Indenture, the Second Lien Mortgage and Security Agreement, the Second Lien Collateral Agreement and the other Loan Documents (as defined in the Second Lien Indenture) are referred to as the "Second Lien Loan Documents", and together with the First Lien Loan Documents, the "Prepetition Loan Documents").

"Prepetition Liens") on substantially all of the Prepetition Collateral.[4]  The priorities between the First Lien Lenders and the Second Lien Note Holders are governed by that certain Intercreditor Agreement, dated December 22, 2013, by and among the Debtors, BMO in its capacity as administrative agent under the First Lien Credit Agreement and U.S. Bank in its capacity as collateral agent under the Second Lien Indenture (the "Intercreditor Agreement").  The Second Liens are junior and subordinate to the First Liens.

16.     Dune Energy's common stock is currently traded under the symbol "DUNR" on the OTCQB tier of the OTC Markets Group.  Certain of the Second Lien Note Holders also own shares of Dune Energy's common stock.  As of May 9, 2014, the following Second Lien Note Holders beneficially owned more than five percent (5%) of the outstanding shares of Dune Energy's common stock:

| Name of Beneficial Owner | Percent of Class |
| --- | --- |
| West Face Long Term Opportunities Global Master L.P. | 14.9 % |
| BlueMountain | 20.6 % |
| Zell Credit Opportunities Side Fund, L.P. | 6.3 % |
| Whitebox | 5.0 % |
| TPG Funds | 13.1 % |
| Strategic Value Special Situation Fund, L.P. | 24.5 % |
| Highbridge International, LLC | 5.0 % |

In addition, as of May 9, 2014, the Officers and Directors of Dune Energy also owned approximately 2.8% of the outstanding shares of common stock.

**B.      Dune's Current Operations**

17.     As noted above, Dune is an independent energy company engaged in the exploration, development, acquisition and exploitation of crude oil and natural gas properties in Texas and Louisiana.  As of the Petition Date, the Debtors have 32 full-time employees.  The

---

[4] As security for its obligations under the Second Lien Credit Agreement, the Debtors have granted to the Second Lien Trustee (for the benefit of the Second Lien Note Holders) a second priority lien on substantially all of their assets, including liens on not less than 85% of the total value of proved oil and gas reserves and not less than 90% of the total value of proved developed and producing reserves.

Debtors are not a party to any collective bargaining agreements and have not experienced any strikes or work stoppages. The Debtors utilize the services of independent contractors to perform various field and other services.

18.  The Debtors' primary focus has been development and exploration in their Gulf Coast properties to expand their reserve base through workovers and recompletions, field extensions, delineation of deeper formations within existing fields and exploratory drilling. The Debtors have also sought to grow their reserves through acquisitions of producing properties, leasehold acreage and drilling prospects in core operating areas that require minimal initial upfront capital. In evaluating acquisition opportunities, the Debtors have sought to acquire operational control of properties that they believe have a solid proved reserve base coupled with significant exploitation and exploration potential.

19.  The Debtors' oil and gas properties cover over 74,000 gross acres across 15 producing oil and natural gas fields.  The Debtors' total proved reserves as of December 31, 2013 were 93.1 billion cubic feet of natural gas equivalent ("Bcfe"), consisting of 50.1 billion cubic feet of natural gas ("Bcf") and 7.2  million barrels of crude oil ("Mmbbl").  At year-end 2013, the Debtors' proved developed producing, or PDP, reserves of 23.6 Bcfe were 25.3% of their 93.1 Bcfe of total proved oil and natural gas reserves, the Debtors' proved developed non-producing, or PDNP, reserves of 25.5 Bcfe were 27.4% of their total proved oil and natural gas reserves, and the Debtors' proved undeveloped, or PUD, reserves of 44.1 Bcfe were 47.3% of their total proved oil and natural gas reserves.

20.  Approximately 58% of the Debtors' total proved oil and gas reserves are located in three fields: Garden Island Bay, Leeville, and Bateman Lake.  These fields have large acreage positions surrounding piercement salt domes.  In the Garden Island Bay field, Dune controls

sixteen (16) prospects and approximately forty (40) separate well locations. Dune maintains a 100% working interest in these prospects. At the Leeville field, Dune participates with a 40% working interest as a non-operator in a shallow drilling program encompassing five (5) to ten (10) primarily PUD locations per year. The Leeville field currently has twenty-eight producing wells, and Shoreline Energy is the operator and majority interest holder in the field. The Bateman Lake field has eleven (11) producing wells. The reserves attributed to the Bateman Lake field are 90% natural gas. As a result of low gas prices, the Debtors have not recently conducted drilling in this field.

21.    The Chocolate Bayou, Comite, and Live Oak fields comprise the Debtors' next three (3) largest properties and consist of 26% of the Debtors' total proved reserves. These assets are typically characterized as having fewer wellbores than the salt dome fields but present numerous opportunities for PUD drilling and fault blocks containing unproved reserves that have been identified with new 3-D seismic data. The remaining fields contain approximately 16% of the Debtors' total proved oil and gas reserves and are characterized by occasional new drilling wells and workovers, but typically do not have the upside opportunities demonstrated in the other fields.

## II.    Events Leading to Chapter 11 and Prepetition Restructuring Initiatives

### A.    Events Leading to Chapter 11

22.    As described in detail above, as of September 30, 2014, Dune had outstanding Prepetition Debt Obligations of approximately $106.8 million. During 2014, as a result of a significant decline in oil prices, the Debtors' revenues fell sharply. Although the Debtors were able to reduce expenses, the significant decline in revenue imposed a strain on the Debtors' liquidity. Dune's earnings before interest, taxes, depreciation, amortization and exploration expenses ("EBITDAX") declined considerably from the prior year. For the twelve months ended

December 31, 2014, Dune's EBITDAX was $13.1 million, compared to EBITDAX of $20.6 million for the same time period in 2013.  The reduction in Dune's EBITDAX is primarily due to lower revenues.  Revenues for the twelve months ended December 31, 2014 were approximately $43.0 million, compared to revenues of $55.5 million for the same time period in 2013. Although the Debtors' $22.6 million in operating expenses for the twelve months ended December 31, 2014 were approximately $2.3 million (9.4%) less than the $24.9 million in operating expenses for the same time period in 2013, the decline in their revenues continued to outpace their cost savings efforts.

23.      In spite of their declining revenues, the Debtors continued to service their debt, making all scheduled interest installment payments on the First Lien Credit Facility and Second Lien Credit Facility.  At the end of the second quarter of 2014, the Debtors were in default of the First Lien Credit Agreement due to the failure to meet certain covenant ratios in the First Lien Credit Agreement.  In addition, on July 15, 2014, the First Lien Agent notified the Debtors that effective July 1, 2014, the Debtors' borrowing base, which was $47.5 million at that time, would be reduced by $2.5 million and would be further reduced by $2.5 million each month until October 2014, resulting in a borrowing base of $37.5 million.  The reduction in the borrowing base under the First Lien Credit Facility significantly restricted the Debtors' liquidity.

24.      To address the Debtors' liquidity constraints and obtain additional working capital to further develop their oil and gas properties, the Debtors engaged in numerous exploratory discussions with independent exploration and production companies regarding potential joint ventures or other strategic transactions.  Prior to the Petition Date, the Debtors contacted a total of forty-five (45) prospective strategic and financial buyers. Thirty (30) of the companies declined to consider an acquisition of or merger with the Debtors.  Fifteen (15) of the companies

expressed an interest in considering an acquisition and proceeded with non-disclosure/standstill agreements, one of which was Eos.

25.     From May through July 2014, the Debtors received seven (7) indications of interest from potential buyers, including a non-binding indication of interest from Eos for the purchase of all of the Debtors' outstanding shares of stock, with an estimation of the Debtors' enterprise value at $140 million.  After careful review of the indications of interest, the Debtors' board of directors authorized the continued discussion and negotiation with Eos and one other prospective buyer in an effort to enter into a definitive agreement in connection with a merger transaction.  As discussions continued, Eos lowered its offer price based on the Debtors' enterprise value.  The other interested party continued its due diligence review, but did not provide a formal offer.

26.     On September 17, 2014, Dune Energy, Eos, and Eos Sub entered into the Merger Agreement.  The Merger Agreement provided for Eos Sub to commence a cash tender offer (the "Tender Offer") for all of the issued and outstanding shares of the Company's common stock for $0.30 per share payable to the holder in cash, without interest and less any applicable withholding taxes (the "Offer Price"), upon the terms and subject to the conditions set forth in the Offer to Purchase, dated October 9, 2014 (as amended or supplemented from time to time, the "Offer to Purchase"), and in the related Letter of Transmittal (the "Letter of Transmittal," which, together with the Offer to Purchase and any amendments or supplements from time to time thereto, constitute the "Offer").  In addition to the Offer Price, Eos agreed to provide Dune Energy with sufficient funds to pay in full and discharge all of Dune Energy's outstanding indebtedness and assume liability for all of Dune Energy's trade debt, as well as fees and

expenses related to the Merger Agreement and the transactions contemplated therein.  The Offer Price was based on an implied enterprise value of $135.9 million.

27.     The Debtors also pursued alternative sources of financing to address their liquidity constraints.  During the third quarter of 2014, the Debtors had executed non-disclosure agreements with five (5) potential financing sources and received four (4) term sheets from potential lenders for a new first lien debt facility that could replace the First Lien Credit Facility. In spite of this initial interest from potential financing sources, the Debtors' negotiations with the potential financing sources proved unsuccessful.

28.     During the third quarter of 2014, the Debtors also engaged in discussions with the First Lien Agent regarding the reduction of the borrowing base and the default that occurred in the second quarter of 2014.  The Debtors also informed the First Lien Agent that it would be unable to comply with certain covenant ratios in the First Lien Credit Agreement for the third quarter of 2014.  The First Lien Agent indicated a willingness to grant the Debtors a forbearance under the First Lien Credit Facility if the Debtors entered into a strategic transaction.

29.     Following Dune Energy's entry into the Merger Agreement with Eos, Dune Energy entered into the Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement (the "First Forbearance Agreement") with the First Lien Agent and the First Lien Lenders.  Under the First Forbearance Agreement, the First Lien Agent and First Lien Lenders agreed to a limited forbearance from exercising their rights and remedies with respect to the defaults under the First Lien Credit Agreement until December 31, 2014, unless earlier terminated in accordance with the terms of the First Forbearance Agreement.  The First Lien Agent and First Lien Lenders also agreed to forego the October 1 reduction to the

borrowing base and agreed to maintain the Debtors' borrowing base at $40,000,000 until the next scheduled redetermination period.

30.     Following entry into the Merger Agreement, Eos commenced the Offer on October 9, 2014.  On November 5, 2014, Eos informed Dune Energy that Eos Sub would not be able to complete the financing and consequently, would not be prepared to consummate the Offer, by the original expiration date of 12:00 midnight, New York City time, on November 6, 2014.  Dune Energy, Eos, and Eos Sub then entered into a series of amendments to the Merger Agreement to extend the Offer to allow Eos Sub to complete the financing in order to fund the Offer and merger.

31.     On December 16, 2014, Eos informed Dune Energy that it could not complete the merger and Offer on the terms originally set forth in the Merger Agreement due to the recent severe decline in the price of oil.  Due to such decline, Eos' potential sources of financing for the merger and Offer were withdrawn. On December 22, 2014, Dune Energy, Eos, and Eos Sub agreed to extend the Offer's expiration date to January 15, 2015 and the "End Date" set forth in the Merger Agreement to January 31, 2015 to allow the parties additional time to negotiate revised terms.

32.     In light of ongoing negotiations related to the Merger Agreement, on January 2, 2015, Dune Energy, the First Lien Agent, and the First Lien Lenders entered into the Amended and Restated Forbearance Agreement and Fifth Amendment to the Amended and Restated Credit Agreement dated effective as of December 31, 2014 (the "Second Forbearance Agreement").  Under the terms of the Second Forbearance Agreement, the First Lien Agent and the First Lien Lenders agreed to extend the limited forbearance until January 31, 2015, unless earlier terminated in accordance with the terms of the Second Forbearance Agreement.  In addition, the

First Lien Agent and the First Lien Lenders agreed to maintain the Debtors' borrowing base at $40,000,000 during the forbearance period. The Debtors agreed to begin making monthly, rather than quarterly, interest payments to the First Lien Agent. The Second Forbearance Agreement also provided that all commitments of the First Lien Lenders under the First Lien Credit Agreement would terminate on January 31, 2015 without further notice.

33.     During January 2015, the Debtors continued to negotiate the revised terms of the Merger Agreement. Dune Energy, Eos, and Eos Sub entered into additional amendments to the Merger Agreement during this time to facilitate further negotiations. In addition, on January 30, 2015, the Debtors, the First Lien Agent, and the First Lien Lenders entered into the Second Amended and Restated Forbearance Agreement dated effective as of January 31, 2015 (the "Third Forbearance Agreement"). Under the terms of the Third Forbearance Agreement, the First Lien Agent and First Lien Lenders agreed to further extend the limited forbearance. The forbearance period under the Third Forbearance Agreement terminated on February 25, 2015.

34.     Despite numerous extensions of the expiration of the Offer, Eos was unable to complete the financing and consummate the proposed transaction with the Debtors. Facing a liquidity crisis in February 2015, the Debtors were unable to agree to any further extensions of the Offer. On March 4, 2015, the Merger Agreement was terminated.

### B.     Prepetition Restructuring Initiatives and Financing Alternatives

35.     Although the Debtors continued to negotiate revised terms of the merger with Eos before the termination of the Merger Agreement, the Debtors also recognized the need to prepare for a restructuring of their affairs in the event the merger was unable to be consummated. The Debtors have been engaged in constructive discussions with their prepetition secured creditors and have attempted to identify potential sources of debtor in possession ("DIP") financing. The

Debtors hired Deloitte to serve as their financial advisors and assist with analyzing restructuring alternatives.

36.     The Debtors and Deloitte began a search for potential sources of DIP financing. Naturally, the Debtors asked the First Lien Agent whether the First Lien Lenders would be willing to extend DIP financing in a chapter 11 case.  As part of the DIP financing discussions, the Debtors also asked the First Lien Agent whether the First Lien Lenders would agree to allow a priming DIP loan provided by a third party lender.  The First Lien Agent advised the Debtors that the First Lien Lenders would not agree to a priming DIP facility.  Under the Intercreditor Agreement, the Second Lien Note Holders are not permitted to provide a DIP loan that primes the First Lien Lenders or to which the First Lien Lenders have not otherwise agreed.

37.     In addition to their negotiations with the First Lien Agent, the Debtors and Deloitte sought to obtain DIP financing from other sources.  During their efforts to identify potential DIP lenders, the Debtors and Deloitte contacted eighteen (18) potential DIP lenders.  Of those parties, six (6) potential DIP lenders executed non-disclosure agreements with the Debtors. Each of the parties that executed NDAs reviewed due diligence materials contained in the Debtors' online data room.  The Debtors did not receive any DIP financing term sheets from third parties.

38.     In the course of the Debtors' and Deloitte's efforts to seek out alternative financing, the Debtors gauged whether parties would be willing to provide postpetition financing on a non-superpriority, unsecured, or non-priming basis.   The Debtors and Deloitte were unable to obtain financing, or even identify any indicative offers to provide such financing, on such terms.  In particular, the Debtors' significant prepetition secured debt precludes them from obtaining postpetition financing in the amount they require on terms other than on a senior

secured and superpriority basis.  Moreover, and in light of potential financiers' unwillingness to provide financing on a priming basis, I believe potential lenders were unwilling to engage in a protracted priming fight with the First Lien Lenders — particularly within the available timeframe — thus deterring such parties from submitting financing offers

39.     Due to the lack of any offers from third parties for potential financing, the Debtors negotiated with the First Lien Lenders for debtor in possession financing.  The Debtors and BMO, in its capacity as administrative agent and collateral agent (the "DIP Agent"), and BMO and CIT Bank, as proposed lenders (the "DIP Lenders"), negotiated a Post Petition Superpriority Loan Agreement (the "DIP Credit Agreement").  These negotiations, which were extensive and at arm's length, culminated in the debtor in possession financing facility (the "DIP Facility"), which will provide the Debtors with a total revolving credit commitment of $10.0 million, and which will allow the Debtors to borrow $3.0 million on an interim basis.  The DIP Credit Agreement permits the Debtors to obtain funding for expenditures in accordance with an approved budget (the "DIP Budget").  The DIP Budget is attached to the DIP Motion as Exhibit B.  The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to finance these Chapter 11 Cases, will be used (a) for working capital and general corporate purposes of the Debtors and (b) to pay fees and expenses related to the DIP Facility and the Chapter 11 Cases.

40.     The terms of the DIP Facility require the Debtors to complete a sale of their assets in accordance with certain milestones.  To seek to maximize the value of their estates, and in compliance with the milestones under the proposed DIP Facility, the Debtors will file a motion seeking authority to conduct an auction process by which the Debtors will solicit offers and ultimately seek approval to sell substantially all of their assets to the bidder with the highest and

best offer.  The Debtors will also seek authority to retain Parkman Whaling LLC to serve as their investment bankers to assist with conducting the marketing and sale of their assets.

41.     As part of its restructuring initiatives, the Debtors recognized that a sale of their assets in the context of a Chapter 11 filing would maximize the value of their assets and would likely be required by the terms of a DIP financing facility.  In the weeks leading up to the filing of the Chapter 11 Cases, the Debtors contacted the seven (7) parties who had previously indicated an interest in purchasing Dune or its assets to determine whether any of those parties would be willing to serve as a stalking horse in an auction process in the event of a bankruptcy filing.  None of those parties was willing to agree to serve as a stalking horse bidder to acquire the Debtors' assets in the available timeframe.

42.     The Debtors and their advisors considered a variety of potential transactions, including refinance and sale options.  Based on all of the factors described herein, the Debtors deemed that it was in the best interests of their business to commence these Chapter 11 Cases and effectuate a comprehensive restructuring.  The Debtors have also determined that the DIP Facility presents the only viable mechanism for providing the liquidity that the Debtors require to continue their operations during the Chapter 11 Cases.  In addition, the Debtors have determined that a prompt and open sale of the assets in which all interested buyers are encouraged to participate is the best way to maximize value for their estates under the circumstances.

### III.    The DIP Facility

43.     As part of the Debtors' First Day Pleadings, the Debtors filed the *Debtors'*
*Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain*
*Postpetition Financing and to Use Cash Collateral, (ii) Granting Adequate Protection to*
*Prepetition Secured Parties, (iii) Scheduling a Final Hearing, and (iv) Granting Related Relief*
(the "DIP Motion"), seeking approval of the DIP Facility.

44.     Importantly, I believe the financial terms and covenants of the DIP Facility are
standard and reasonable for financing of this kind.  Based on the extensive negotiations that took
place, I believe that these are the only terms on which the DIP Lenders will provide the
financing.  As the DIP Facility proceeds are necessary and the only financing available at this
time, I believe that sufficient justification exists for agreeing to these provisions.  Moreover, it is
my understanding that the DIP Lenders would not have been amenable to providing financing
without the heavily bargained-for protections contained in the DIP Credit Agreement.

### A.    The Terms of the DIP Facility are Fair and Reasonable

45.     The proceeds of the DIP Facility are sized to support the Debtors through the
anticipated pendency of these Chapter 11 Cases.  Moreover, I believe that the financial terms and
covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on
the negotiations that took place, I believe that these are the only terms on which the DIP Lenders
will provide the financing.

46.     Specific to these Chapter 11 Cases, the DIP Facility sets certain milestones for
certain restructuring initiatives *(e.g.,* approval of bid and sale procedures, conducting an auction,
consummating a sale of all or substantially all of the Debtors' assets) and entitles the DIP
Lenders to certain fees.   Based on the extensive negotiations that took place, I believe that these
are the only terms on which the DIP Lenders will provide the financing. In addition, I am

generally aware that terms similar to those included in the DIP Credit Agreement have been approved in other recent and/or ongoing cases.

47.     It is my further understanding that any alternative financing arrangement, including an arrangement provided by other potential DIP lenders, likely would have led to a lengthy and potentially value-destructive priming fight. Moreover, I understand that the DIP Lenders would not have been amenable to providing financing without these bargained-for provisions. In the course of negotiations with the DIP Lenders, the Debtors explored whether the DIP Lenders would provide the DIP Facility with lower or no associated fees and free from procedural milestones. The DIP Lenders made clear that they would not be willing to provide the DIP Facility on more favorable terms.

48.     The Debtors and the DIP Lenders engaged in discussions immediately prior to the Petition Date concerning certain provisions of the DIP Facility. I believe that the terms of the DIP Credit Agreement and associated loan documents (collectively, the "DIP Loan Documents") constitute, on the whole, the most favorable terms the Debtors could achieve on which the DIP Lenders will extend the necessary postpetition financing. Although the Debtors explored whether the DIP Lenders would provide the DIP Facility without certain provisions, in the course of negotiations, the DIP Lenders indicated they would not be willing to provide the DIP Facility without such terms. In particular, it is my understanding that the provisions requiring: (a) the achievement of certain sale milestones, (b) the retention of Parkman Whaling LLC to serve as investment banker and assist with the sale process, and (c) the appointment of a chief restructuring officer are key components of consideration for the DIP Lenders without which they have indicated they are unwilling to provide the DIP Facility. Accordingly, the Debtors, Deloitte, and the Debtors' other advisors—recognizing the absence of favorable competing

proposals and the benefits to be provided under the DIP Facility—determined in their sound business judgment that the terms of the DIP Credit Agreement were and remain superior to any other set of terms reasonably available to the Debtors at this time. I therefore believe that the DIP Facility provides the Debtors with the best, most feasible and most value-maximizing financing option available at this time.

**B.      The Terms of the Debtors' Cash Collateral Use are Fair and Reasonable**

49.      In addition to the DIP Facility, the Debtors require the continued use of their cash collateral (as defined in Section 363(a) of the Bankruptcy Code, the "Cash Collateral"). The requisite prepetition secured parties have consented to the Debtors' continued use of Cash Collateral subject to the terms of the form of order approving the DIP Facility on an interim basis (the "Interim DIP Order"). In particular, the First Lien Lenders have agreed to the terms of the proposed use of Cash Collateral. Given the consent of the First Lien Lenders, the Intercreditor Agreement provides that the Second Lien Note Holders are deemed to have consented and have agreed not to raise any objection to the Debtors' use of Cash Collateral. The Debtors therefore have the requisite consent to use Cash Collateral.

50.      I believe that continued access to Cash Collateral will (a) ensure that the Debtors have access to sufficient working capital to, among other things, pay their employees, vendors, and suppliers, (b) enable the Debtors to continue honoring their prepetition obligations under and in accordance with other "first-day" orders entered by the Court, and (c) satisfy administrative expenses incurred in connection with the commencement of these Chapter 11 Cases.

**C.      The Adequate Protection Package is Justified Under the Circumstances**

51.      The Debtors and the First Lien Lenders have agreed that the Debtors will provide the following primary forms of adequate protection (the "Adequate Protection Package"):

- As adequate protection of the interests of the Prepetition Agents and Prepetition Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors shall grant to the Prepetition Agents, for the benefit of themselves and the Prepetition Lenders, continuing, valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order, the "Adequate Protection Liens");

- As further adequate protection of the interests of the First Lien Agent and First Lien Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, to the extent any First Lien Obligations are outstanding, the First Lien Agent and First Lien Lenders shall be granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Cases (the "Adequate Protection Claim").

52.     The Adequate Protection Package will adequately protect the Prepetition Lenders' interests in the Prepetition Collateral from diminution in value caused by the Debtors' use of the Cash Collateral, as well as for any decline in, or diminution of, the value of the Prepetition Lenders' liens or security interests under any of the Prepetition Loan Documents.

53.     Further, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection.  I believe that the Debtors' secured creditors will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent diminution of the value of the Prepetition Collateral and enhance the likelihood of preserving and maximizing the Debtors' overall going concern value.  In light of the likely disruptive effects of any priming fight, as well as the Debtors' desire to administer these cases on a consensual basis, I believe that entering into the DIP Facility with the DIP Lenders best maximizes estate value at this time and therefore support authorization and approval of the priming liens and superpriority claims contemplated in the Interim Order.

**D.      The DIP Facility Was Negotiated in Good Faith**

54.     The Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Agent and the DIP Lenders offered the most viable option for obtaining the postpetition financing the Debtors require.  I believe that the DIP Credit Agreement is the result of the Debtors' reasonable and informed determination that the DIP Agent and the DIP Lenders offered the most favorable terms on which to timely obtain needed postpetition financing, and of arm's length, good faith negotiations between the Debtors and the DIP Agent and DIP Lenders.

**E.      The Debtors Require Immediate Access to Cash Collateral and the DIP Facility**

55.     I believe that the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested in the DIP Motion is not granted, including authorizing the Debtors' use of Cash Collateral and borrowings of $3.0 million on an interim basis under the DIP Credit Agreement.  I further believe that the commencement of these Chapter 11 Cases will significantly increase demands on the Debtors' free cash as a result of, among other things, the costs of administering these Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations.   The Debtors' projections reflect that their cash position will be negative at the end of the week ended March 14, 2015.

56.     Without Court approval of the DIP Facility, the Debtors will not have sufficient cash to make timely payments to vendors and employees that are required to support the Debtors' continued operations.   Failure to pay these expenses would result in immediate cessation of the Debtor's operations. The Debtors' ability to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the DIP Facility is

vital to the confidence of the Debtors' employees and vendors and to the preservation and maintenance of the going-concern value of the Debtors' estates. The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with vendors, pay employees and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful reorganization. Based on these circumstances, the Debtors require the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to their operations, businesses and estates.

## IV.   First Day Pleadings[5]

57.    The Debtors have requested a variety of relief in the First Day Pleadings to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses and to ensure that their restructuring goals can be implemented with limited disruption to operations. I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into Chapter 11. I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to use Cash Collateral, make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.

58.    In my opinion, approval of the relief requested in the First Day Pleadings, each of which is explained herein, will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

---

[5] Capitalized terms used in this Section IV but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Pleadings.

A. **Debtors' Emergency Ex Parte Motion for Joint Administration (the "Joint Administration Motions")**

59.     On the Petition Date, each of the Debtors filed Joint Administration Motions in their respective Chapter 11 Cases, requesting joint administration of the Chapter 11 Cases for procedural purposes only.   The Debtors operate as an integrated business with common ownership and control.  Dune Energy is the direct parent wholly owns each of Dune Properties and Dune Operating.  Additionally, each of the Debtors is directly liable for, or a guarantor of, the approximately $105 million in outstanding Prepetition Debt Obligations that the Debtors seek to restructure as part of the Chapter 11 Cases.  As a result, many of the motions, hearings and orders that will arise in the Chapter 11 Cases will affect each and every Debtor.

60.     Additionally, I believe joint administration of the Chapter 11 Cases will provide significant administrative convenience and that entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration will also allow all parties to monitor the Chapter 11 Cases with greater ease and efficiency.

61.     I do not believe that joint administration will give rise to any conflict of interest among the Debtors' estates, nor will joint administration adversely affect the Debtors' respective constituencies because the Joint Administration Motions request only administrative, not substantive, consolidation of the Debtors' cases.  I do not believe that parties in interest will be harmed by the relief requested but, instead, will benefit from the cost reductions associated with joint administration of the Chapter 11 Cases.  Therefore, on behalf of the Debtors, I respectfully request that the Court grant the Joint Administration Motions.

**B. Debtors' Emergency Motion to Extend Deadline to File Schedules of Assets and Liabilities, Schedule of Executory Contracts, and Statement of Financial Affairs (the "<u>Schedules and SOFA Motion</u>")**

62.     The Debtors are requesting entry of an order granting additional time to file their Schedules and Statements for an additional sixteen (16) days.  Prior to the Petition Date, the Debtors were unable to assemble all of the information necessary to complete and file their schedules of assets and liabilities (the "<u>Schedules</u>") and statements of financial affairs (the "<u>Statements</u>") required by the Bankruptcy Rules because of (a) the exigent nature of the Debtors' bankruptcy filing as well as the size of the Debtors' Chapter 11 Cases; (b) the Debtors' lack of liquidity; (c) the Debtors' employees devoted to trying to negotiate, finalize and close the Merger Agreement with Eos and negotiate with various creditor constituencies; and (e) business exigencies incident to the commencement of these Chapter 11 Cases.  The Debtors hired Deloitte to assist them with the preparation of their Statements and Schedules and are working diligently and expeditiously to prepare the Schedules and Statements.  I believe that the complexity of the Debtors' businesses, the limited staff available to perform the required internal review of their financial records and affairs, the numerous critical operational matters that their accounting and legal personnel must address in the early days of the Chapter 11 Cases, the pressure incident to the commencement of the Chapter 11 Cases, and the fact that certain prepetition invoices have not yet been received or entered into their accounting systems provide ample cause justifying, if not necessitating, a sixteen (16) day extension of the deadline to file the Schedules and Statements.

63.     I believe that the relief requested in the Schedules and SOFA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and SOFA Motion should be approved.

    **C.**    **Debtors' Emergency Motion for an Order (i) Authorizing Continued Use of Existing Business Forms and Records; (ii) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System; and (iii) Waiving Certain U.S. Trustee Requirements (the "<u>Cash Management Motion</u>")**

64.    The Debtors filed the Cash Management Motion to request entry of an order (i) authorizing the Debtors to continue using their existing business forms and records; (ii) authorizing the Debtors to maintain the Bank Accounts and Cash Management System, provided, however, that pursuant to the terms of the DIP Facility and upon advance reasonable notice, the Required Lenders under the DIP Credit Agreement may require (to the extent consistent with local rules and guidelines) that the Bank Accounts be closed and new accounts be opened at BMO Harris Bank N.A.; and (iii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the Western District of Texas (the "<u>U.S. Trustee</u>").

65.    The Debtors use their Cash Management System to collect, transfer and disburse funds generated from their operations, facilitate cash monitoring, forecasting and reporting, and to enable the Debtors to maintain control over the Bank Accounts.[6]   The Debtors' Cash Management System consists of six (6) Bank Accounts maintained at BBVA Compass Bank. The Bank Accounts are subject to account control agreements in favor of BMO for the benefit of the First Lien Lenders.  All of the Bank Accounts have been open since 2007 with the exception of the Insurance Account, which was opened in 2009, and the Intermediary Operating Account, which was opened in 2010.  There is no co-mingling with any other accounts.  There are no related non-debtor accounts.

---

[6] A list of the Debtors' Bank Accounts is contained in the Cash Management Motion.

66.     Dune Operating also maintains an escrow account (the "Escrow Account") at U.S. Bank, National Association (XXXXXXX035).   This Escrow Account was initially styled "Goldking/EnerVest Bonding Fund" and was established in 2005 by Goldking Energy Corporation ("Goldking"), Chevron U.S.A. Inc., and EnerVest Energy, L.P. for the purpose of assuring that certain plugging and abandonment obligations would be performed.  In 2007, the Debtors acquired certain assets of Goldking, including the properties for which the Escrow Account was established.  Goldking's interest under the Escrow Account was assigned to the Debtors.  The Debtors do not have the ability to access or utilize the funds in the Escrow Account except as set forth in the Escrow Agreement, dated as of October 31, 2005, by and between Goldking Energy Corporation, Chevron U.S.A. Inc., EnerVest Energy, L.P. and Wachovia Bank, National Association as assigned to the Debtors.

67.     The Cash Management System is managed from the Debtors' offices in Houston, Texas and serves as a conduit for revenue obtained from business operations for distribution to employees, vendors, and other creditors.  The Debtors have designed the Cash Management System to meet their operating needs, enable them to centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances.   Additionally, in contemplation of the commencement of these Chapter 11 Cases, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department and this Court.

*(i)     Continued Use of Existing Business Forms and Records*

68.     The Debtors are requesting a waiver of the requirement that they open a new set of books and records as of the Petition Date.  I believe that opening a new set of books and

records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors are engaged and the numerous other parties with whom they deal, the Debtors need to use their existing business forms without alteration or change. Printing new business forms would take an undue amount of time and expense. Fulfillment of the requirement would likely delay the payment of postpetition claims and negatively affect operations and the value of these estates. Accordingly, I support the Debtors' request that the Court authorize them to continue to use their existing business forms and to maintain their existing business records.

(ii)     *Continued Use of Corporate Bank Accounts and Cash Management System*

69.     The Debtors are also requesting authority to maintain their existing Bank Accounts and Cash Management System in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to operations. As set forth in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Parties, (iii) Scheduling a Final Hearing, and (iv) Granting Related Relief* (the "DIP Motion") filed concurrently herewith, the Debtors also request authority (i) to maintain their Bank Accounts subject to control agreements in form and substance satisfactory to the DIP Agent (as defined in the DIP Motion) and (ii) to grant the DIP Agent and/or its authorized representative "view-only" electronic access to each of the Bank Accounts. In addition, subject to the limitations contained in the proposed DIP Facility (as defined in the DIP Motion), the Debtors are requesting authority to close any of the Bank Accounts or open

new bank accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates or if a new bank account is required to comply with an order of this Court.

70.     I believe that only if the Debtors continue to use the Bank Accounts with the same account numbers can the transition into chapter 11 be smooth and orderly, with minimal interference with continuing operations.  Requiring the Debtors to open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' businesses.  The Debtors will add the designation "Debtor-in-Possession" or "DIP" to any checks in their possession[7] and instruct the Bank to add the designations to current and any future Accounts.

71.     By preserving business continuity and avoiding operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would necessarily create, I believe that all parties-in-interest will be best served and the benefit to the Debtors' estates will be considerable.  To the best of my knowledge, the Bank Accounts are in a financially stable institution that is insured by the Federal Deposit Insurance Corporation up to the applicable limit.  The confusion that would otherwise result could only work to the detriment of the Chapter 11 Cases.  It is my understanding that no checks issued prior to the Petition Date will be honored by the Debtors, except as otherwise provided by separate order of this Court.  It is also my understanding that the Debtors will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred.

72.     I believe that the Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among

---

[7] The Debtors maintain blank stock and propose to use such stock (with the Debtor-in-Possession designation manually added) until the stock is depleted.

other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Accordingly, I believe that any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' reorganization efforts.

73.    I also believe that the relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System, as modified, will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of the Chapter 11 Cases.

### (iii)    Continued Maintenance of Accounts at BBVA Compass

74.    Because it does not appear that BBVA Compass is an authorized depository in the Western District of Texas, the Debtors are requesting a waiver of the U.S. Trustee Guidelines to allow the Debtors to maintain the Bank Accounts at BBVA Compass. I believe that the deposit of funds with a recognized and stable financial institution such as BBVA Compass should not pose a substantial risk to the Debtors' estates or creditors.

75.    Due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take a large amount of time for the Debtors to locate and determine, where necessary, appropriate alternative accounts that satisfy the Guidelines. Requiring the Debtors to change their deposits and other procedures could result in harm to the Debtors, their estates, and creditors because such change would disrupt the Cash Management System. Conversely, I believe that the Debtors' estates and creditors will not be harmed by the Debtors' maintenance of the status quo because of the relatively safe and prudent practices already utilized by the Debtors.

76.     In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Cases, I believe that BBVA Compass should be authorized and directed to continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course, and to pay any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts on account of a claim arising on or after the Petition Date so long as there are sufficient funds in the relevant Bank Accounts.

77.     Further, BBVA Compass charges monthly fees to the Debtors for maintaining the Bank Accounts, which may vary monthly based on actual usage.[8]  The Debtors were current on payment of these monthly fees as of the Petition Date.  The Debtors are requesting authority to continue paying the monthly fees in the ordinary course of business, including any portion of the fee attributable to prepetition services.

*(iv)     Continued Use of Payroll Account and ADP in Cash Management System*

78.     The Debtors are also seeking a waiver of the U.S. Trustee Guideline requiring the establishment of specific debtor in possession accounts for payroll.  Although Dune Operating maintains the Payroll Account, as a general matter, ADP makes the Debtors' payroll payments through a separate contractual arrangement.  The Debtors fund their obligations to ADP with transfers from the Payroll Account approximately two (2) days prior to the Debtors' pay date.  I believe that the Debtors' payroll obligations are most efficiently met through their existing arrangement with ADP and their existing Bank Accounts, and that requiring the establishment of a new payroll account would be unnecessary and disruptive to their businesses.

---

[8] The Debtors' average monthly banking fees during 2014 were approximately $1,900.

79.     In addition, the Debtors are seeking a waiver of the U.S. Trustee Guideline requiring debtors to establish specific debtor in possession accounts for tax payments and to deposit in such tax accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll.  I believe that the Debtors can pay their tax obligations most efficiently from the existing Bank Accounts in accordance with their existing practices, and that the U.S. Trustee can adequately monitor the flow of funds into, between, and out of the Bank Accounts. The creation of new accounts designed solely for tax obligations would be unnecessary and inefficient.  Moreover, the Debtors' payroll tax payments are made by ADP pursuant to a separate contractual arrangement.  The Debtors generally fund their payroll tax obligations to ADP through the Cash Management System.  With the current system, the Debtors are current on their payroll tax obligations and anticipate remaining current on such obligations.

80.     I believe that absent the requested relief, the Debtors would be unable to effectively maintain their financial operations, which would cause immediate and irreparable harm to the Debtors, their estates, creditors, and all parties in interest.

81.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**D.      Debtors' Emergency Motion for Order Authorizing the Debtors to (I) Pay Certain Prepetition Wages, Other Compensation and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs (the "Employee Benefits Motion")**

82.     In the Employee Benefits Motion, the Debtors are requesting authority to pay certain prepetition Employee Obligations owed to either their employees or those who provide

employee benefits, to honor and continue certain employee benefits, and to authorize and direct financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Employee Obligations. The prepetition Employee Obligations include Wage Obligations, Unpaid Payroll Service Fees, Unremitted Deductions, Unremitted Payroll Taxes, Reimbursable Expenses, Unremitted Independent Contractor Compensation, Unpaid Health Benefits, Unpaid Employee Insurance Coverage Obligations, Unremitted 401(k) Contributions, and Unused Vacation (as each term is defined in the Employee Benefits Motion). Each of the Employee Obligations described in the Employee Benefits Motion have been included in the DIP Budget approved by the lenders in connection with the Debtors' request for authority to enter into the DIP Facility and is subject thereto.

83.     Additionally, the Debtors' request under the Employee Benefits Motion includes continuation of the following Employee Obligations in the ordinary course of business on a postpetition basis: (a) Wage Obligations; (b) ADP payroll services; (c) Deductions and Payroll Taxes; (d) Vacation and Other Time Off; (e) Independent Contractor Compensation; (f) Health Benefits; (g) Employee Insurance Coverage; and (h) the 401(k) Plan (as each term is defined in the Employee Benefits Motion).

84.     As of the Petition Date, the Debtors employ thirty-two (32) salaried Employees. In addition, the Debtors employ three (3) Independent Contractors. The Employees are responsible for the ongoing business operations of the Debtors. I believe that the Employees' skills, knowledge and understanding with respect to the Debtors' operations are essential to the effective reorganization of the Debtors' financial affairs.

85.     I am of the understanding that the majority of the Debtors' Employees and Independent Contractors rely exclusively on their compensation, benefits and reimbursement of

expenses to satisfy their daily living expenses. Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, I believe that Employee morale and loyalty will be jeopardized at a time when Employee support is critical. In the absence of such payments, I believe that the Debtors' Employees may seek alternative employment opportunities, thereby hindering the Debtors' ability to continue their operations. Moreover, it is my opinion that loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be distracting at a time when the Debtors should be focusing on maintaining their operations. Finally, I believe the Independent Contractors provide services that are vital to the success of the Debtors' businesses, and it is essential to pay and honor the Independent Contractor Compensation.

86.     I believe that the relief requested in the Employee Benefits Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Benefits Motion should be approved.

**E.      Debtors' Emergency Motion for an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, (i) Authorizing the Debtors to Pay Certain Prepetition Obligations on Account of Royalties, Overriding Royalty Interests, Working Interest Owner Payments, and Severance Taxes and (ii) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers (the "Royalties Motion")**

87.     In the Royalties Motion, the Debtors are requesting entry of an Order (a) authorizing, but not directing, the Debtors, in their discretion, to pay the Obligations to various Interest Owners and Taxing Authorities, and (b) authorizing the Debtors' banks to honor and process related checks and electronic transfers.

88.     The Debtors are seeking to pay certain Obligations arising from the production of oil and gas from their Leases, including Royalties, proceeds attributable to Overriding Royalty Interests, Working Interest Owner Payments, and Severance Taxes. On or about the twenty-fifth (25th) day of each month, the Debtors remit the Oil Payments related to the production of oil during the previous month. The Debtors also remit the Gas Payments related to the production of gas and the Severance Taxes related to the production of oil and gas one month in arrears.

89.     As of the Petition Date, the Debtors have not yet remitted the Oil Payments for January 2015 or the Gas Payments or Severance Taxes for December 2014. In addition, the Debtors are unable to determine the precise amount of the Gas Payments and Severance Taxes due for January 2015. The Debtors are also unable to determine the precise amounts owed for the Oil Payments, the Gas Payments, and the Severance Taxes for February 2015. Such Obligations remain accrued but unpaid liabilities of the Debtors and their estates. Based on historical figures, the Debtors estimate that the unpaid Obligations due to be paid in February 2015 and March 2015 total approximately $933,679.

90.     With respect to wells in which the Debtors are the operator under a joint operating agreement, the Debtors may from time to time require the other Working Interest Owners with interests in such wells to fund their estimated shares of the costs of certain well operations, such as drilling, recompletion, or plugging and abandonment operations. In the event the Debtors require the approval of the other Working Interest Owners to conduct such operations, the Debtors issue an authorization for expenditure (an "AFE") to obtain the other Working Interest Owners' consent to the operations. If the AFE is approved, the Debtors then may issue Cash Calls to require the other Working Interest Owners to advance their share of the estimated costs of the operations. When the Working Interest Owners pay their estimated share of the costs

under a Cash Call, the Debtors reflect the funds as a credit against the Working Interest Owners' share of the expenses of the operations for which the Cash Calls were issued.

91.     Prior to the Petition Date, certain of the Working Interest Owners in the Bateman Lake field provided Cash Call Funds in the approximate amount of $185,000 pursuant to Cash Calls issued by the Debtors for future work to be performed.  The Debtors intend to maintain the Cash Call Funds in a segregated bank account.

92.     I believe that payment of the Obligations is necessary to maintain the Debtors' rights under the Leases and ensure that their operations continue on an uninterrupted basis, as the related revenues represent substantially all of the Debtors' operating income and are at the core of their business.  The payment of these Obligations should take into account and, if appropriate, set off, all such amounts for which the counter-parties of such Obligations have not timely paid certain obligations they may owe the Debtors.  If the Debtors are unable to pay the Obligations as they come due, the Debtors' operations will be severely impacted and production may cease, which would jeopardize the Debtors' efforts to successfully reorganize their affairs.   The Debtors' operations depend, almost entirely, on the Debtors' relationships with the Interest Owners.  If these relationships are harmed, either through the nonpayment of the Obligations as they become due, or through the perceived difficulties of dealing with the Debtors while they are in Chapter 11, the Debtors will encounter controversies with these parties, and incur the unnecessary costs, distractions, and harm to their operations that will be attendant to such controversies.  I believe that the loss or impairment of any of the Leases could deal an irreparable blow to the Debtors' efforts to preserve and maximize the value of their assets, as there is no guarantee that the Debtors would be able to renew or reinstate any of the Leases that are defaulted or terminated or that doing so would come without a significant cost and delay.

93.     Also, it is my understanding that the Debtors' failure to timely pay the Obligations could lead to instances of attempted setoff or recoupment by the Interest Owners, which would create a chaotic and uncertain environment for the Debtors to operate within, at a time when it is critically important that the Debtors' energy and resources remain focused on their chapter 11 efforts.   In addition, to ensure that the Debtors have sufficient liquidity to operate their business and that such liquidity is not negatively impacted by any setoff and recoupment rights of third parties, I believe it is necessary for the Debtors to pay the Obligations when they come due in the ordinary course of business (including following any set off to which the Debtors may be entitled to assert).

94.     I believe that the relief requested in the Royalties Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.   Accordingly, on behalf of the Debtors, I respectfully submit that the Royalties Motion should be approved.

**F.      Debtors' Emergency Motion for an Order Under 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtors to (I) Continue Their Insurance Policies and Bond Obligations and (II) Pay Insurance Premiums, Bond Payments and Financing Payments Thereon (the "Insurance Motion")**

95.     In the Insurance Motion, the Debtors are requesting authority, subject to the terms and conditions of the DIP Facility, to (a) continue to administer the Insurance Programs and renew or obtain new Bonds in the ordinary course of business, (b) pay outstanding prepetition Loan Payments and prepetition amounts due under the Insurance Policies and Bonds, and (c) continue to pay premiums for the Bonds and Loan Payments in the ordinary course of business to the extent they may become due and payable on a post-petition basis according to the terms of the Insurance Policies, related insurance premium financing agreements and Bonds.

96.    In connection with the operation of their businesses, the Debtors maintain various Insurance Policies which the Debtors have obtained through third-party Insurance Providers, including, without limitation coverage for general liability, vessels and offshore liability, hull and machinery liability, directors and officers (D&O) liability, employers liability, workers' compensation liability, automobile insurance, and other coverage as set forth on Exhibit A to the Insurance Motion.  Although, as of the Petition Date, the Debtors do not owe any premiums directly to Insurance Providers under the Insurance Policies, the Debtors have financed the premiums for the majority of their insurance policies through Upstream Brokers.  Specifically, the Debtors have entered into two (2) Premium Finance Agreements with Premium Assignment Corporation ("PAC") to finance premiums on several of the Debtors' Insurance Policies, including their General Liability Policies and their Energy Policies.  The Debtors have also entered into a Premium Financing Agreement with FlatIron Capital to finance premiums on their D&O liability policies.  As of the Petition Date, the Debtors owe approximately $229,499.48 in unpaid monthly payments under their Premium Finance Agreements (the "Loan Agreements").

97.    Each of the Loan Agreements provides that the applicable finance company has, among other things, a security interest in unearned premiums.  Each of the Loan Agreements also grants the applicable finance company an irrevocable power of attorney to cancel the insurance policies financed thereunder in the event that Dune Energy defaults in making the Loan Payments under the applicable Loan Agreements.

98.    Finally, the Debtors maintain several stand-alone insurance policies: two workers' compensation policies, an automobile insurance policy, a personal property insurance policy, and a Maritime Employer's Liability policy.  As of the Petition Date, $4,672 is due on the personal property insurance policy, approximately $25,000 is due on the two workers' compensation

policies and $3,672 is due on the Maritime Employer's Liability Policy.  The monthly premium payment due for the auto insurance policy has been paid.

99.     In the ordinary course of their businesses, the Debtors are required by local, state, and federal law to provide to certain third parties surety Bonds to secure the Debtors' payment or performance of certain Bond Obligations.   The premiums for the Bonds are due at various times throughout the year and expire at various times as reflected in the schedule attached to the Insurance Motion as Exhibit B.   All of the Bonds are issued by IndemCo L.P. in varying amounts.  I am informed that the Debtors are current with respect to all of the premiums due under the Bonds except for their ERISA Compliance bond, and the amount due for such bond is approximately $400.

100.    I believe it is essential to the Debtors' continued operation and reorganization efforts that the Debtors maintain the Insurance Policies and Bonds on an ongoing and uninterrupted basis.  The Insurance Policies provide a comprehensive range of coverage for the Debtors and their properties.  Allowing the Insurance Policies to lapse would expose the Debtors to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.  Moreover, I am informed that the United States Trustee for the Western District of Texas will require maintenance of the Insurance Policies.

101.    Additionally, it is my understanding that the Bonds are required for the Debtors to continue their operations. Failure to provide, maintain and timely replace these surety bonds could jeopardize the Debtors' ability to conduct their operations.   If any of the Bonds are cancelled, the Debtors' operations could be severely affected, endangering the Debtors' ability to maximize the value of their estates.

102.    The amounts the Debtors propose to pay for prepetition periods for the Loan Payments and for the Bonds are small when compared with the need to further the Debtors' rehabilitation efforts and the potential exposure of the Debtors to significant claims absent insurance coverage.  I therefore believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**G.**    **Debtors' Emergency Motion for an Order Under 11 U.S.C. §§ 105(a) and 366 (i) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (ii) Approving Deposit Account as Adequate Assurance of Payment, and (iii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Adequate Assurance of Payment (the "<u>Utilities Motion</u>")**

103.    In the Utilities Motion, the Debtors are seeking entry of an order (a) prohibiting the Utility Companies from altering or discontinuing service on account of unpaid prepetition invoices, (b) approving the Utility Deposit Account as providing the Utility Companies with "adequate assurance of payment" within the meaning of Section 366 of the Bankruptcy Code absent a Request from a Utility Company for additional adequate assurance, and (c) establishing the Procedures for resolving any disputes regarding additional Requests for adequate assurance of payment that cannot be resolved among the Debtors and the Utility Companies.

104.    In the normal conduct of their business operations, the Debtors have relationships with many different Utility Companies for the provision of electric, water, sewer, natural gas, trash removal, telephone, cellular telephone, internet services, and similar Utility Services.  The Utility Companies service the Debtors' corporate offices and other locations.

105.    The Debtors estimate that the average monthly amount owed to the Utility Companies is approximately $15,000.  The Debtors owe certain amounts to Utility Companies as of the Petition Date for prepetition Utility Services.  Due to the timing of the Petition Date in relationship to the Utility Companies' billing cycles, the Debtors are also aware of Utility Services that have been invoiced to the Debtors for which payment is not yet due and Utility Services that have been provided since the end of the last billing cycle but not yet invoiced to the Debtors.

106.    I believe that uninterrupted Utility Services are essential to the continued operations of the Debtors' businesses.  If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  If such disruption occurred, I believe the impact on the Debtors' business and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts.  Thus, it is critical that the Utility Services continue uninterrupted during the Chapter 11 Cases.

107.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

### Conclusion

108.    To minimize any loss of value to their business, the Debtors' immediate objective is to engage in business as usual following the commencement of these Chapter 11 Cases with as minimal interruption to the Debtors' operations as possible.  I believe that if this Court grants the relief requested in the First Day Pleadings, the prospect of achieving these objectives—to the

maximum benefit of the Debtors' estates, creditors and parties in interest—will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing *Declaration of Donald R. Martin, Chief Restructuring Officer of Dune Energy, Inc. and its Subsidiaries, in Support of First Day Pleadings* is true and correct.

Dated: 3/8/15

By: _____
Name: Donald R. Martin
Title: Chief Restructuring Officer
Dune Energy, Inc.