

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: April 09, 2015.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**
_____

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | (CHAPTER 11) |
| | § | |
| DUNE ENERGY, INC. | § | CASE NUMBER 15-10336 |
| DUNE OPERATING COMPANY | § | CASE NUMBER 15-10337 |
| DUNE PROPERTIES, INC. | § | CASE NUMBER 15-10338 |
| | § | |
| DEBTORS. | § | (JOINTLY ADMINISTERED UNDER |
| | § | CASE NUMBER 15-10336 |

**STIPULATION AND FINAL ORDER (1) APPROVING POSTPETITION FINANCING,**
**(2) AUTHORIZING USE OF CASH COLLATERAL,**
**(3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION AND**
**(5) MODIFYING AUTOMATIC STAY**

      **CAME ON FOR CONSIDERATION** on April 2, 2015, the motion (the "Motion")

dated March 9, 2015 of DUNE ENERGY, INC. ("Dune Energy"), DUNE OPERATING

COMPANY ("Dune Operating") and DUNE PROPERTIES, INC. ("Dune Properties" and

collectively with Dune Energy and Dune Operating, the "Debtors" and each a "Debtor"), seeking

715471616

the entry of an interim order (the "Interim Order") and a final order (this "Final Order") pursuant

to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "Bankruptcy Code"), Rules 2002,

4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Local Bankruptcy Rule 4001-2, seeking entry of this Final Order *inter alia*:

      (i)     authorizing the Debtors to obtain postpetition financing pursuant to sections 363 and 364 of the Bankruptcy Code, by entering into a secured, postpetition, debtor-in-possession credit facility on a superpriority and priming basis executed after the entry of the Interim Order (as may be amended, supplemented or otherwise modified from time to time, the "DIP Facility") providing for a multiple-draw, term loan facility in an aggregate principal amount not to exceed $10 million to be utilized for operating costs in accordance with the DIP Budget (as defined below) (the "DIP Loans");

      (ii)    authorizing the Debtors to execute and enter into the DIP Facility, among the Debtors, Bank of Montreal, as agent (the "DIP Agent") and postpetition lender, and those certain lender institutions that are signatories to the DIP Facility (collectively with the DIP Agent, the "DIP Lenders," and all documents, agreements or instruments in connection with the DIP Loans or related thereto, including the DIP Facility, the Interim Order, this Final Order and all other agreements, documents, notes or instruments related to the DIP Loans, the "DIP Loan Documents") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

      (iii)   authorizing the Debtors upon the written consent of the DIP Lenders to enter into certain interest rate protection and hedging arrangements (the "Hedging Arrangements") by and among Dune Energy, the DIP Agent or one or more DIP Lenders (or any of their affiliates) from time to time in accordance with the terms of the DIP Facility;

      (iv)   granting priming liens and superpriority claims to and on behalf of and for the benefit of the DIP Lenders in all DIP Collateral (as defined below) in accordance with the DIP Loan Documents, the Interim Order and this Final Order to secure any and all of the Postpetition Obligations (as defined below);

      (v)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral (as defined below), which liens shall be subject to the priorities set forth herein;

      (vi)   authorizing the Debtors to use the Cash Collateral (as defined below) of (a) Bank of Montreal, as administrative agent (the "First Lien Agent") for the lenders (the

"First Lien Lenders")[1] party to the First Lien Credit Agreement (as defined below) and (b) U.S. Bank National Association, as indenture trustee and collateral agent (the "Second Lien Trustee" and, together with the First Lien Agent, the "Prepetition Agents"), for the benefit of holders of the Floating Rate Senior Secured Notes due 2016 (the "Second Lien Lenders" and, together with the First Lien Lenders, the "Prepetition Lenders"), pursuant to Section 363(c) of the Bankruptcy Code, and providing adequate protection to the (1) First Lien Agent and First Lien Lenders for any diminution in value of their interests in the Prepetition Collateral (as defined below), including Cash Collateral; and (2) Second Lien Trustee and Second Lien Lenders for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral;

(vii)    approving certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Liens, subject to paragraph 33 of this Order;

(viii)    approving the DIP Loans under the DIP Facility;

(ix)    modifying the automatic stay, under section 362 of the Bankruptcy Code, to permit the DIP Lenders to accelerate the repayment of amounts due and to terminate all commitments under the DIP Facility following the DIP Remedies Notice Period (as defined below); and

(x)    limiting the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code.

The Court considered the Motion; the exhibits attached thereto, including the DIP Loan Documents; the Declaration of Donald R. Martin, Chief Restructuring Officer of Dune Energy, Inc. and its Subsidiaries in Support of First Day Pleadings, sworn to on March 10, 2015 (the "Declaration"), the evidence submitted at the interim hearing held on March 10, 2015 (the "Interim Hearing"), the Post-Petition Superpriority Loan Agreement attached as an exhibit to the Interim Order, the representations of counsel and the entire record made at the Preliminary Hearing and granted the Motion on an interim basis.

Due and sufficient notice of the Motion under the circumstances having been given, this Court conducted a final hearing on the Motion (the "Final Hearing"), at which time the Debtors presented the Declaration.  This Court, having considered the Motion, the exhibits attached

---

[1]    As of the Petition Date (as defined below), the First Lien Lenders were Bank of Montreal and CIT Bank.

thereto, including the DIP Loan Documents, having reviewed the Declaration, the evidence adduced by the parties, and the representations of counsel, and upon the entire record made at the Final Hearing, having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code section 503(b)(1); and adequate protection being provided on account of the interests of holders of liens on the property of the estate on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING AND ALL PLEADINGS FILED HEREIN, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    ***Petition Date***.  On March 8, 2015 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly administered under Case No. 15-10336.

B.    ***Jurisdiction and Venue***.  This Court has jurisdiction, pursuant to 28 U.S.C. § 1334, and authority under 28 U.S.C. § 157 and the General Order of Reference to Bankruptcy Judges over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. §§

157(b)(2)(A), (K), (M), and (O).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    ***Debtors in Possession***.  The Debtors are continuing in possession of their property and are operating and managing their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

D.    ***Committee Formation***.  On March 20, 2015, the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.

E.    ***Debtors' Stipulations***.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 33 herein (but subject to the limitations with respect to such rights contained in paragraph 32 of this Order), the Debtors (a) acknowledge, (b) admit and (c) agree not to contest the following: (collectively, paragraphs E(i) and E(ii) hereof shall be referred to herein as the "Debtors' Stipulations"):

(i)    *First Lien Facility*.  The First Lien Agent, the First Lien Lenders and Dune Energy are parties to that certain Amended and Restated Credit Agreement, dated as of December 22, 2011 (as amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "First Lien Credit Agreement").  Pursuant to that certain Amended and Restated Guarantee and Collateral Agreement (the "First Lien Guarantee and Collateral Agreement"), Debtors Dune Operating and Dune Properties (the "Debtor Guarantors") have guaranteed the obligations of Dune Energy pursuant to the First Lien Credit Agreement (the First Lien Credit Agreement, the First Lien Guarantee and Collateral Agreement,

and any collateral and ancillary documents executed in connection therewith, collectively, the "First Lien Loan Documents").

(ii)    *First Lien Obligations*.  As of the Petition Date, the outstanding amount under the First Lien Credit Agreement was not less than $40,197,480.60, consisting of $38,000,000.00 of principal indebtedness, $187,397.26 of interest, $2 million of letters of credit, and $10,083.34 of letter of credit fees, plus fees, costs and other amounts due and owing pursuant to the Debtors' obligations under the First Lien Loan Documents, (together with any additional amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the First Lien Loan Documents, including, without limitation, accrued and unpaid interest (including at applicable default rates), any fees, expenses and disbursements (including, without limitation, attorneys' and other professionals' fees, related expenses and disbursements), reimbursement obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations pursuant to the First Lien Loan Documents relating solely to the loans provided thereunder (the "First Lien Obligations").

F.    *Prepetition Collateral*.

(i)    *Second Lien Notes*.  The Second Lien Trustee, Dune Energy, as issuer, and the Debtor Guarantors, as subordinated secondary guarantors, are parties to that certain Indenture, dated as of December 22, 2011 (as amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "Second Lien Indenture") and that certain Collateral Agreement, dated as of December 22, 2011, made by the Debtors in favor of the Second Lien Trustee (together with the Second Lien Indenture and any collateral and

ancillary documents executed in connection therewith, the "Second Lien Loan Documents," and collectively with the First Lien Loan Documents, the "Prepetition Loan Documents").

      (ii)    *Second Lien Obligations*. The Debtors issued notes (the "Second Lien Notes") in the aggregate principal amount of $67.8 million pursuant to the Second Lien Loan Documents. The outstanding principal amount under the Second Lien Notes, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Second Lien Loan Documents, including, without limitation, accrued and unpaid interest (including at applicable default rates), any fees, expenses and disbursements (including, without limitation, attorneys' and other professionals' fees, related expenses and disbursements), reimbursement obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations pursuant to the Second Lien Loan Documents relating solely to the loans provided thereunder, are referred to herein as the "Second Lien Obligations," and together with the First Lien Obligations, the "Prepetition Obligations").

      (iii)    *First Lien Collateral*.[2] To secure the First Lien Obligations, the First Lien Loan Documents provide that each of the Debtors granted to the First Lien Agent first-priority liens and security interests (the "First Liens") for the benefit of the First Lien Agent and the First Lien Lenders, in, to and against substantially all of their respective assets (the "First Lien Collateral"), including, without limitation, interests in various debt securities that have been issued to the Debtors, along with proceeds thereof. The First Liens were granted pursuant to and are evidenced and perfected by, among others, those mortgage and security documents listed on Schedule 1 attached hereto.

---

[2]     The findings in paragraphs F(iii), F(iv), F(vi), and F(vii) are without prejudice to the rights of parties in interest as set forth in paragraph 33 of this Order (but subject to the limitations with respect to such rights contained in paragraph 32 of this Order).

(iv) *Second Lien Collateral*. To secure the Second Lien Obligations, the Second Lien Loan Documents provide that each of the Debtors and by guarantees granted by the Debtor Guarantors (the "Second Lien Guarantees") to the Second Lien Trustee liens and security interests (the "Second Liens") for the benefit of the Second Lien Trustee and the Second Lien Lenders, in, to and against substantially all of the Debtors' respective assets (the "Second Lien Collateral," and together with the First Lien Collateral, the "Prepetition Collateral"). The Second Liens were granted pursuant to and are evidenced by, among others, those mortgage and security documents listed on Schedule 2 attached hereto.[3]

(v) *Priority of the First Liens and Second Liens; Intercreditor Agreement*. Pursuant to that certain Intercreditor Agreement, dated as of December 22, 2011, by and among the Debtors, the First Lien Agent and the Second Lien Trustee (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Intercreditor Agreement"), governing the respective rights, obligations and priorities of the First Lien Agent (on behalf of itself and the First Lien Lenders) and the Second Lien Trustee (on behalf of itself and the Second Lien Lenders) with respect to their respective interests in the Prepetition Collateral, the First Liens are senior in priority to any Second Liens on all Prepetition Collateral, and the Second Lien Trustee and the Second Lien Lenders shall not seek or request any form of adequate protection or any other relief in connection with the DIP Facility other than the adequate protection provided under this Final Order.

(vi) *Validity of Prepetition Liens, Claims and Obligations*. (a) The First Liens are valid, binding, enforceable, non-avoidable and properly perfected; (b) the First Liens have

---

[3]     All defined terms used in the description of Prepetition Collateral herein shall have the meanings ascribed thereto in the First Lien Loan Documents, the Second Lien Loan Documents, and the Intercreditor Agreement (as defined below).  All terms not specifically defined in the First Lien Loan Documents, Second Lien Loan Documents, or the Intercreditor Agreement shall have the meanings assigned to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

priority over any and all other liens on Prepetition Collateral, subject only to certain liens that were valid, non-avoidable and senior in priority to the First Liens as of the Petition Date and are Permitted Liens (as defined in paragraph 7 hereof)[4]; (c) the First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the First Liens or the First Lien Obligations exist, and no portion of the First Liens or the First Lien Obligations is subject to any challenge or defense, including, without limitation, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the First Lien Agent, the First Lien Lenders, and/or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the First Lien Loan Documents; and (f) the Debtors have waived, discharged and released any right they may have to challenge any of the First Lien Obligations and the security for these obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the First Lien Agent and the First Lien Lenders, and/or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees.

---

[4]     Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Liens are valid, senior, perfected and non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the DIP Agent, the DIP Lenders, the First Lien Agent, the Second Lien Trustee, the First Lien Lenders, the Second Lien Lenders and the Committee to challenge the validity, priority, perfection or extent of any such Senior Prior Lien and/or security interest.

(vii)  *Cash Collateral*.  The Debtors represent that substantially all of the Debtors' cash, including the cash in their deposit accounts that are subject to Prepetition Liens, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, and all other "cash collateral," wherever located, as such term is defined in 11 U.S.C. § 363(a) (the "Cash Collateral"), constitutes Prepetition Collateral of the First Lien Agent and the First Lien Lenders; *provided, however*, that funds held in revenue accounts, to the extent held by the Debtors solely for the benefit of royalty interest owners (collectively, the "Royalty Interest Owners")[5] in BBVA Compass Acct. No. [XXXXX599] (or such other revenue account that the Debtors designate for funds solely for the benefit of royalty interest owners, the "Third Party Revenue Account"), as well as funds paid or due to be paid to the Debtors and properly segregated into the Third Party Revenue Account, for the ratable benefit of the Royalty Interest Owners, do not constitute the Cash Collateral.  Other funds also are held in or will be segregated into the Third Party Revenue Accounts for the benefit of working interest and overriding royalty interest owners, although nothing contained in this Order shall be deemed to constitute a finding or determination as to the rights of any of the Debtors' estates, the First Lien Agent, the Second Lien Trustee or any other party in interest with respect to such funds or interests therein. Additionally, Shoreline Southeast, LLC ("Shoreline") asserts rights, liens, claims, and encumbrances, including recoupment and setoff, on or to the Cash Collateral that constitute the proceeds of production attributable to oil and gas and/or mineral leases operated by Shoreline. Nothing in this Final Order shall determine the extent or priority of any right, lien, claim or encumbrance, if any, of Shoreline on or to the Cash Collateral and the designation herein of items as Cash Collateral is without prejudice to Shoreline as set forth above.

---

[5]   The term Royalty Interest Owners does not include overriding royalty interest owners and/or working interest owners.

(viii)    *Defaults by the Debtors*.  The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the First Lien Loan Documents.

G.    ***Findings Regarding the Postpetition Financing***.

(i)    *Need for Postpetition Financing and Use of Cash Collateral*.    The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates.    The ability of the Debtors to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise finance their operations requires the availability of capital from the DIP Facility and the use of Cash Collateral, the absence of any of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and the possibility for a successful reorganization.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(ii)    *No Credit Available on More Favorable Terms*.    Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain adequate financing from sources other than the DIP Lenders or on terms more favorable than the DIP Facility.  The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain adequate credit:  (a) having priority over that of administrative expenses of the kind specified in sections 503(b) and 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a

lien. Adequate financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired tangible and intangible property with the priorities set forth in paragraph 8 hereof, (2) superpriority claims and liens, and (3) the other protections set forth in this Final Order.

(iii)     *Priming of the Prepetition Liens.*  The priming of the First Liens, Second Liens, and all other liens (other than Permitted Liens) on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and stakeholders.  However, the First Lien Agent and the First Lien Lenders, with respect to the First Lien Obligations, and the Second Lien Trustee and the Second Lien Lenders, with respect to the Second Lien Obligations, are entitled to receive adequate protection in the form set forth in this Final Order pursuant to sections 361, 363 and 364 of the Bankruptcy Code, for any diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale or lease of such collateral, the imposition of the automatic stay, the priming of the First Liens and the Second Liens on the Prepetition Collateral, and the subordination to the Carve-Out Amount (as defined below) (collectively, the "Diminution in Value").

(iv)     *Use of Proceeds of the DIP Facility.*  As a condition to the entry into the DIP Loan Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the DIP Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents and

in accordance with the budgets prepared by the Debtors in accordance with the terms of the DIP Loan Documents (as the same may be modified from time to time with the written consent of the DIP Lenders and consistent with the terms of the DIP Loan Documents, and subject to such variances as are permitted therein, collectively, the "DIP Budget"), solely (a) to finance working capital and general corporate purposes and capital expenditures specified in the DIP Budget; (b) to pay the fees and expenses of the First Lien Agent and First Lien Lenders incurred prior to the Petition Date as set forth herein; and (c) to pay the fees, costs and expenses incurred by the Debtors in connection with the DIP Credit Agreement and the Chapter 11 Cases.

(v)  *Adequate Protection*.  The First Lien Agent, for the benefit of itself and the First Lien Lenders, and the Second Lien Trustee, for the benefit of itself and the Second Lien Lenders, are each entitled to receive adequate protection to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, as adequate protection, the First Lien Agent, for the benefit of itself and the First Lien Lenders, will receive adequate protection liens and superpriority claims, as more fully set forth in paragraphs 14 and 15 herein.  Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, as adequate protection, the Second Lien Trustee, for the benefit of itself and the Second Lien Lenders, will receive adequate protection liens, as more fully set forth in paragraph 14 herein.

(vi)  *Sections 506(c) and 552(b)*.  In light of, among other things, (a) the DIP Agent's and DIP Lenders' agreement to subordinate their liens and superpriority claims to the current payment of administrative expenses of the Debtors' estates in accordance with the DIP Budget and the DIP Loan Documents and the Carve-Out Amount and (b) the First Lien Agent's

13

and the First Lien Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out Amount and the DIP Liens, (1) the First Lien Agent and the First Lien Lenders are each entitled to a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (2) the DIP Agent, the DIP Lenders, the First Lien Agent and the First Lien Lenders are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the DIP Agent or the DIP Lenders that section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to section 364 of the Bankruptcy Code).

      H.    ***Willingness to Provide Financing***.

      (i)    *Good Faith of the DIP Agent and the DIP Lenders*.  The DIP Lenders have indicated a willingness to provide financing to the Debtors pursuant to the DIP Loan Documents subject to:  (a) the entry of the Interim Order and this Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are extending credit to the Debtors pursuant to the DIP Loan Documents in good faith, and that the DIP Agent's and the DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Final Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order or any other order.

      (ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the DIP Loan Documents, and the fees to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances,

reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility, the DIP Loan Documents and the authorized use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders. Use of Cash Collateral and credit to be extended under the DIP Facility and the DIP Loan Documents shall be deemed to have been allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order, and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order or any other order.

I.    *Notice*. Notice of the Final Hearing and the relief requested in the Motion has been provided by United States mail, first-class postage prepaid, and electronic mail or facsimile to: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this court; (c) counsel for the Committee, if any; (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The parties have made reasonable efforts to afford the best notice possible under the circumstances, and such notice is good and sufficient to permit the relief set forth in this Final Order.

Based upon the foregoing findings, stipulations and conclusions, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    <u>DIP Motion Approved</u>. The Motion is approved on the terms and conditions set forth in this Final Order. This Final Order shall become effective immediately upon its entry.

To the extent any provisions in this Final Order conflict with any provisions of any DIP Loan Documents, the provisions of this Final Order shall control and govern to the extent of such conflict.

2.      Objections Overruled.  All objections to the relief requested in the Motion and entry of this Final Order to the extent not withdrawn or resolved are hereby overruled.

3.      Ratification of Interim Order and Authorization of the DIP Loan Documents.  The terms of the Interim Order are hereby ratified and confirmed, except to the extent amended or modified by this Final Order, and all borrowings and payments made thereunder shall be deemed made in accordance with and pursuant to this Final Order.  The terms and conditions of the DIP Facility and the DIP Loan Documents are hereby approved.  To the extent requested by the DIP Agent, the Debtors are hereby authorized to enter into and deliver such additional or modified documents, instruments, notes and agreements that are consistent with the terms of this Final Order (and consistent with paragraph 17 herein) as may be reasonably required by the DIP Agent to implement the terms or effectuate the purposes of this Final Order. Donald R. Martin, Chief Restructuring Officer of the Debtors, is authorized, on behalf of each of them, to execute the DIP Loan Documents and any additional or modified documents, instruments, notes and agreements that are consistent with the terms of this Final Order as may be reasonably required by the DIP Agent or otherwise deemed necessary by the Debtors to implement the terms or effectuate the purposes of this Final Order. Dune Energy is hereby authorized to borrow money under the DIP Facility, in accordance with the terms of this Final Order.  Upon execution and delivery of any such DIP Loan Documents by Dune Energy, this Final Order shall be deemed to incorporate such DIP Loan Documents by reference as part of this Final Order, and such DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against

each Debtor party thereto (and its respective estate, successor and assigns) in accordance with the terms thereof. The DIP Agent may impose a reserve against the Commitment (as defined in the DIP Credit Agreement) in the amount of the Carve-Out Amount (as defined in paragraph 31 below) as calculated from time to time by the DIP Agent with written notice to the Debtors. To the extent there are any conflicts or inconsistencies between the terms of this Order and any DIP Loan Document, the terms of this Final Order shall control and govern.

4.    <u>Authorization to Borrow</u>.    Subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, DIP Facility, and this Final Order, and in order to prevent immediate and irreparable harm to the Debtors' estates, Debtors are hereby authorized to borrow the amounts described in paragraph 10 herein and are hereby authorized to enter into any Hedging Arrangements with the written consent of the DIP Lenders (collectively, the "<u>DIP Financing</u>"). Any payments to be made under any order (including any "first day" orders) shall be made subject to the DIP Budget.

5.    <u>DIP Obligations</u>. The DIP Loan Documents and this Final Order shall constitute and evidence the valid and binding effect of the DIP Obligations (defined below) on the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation any trustee appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>"). Upon entry of this Final Order, the "<u>DIP Obligations</u>" will include and mean all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the Debtors to the DIP Agent or any of the DIP Lenders, under the respective DIP Loan Documents, the Interim Order or this Final Order, including, without

17

limitation, all principal, accrued interest, costs, fees, expenses and other amounts under the respective DIP Loan Documents.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease, on the Termination Date (defined below), except as provided in paragraph 11 and paragraph 31 herein.

6. <u>DIP Liens and DIP Collateral</u>.  In order to secure the DIP Obligations, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent is hereby granted, for the benefit of itself and the DIP Lenders, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (the "<u>DIP Liens</u>") on all now owned or hereafter acquired tangible and intangible property of the Debtors and the Debtors' estates in these Chapter 11 Cases, including, without limitation, all inventory, accounts receivable, general intangibles, Hydrocarbon Interests (as defined in the Post-Petition Superpriority Loan Agreement to be entered into as part of the DIP Loan Documents among Dune Energy, the DIP Agent and the DIP Lenders (the "<u>DIP Credit Agreement</u>"), Hydrocarbons (as defined in the DIP Credit Agreement), mineral rights, as-extracted collateral, royalty interests, chattel paper, owned real estate, real and personal property leaseholds, fixtures and machinery and equipment, deposit accounts, Cash Collateral, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements, other intellectual property, capital stock of direct subsidiaries of the Debtors, the proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code to recover any postpetition transfer of collateral, the Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof and the proceeds of any of the Debtors' D&O insurance policies; <u>provided</u>, <u>however</u>, that nothing herein shall limit the rights or claims of the First Lien Agent or the First Lien Lenders with respect to such policies (collectively, the "<u>DIP Collateral</u>");

18

provided, further, that the DIP Collateral does not include avoidance actions under Chapter 5 of the Bankruptcy Code and their proceeds (except those arising under section 549 of the Bankruptcy Code).

7. <u>DIP Lien Priority</u>. The DIP Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral, provided however, that the DIP Liens shall be subject to valid perfected and non-avoidable liens in existence as of the Petition Date that are senior to the liens securing the First Lien obligations or to valid and non-avoidable liens in existence as of the Petition Date that are senior to the liens securing the First Lien Obligations that are subsequently perfected as permitted by Section 546(b) of the Bankruptcy Code (the "<u>Permitted Liens</u>") and the Carve-Out Amount. Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8. <u>DIP Superpriority Claims</u>. The DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim against each of the Debtors in the Chapter 11 Cases and any Successor Cases (collectively, the "<u>Superpriority Claim</u>") for all DIP Obligations. The

Superpriority Claim shall be subordinate only to the DIP Liens, Permitted Liens, and the Carve-Out Amount. The Superpriority Claim (a) shall otherwise have priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law. The Debtors (nor any trustee or examiner) shall not obtain credit or incur any indebtedness in these Chapter 11 Cases or any Successor Case that is (i) secured by a security, mortgage, collateral interest or lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens or (ii) entitled to priority administrative status that is equal to or senior to the DIP Superpriority Claim; *provided*, *however*, that nothing herein shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of the Prepetition Obligations and all of the post-petition indebtedness incurred under the DIP Loan Documents must be indefeasibly paid in full, in cash from the proceeds of such credit or indebtedness.

9.     No Obligation to Extend Credit. The DIP Agent and DIP Lenders shall have no obligation to make any loan or advance under the DIP Loan Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents

and this Final Order have been satisfied in full or waived by the Required DIP Lenders in their

sole discretion.

10.    Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtors shall

use advances of credit under the DIP Facility only for the purposes specifically set forth in this

Final Order, the DIP Loan Documents and, subject to permitted variances, in compliance with

the DIP Budget, a copy of which is attached to this Final Order as Exhibit A.

a.  Upon the date that all of the conditions precedent contained in the
DIP Loan Documents to the initial availability of the DIP Facility
were satisfied, up to $3 million under the DIP Facility was made
available for uses consistent with and in accordance with the DIP
Budget (including amounts required to be paid with respect to the
DIP Facility, including an amount necessary to pay the reasonable
out-of-pocket outstanding fees and expenses (including fees and
expenses of their professionals) of the First Lien Agent, the DIP
Agent and the DIP Lenders, which payment of fees and expenses
the Debtors are hereby authorized to make.

b.  The remaining amounts under the DIP Facility will be made
available for uses consistent with and in accordance with the DIP
Budget and the terms and conditions of the DIP Facility.

11.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this

Final Order, the DIP Facility and the DIP Loan Documents and in accordance with the DIP

Budget, the Debtors are authorized to use Cash Collateral until the Termination Date (as defined

below).  Following the occurrence of a Termination Date, the Debtors shall no longer be

authorized to use Cash Collateral (subject to the Debtors' and the Committee's right to seek an

emergency hearing with the Court for the sole purpose of contesting whether an Event of Default

has occurred).  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Final Order, the DIP Facility, the DIP Loan Documents, and, subject to permitted variances, in accordance with the DIP Budget.

12.     <u>Reporting Requirement</u>.  The Debtors shall provide the DIP Agent and/or its authorized representative with "view-only" electronic access for each of the Debtors' bank accounts.

13.     <u>Adequate Protection Liens</u>.

a.     *First Lien Adequate Protection Liens*.  Pursuant to section 361, 363(e) and 364(d) of the Bankruptcy Code, with respect to any outstanding First Lien Obligations, as adequate protection of the interests of the First Lien Agent and First Lien Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the First Lien Agent, for the benefit of itself and the First Lien Lenders, continuing valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (the "<u>First Lien Adequate Protection Liens</u>").

b.     *Second Lien Adequate Protection Liens*.  Pursuant to section 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Second Lien Trustee and Second Lien Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Second Lien Trustee, for the benefit of itself and the Second Lien Lenders, continuing valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Second Lien Adequate Protection Liens</u>," and together with the First Lien Adequate Protection Liens, the "<u>Adequate Protection Liens</u>").

c. *Priority of Adequate Protection Liens.*

1)      The First Lien Adequate Protection Liens shall be junior only to:  (A) the Carve-Out Amount; (B) the DIP Liens; and (C) the Permitted Liens.  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

2)      Subject to Paragraph 50 below, the Second Lien Adequate Protection Liens shall be junior only to:  (A) the Carve-Out Amount; (B) the DIP Liens; (C) the Permitted Liens; (D) the First Liens; and (E) the First Lien Adequate Protection Liens.  The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

3)      Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, or upon the dismissal of the Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the First Liens, Second Liens or the Adequate Protection Liens.

14.      <u>Adequate Protection Superpriority Claims</u>.  As further adequate protection of the interests of the First Lien Agent and First Lien Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, to the extent any First Lien Obligations are outstanding, the First Lien Agent and First Lien Lenders are each hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed

23

superpriority administrative expense claim in the Chapter 11 Cases and any Successor Cases (the "Adequate Protection Claim").

15.     <u>Priority of the Adequate Protection Claim</u>.  The Adequate Protection Claim shall be junior to (A) the Carve-Out Amount; and (B) the Superpriority Claim.   The Adequate Protection Claim shall otherwise have priority over all administrative expense claims and unsecured claims against each of the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

16.     <u>Section 507(b) Reservation</u>.    Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the First Lien Agent and the First Lien Lenders is insufficient to compensate for any Diminution in Value of their interests in the First Lien Collateral during the Chapter 11 Cases or any Successor Cases.     To the extent not waived under or otherwise not permitted under the Intercreditor Agreement (because, among other reasons, other than Section 13(b) hereinabove, the First Lien Agent and First Lien Lenders have not consented to additional rights or protections for the Second Lien Agent and Second Lien Lenders, including under Section 507(b)), nothing herein shall impair or modify the application, if any in light of the Intercreditor Agreement, of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Second Lien Agent and the Second Lien Lenders is insufficient to compensate for any Diminution in Value of their interests in the Second Lien Collateral during the Chapter 11 Cases or any Successor Cases.

17.     <u>Amendment of the DIP Loan Documents</u>. The DIP Loan Documents may from time to time be amended, modified or supplemented by the parties thereto upon two (2) business days' advance notice by email to counsel for the Committee and the U.S. Trustee. If: (a) the amendment, modification, or supplement is: (i) not material; (ii) in accordance with the DIP Loan Documents, (iii) beneficial to the Debtors and (iv) not prejudicial in any material respect to the rights of third parties; (b) a copy (which may be provided by fax or email) of the amendment, modification or supplement is provided to counsel for the Committee and the U.S. Trustee; and (c) the amendment, modification or supplement is filed with the Court, the amendment, modification or supplement will be effective without a hearing, and consent of the Committee or the U.S. Trustee, and approval of the Court are not necessary to effectuate any such amendment, modification or supplement. If the amendment, modification or supplement is material, the Committee (and any subsequent trustee of the Debtors' estates) and the U.S. Trustee, shall each have five (5) business days from the date of such notice to object in writing to such amendment, modification or supplement, which objection shall be served on counsel to the Debtors and counsel to the DIP Agent and the First Lien Agent. If the Committee (or any subsequent trustee of the Debtors' estates) or the U.S. Trustee timely objects to any material amendment, modification or supplement to any DIP Loan Document, then such modification or amendment shall only be permitted pursuant to an order of this Court. The Debtors shall reimburse the DIP Agent and DIP Lenders for costs and expenses (including but not limited to attorney fees) related to document preparation with respect to any material modification or amendment to any DIP Loan Documents.

18.     No waiver, modification or amendment of any of the provisions of any DIP Loan Document shall be effective unless set forth in writing, signed on behalf of the Debtors and the

Required DIP Lenders (as defined in the DIP Loan Documents) and, if required pursuant to paragraph 17, approved by the Court on notice.

19.     <u>Budget Maintenance</u>.  The DIP Budget, and any modification to or amendment or update of the DIP Budget, shall be in form and substance acceptable to the Required DIP Lenders, in their sole and absolute discretion; <u>provided</u>, <u>however</u>, that the line item for the Committee's professionals' fees, costs, and expenses shall not be modified without the Committee's consent.  The DIP Budget may be amended or modified in writing from time to time only with the written consent of the Required DIP Lenders, in their sole and absolute discretion, and such amendment or modification shall not require the consent of the Committee (or any subsequent trustee of the Debtors' estates) or the U.S. Trustee or approval of the Court; <u>provided</u>, <u>however</u>, that the line item for the Committee's professionals' fees, costs, and expenses shall not be modified without the Committee's consent.  The Debtors shall update the DIP Budget from time to time (provided that any update shall be in form and substance acceptable to the Required DIP Lenders in their sole and absolute discretion, and shall be only deemed to be amended or modified based on their written consent), in accordance with the DIP Loan Documents.  Any such modification of the DIP Budget, other than regular updates, shall be filed with the Court.

20.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, Superpriority Claim, and the Adequate Protection Claim, and to grant liens thereon as described herein; (b) permit the Debtors to perform such acts as the DIP Agent, the DIP Lenders, the First Lien Agent or the Second Lien Trustee each may request in its

sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders under the DIP Loan Documents, the DIP Facility and this Final Order; and (d) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders to retain and apply, all payments made in accordance with the terms of the Interim Order and this Final Order.

21.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, mortgages or deeds of trust) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Adequate Protection Liens, or to entitle the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and the Prepetition Agents each are authorized to file and obtain, as each deems necessary in its sole discretion, such financing statements, mortgages, notices of liens, control agreements and other security documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and/or the Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, control agreements and other security documents shall be deemed to have been filed or recorded as of the Petition Date; <u>provided</u>, <u>however</u>, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtors are

authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Agents all such financing statements, mortgages, notices, control agreements and other security documents as the DIP Agent and the Prepetition Agents each may reasonably request.  The DIP Agent and the Prepetition Agents, each in its discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

22.    Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in this Case or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full of all DIP Obligations and First Lien Obligations, the satisfaction of the Superpriority Claim, and the termination of the DIP Agent's and DIP Lenders' obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent, to be applied as set forth in the DIP Loan Documents and this Final Order.

23.    Maintenance of DIP Collateral.  Until the indefeasible payment in full of all DIP Obligations and all Prepetition Obligations, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Facilities, as applicable; and (b) maintain the cash management system in

28

effect as of the Petition Date, as modified (i) by any order that may be entered by the Court which has first been agreed to by the Required DIP Lenders or (ii) as otherwise required by the DIP Loan Documents.

24.     Disposition of DIP Collateral.

a.     Except as otherwise provided for in the DIP Loan Documents, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the Required DIP Lenders, and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent, the DIP Lenders, or from any order of this Court.

b.     In the event of any sale, lease or other disposition of any DIP Collateral (a "Collateral Disposition"), the Debtors shall, to the extent required by the DIP Loan Documents, pay, or cause to be paid, to the DIP Agent the proceeds of such Collateral Disposition for application in accordance with the DIP Loan Documents and this Final Order. All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the DIP Loan Documents.

25.     Maturity Date.  Upon the earliest to occur of (such earliest date the "Maturity Date" or the "Termination Date") (a) the date that is 130 days after the Petition Date; (b) the effective date of any plan filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by this Court; (c) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; and (d) the acceleration of the DIP Facility loans and the termination of all remaining commitments of the DIP Lenders thereunder following an Event of Default (as defined therein), subject to the provisions of paragraph 27 of this Order, (i) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, and (ii) all authority to use Cash Collateral shall cease, except as set forth in and in accordance with paragraphs 11 and 31.

29

26.    Events of Default.  The occurrence of an "Event of Default" under the DIP Loan Documents as set forth therein shall constitute an event of default under this Final Order, unless waived in writing by the Required DIP Lenders, as applicable (the "Events of Default").

27.    Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent, upon the direction of the Required DIP Lenders, may declare (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains, (iii) the termination of the DIP Credit Agreement and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and/or (iv) the termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, except as provided in and in accordance with paragraphs 11 and 31 herein (any such declaration, shall be referred to herein as a "DIP Termination Declaration").  The DIP Termination Declaration shall be given by email to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee and filed with the Court. The earliest date any such DIP Termination Declaration is made shall be the Termination Date. Any automatic stay otherwise applicable to the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Lenders is hereby modified so that seven (7) calendar days after the Termination Date (the "DIP Remedies Notice Period"), (A) the DIP Agent, with the consent of the Required DIP Lenders, shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Final Order and shall be permitted to satisfy the Superpriority Claim and all DIP Obligations, subject to the Carve-Out Amount, and (B) to the extent any First Lien Obligations are outstanding, the First Lien Agent (but subject to the rights, remedies and

30

actions taken by the DIP Agent upon the consent of the Required DIP Lenders) shall be entitled

to exercise its rights and remedies to satisfy the First Lien Obligations and the Adequate

Protection Claim, subject to the Carve-Out Amount and the terms of this Final Order; provided,

however, the DIP Agent's and the DIP Lenders' liens, claims and security interests in the DIP

Collateral and the Superpriority Claim, and the Prepetition Agents' and Prepetition Lenders'

liens, claims and security interests in the Prepetition Collateral (including Cash Collateral), and

the Replacement Collateral and the Adequate Protection Claim shall, in each instance, be subject

to the right of payment of the Carve-Out Amount. During the DIP Remedies Notice Period, the

Debtors and/or the Committee shall be entitled to seek an emergency hearing with the Court for

the sole purpose of contesting whether an Event of Default has occurred. Unless the Court

determines during the DIP Remedies Notice Period that an Event of Default has not occurred, the

automatic stay, as to all of the DIP Lenders, shall automatically be terminated at the end of the

DIP Remedies Notice Period without further notice or order. Upon the expiration of the DIP

Remedies Notice Period, (a) the DIP Agent, with the written consent of the Required DIP

Lenders (but subject to the rights, remedies and actions taken by the DIP Agent upon the consent

of the Required DIP Lenders); and (b) the First Lien Agent, upon the later of (i) the expiration of

the Challenge Period (as defined in paragraph 33 below) and (ii) the resolution of any pending

Challenge (as defined in paragraph 33 below) pursuant to a final, non-appealable order, shall be

permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Loan

Documents, the First Lien Credit Agreement and the First Lien Loan Documents respectively,

and as otherwise available at law without any further order of or application or motion to the

Court, and without restriction or restraint by any stay under sections 362 or 105 of the

Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest or any

other rights and remedies granted to any of the DIP Agent, the DIP Lenders, the First Lien Agent and the First Lien Lenders pursuant to the DIP Credit Agreement, the DIP Loan Documents, the First Lien Credit Agreement, the First Lien Loan Documents, or this Final Order.

28.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of This Final Order.  The DIP Agent, DIP Lenders, First Lien Agent, and First Lien Lenders have acted in good faith in connection with this Final Order and their reliance on this Final Order is in good faith.  Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lenders, the First Lien Agent and the First Lien Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

29.     Proofs of Claim.  The DIP Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders will not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case for any claim.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases or any Successor Case to the contrary, The First Lien Agent and the First Lien Lenders are hereby authorized and entitled in their sole

32

discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases or any Successor Case for any claim allowed herein.  Any proof of claim filed by the First Lien Agent shall be deemed to be in addition to and not in lieu of any proof of claim that may be filed by any of the First Lien Lenders.  Notwithstanding anything to the contrary herein, in the event any First Lien Agent files a proof of claim, the First Lien Lenders, may, but are not required to, file proofs of claim.  Any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders.

30.    <u>Rights of Access and Information</u>.  Without limiting the rights of access and information afforded the DIP Agent and DIP Lenders under the DIP Loan Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and the DIP Lenders, the First Lien Agent and First Lien Lenders (to the extent any First Lien Obligations are outstanding), reasonable access to the Debtors' premises and their books and records in accordance with the DIP Loan Documents and First Lien Loan Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  The Debtors shall provide reasonable access and information to and shall cooperate with any third-party reserve engineering firm selected by the DIP Lenders, in a manner consistent with the DIP Loan Documents.  In addition, the Debtors shall authorize their independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the DIP Agent and each DIP Lender all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtors.  All DIP Lenders (and all prospective

lenders who have agreed to keep such information confidential on terms consistent with the First

Lien Credit Agreement or customary market practices) will be provided access by the Debtors to

all information (including, without limitation, via a virtual data room) provided to the DIP

Lenders in connection with the DIP Facility and, on reasonable notice and at all reasonable

times, to the Debtors and their subsidiaries, including, without limitation, their operations, assets

and liabilities, contracts, and commitments, projections and plans, and third-party reports and

analyses, and including access to any data room established by the Debtors and all information

contained therein.  The Committee shall be granted access to a virtual data room containing any

information that the Debtors have provided to the DIP Lenders in connection with the DIP

Facility.

      31.    <u>Carve-Out Amount and Carve-Out Expenses</u>.

      a.    <u>Carve-Out Amount and Carve-Out Expenses</u>.  As used in this Final

Order, the term "<u>Carve-Out Expenses</u>" means (i) those accrued, but unpaid, statutory fees

payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (ii) those accrued, but unpaid,

fees payable to the Clerk of the Court; (iii) the lesser of (A) the amount of the unpaid and

outstanding reasonable fees, costs and expenses actually incurred by the Debtors' professionals

(including ordinary course professionals) and (B) the budgeted and unpaid amount of the fees,

costs and expenses of the Debtors' professionals (including ordinary course professionals) as set

forth in the DIP Budget, in each case ( *e.g*., (i), (ii) and (iii)) for the period from and after the

Petition Date through the Termination Date, minus the amounts of the retainers or any other

unapplied funds held by the Debtors' professionals (including ordinary course professionals) or

any set-offs available to Debtors as of the Termination Date ("<u>Allowed Professional Fees</u>");

provided, that such fees, costs and expenses with respect to Debtors' non-ordinary course

professionals are ultimately allowed by a final order of the Court pursuant to Section 330 of the

Bankruptcy Code within sixty (60) days of the Termination Date; (iv) in an amount not to exceed

$235,000, all employee payroll, benefits, taxes, and employee expenses that have been accrued since the last post-petition funded payroll period through and including the Termination Date and which remain unpaid; (v) all compensation and expense reimbursement for the Debtors' Chief Restructuring Officer that have accrued from and after the Petition Date through and including the Termination Date and remain unpaid and that are allowed by final order pursuant to Section 330 of the Bankruptcy Code not later than sixty (60) days following the Termination Date; (vi) the lesser of (A) the amount of the unpaid and outstanding reasonable fees, costs and expenses actually incurred by the Committee's professionals and (B) the budgeted and unpaid amount of the fees, costs and expenses of the Committee's professionals as set forth in the DIP Budget for the period from and after the Petition Date through the Termination Date, provided, that such fees, costs and expenses with respect to the Committee's professionals are ultimately allowed by a final order of the Court pursuant to Section 330 of the Bankruptcy Code within sixty (60) days of the Termination Date; (vii) any severance taxes and royalty interest payments that have become due and owing as a result of production after the period corresponding to the last receipt of proceeds by Debtors through the Termination Date or effective date of any sale, whichever is earlier and which remain unpaid or unsegregated in the separate royalty and trust accounts; and (viii) in an amount not to exceed $30,000, any and all claims for health care services provided on or before Termination Date pursuant to any of the Debtors' self-funded insurance from the Petition Date through and including the Termination Date and which remain unpaid and have not been separately segregated in the account designated for such payment of such amounts, and the sum of the Carve-Out Expenses is referred to herein as the "Carve-Out Amount." Any payment or reimbursement made on or after the occurrence of a Termination Date in respect of any Allowed Professional Fees (exclusive of the application of any retainers by any of the Professionals) shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis or, if in excess of such amount to which such party should be entitled under the Carve-Out Amount, shall be refunded to the DIP Agent. Any funding of the Carve-Out Expenses may be reserved by

35

the DIP Agent against the Commitment as provided in paragraph 3 above, shall not increase the Commitment and shall be part of the DIP Obligations secured by the DIP Collateral and otherwise entitled to the protections granted under this Final Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.  On the Maturity Date, the Commitment shall be deemed terminated (except in the case of a Maturity Date that occurs under clauses (a) or (d) of paragraph 25 above, in which case the Commitment shall terminate 5 days after the Maturity Date, unless the Bankruptcy Court orders otherwise, or the Required Lenders agree to rescind the related Carve-Out Trigger Notice), and the DIP Lenders shall have no further obligation to provide financing pursuant to the DIP Facility; provided, however, notwithstanding any other provision of this Final Order or the DIP Loan Documents, following an Event of Default or Maturity Date and subject to the limitations on and not to exceed the total amount of the DIP Facility, the DIP Lenders shall only be obligated to advance additional funds to the Debtors under the DIP Facility to fund the Carve-Out Expenses but the obligation to fund such Carve-Out Expenses shall terminate with respect to any Carve-Out Expenses that require Bankruptcy Court approval as provided above and are not approved by a final order of the Bankruptcy Court within sixty (60) days of the Termination Date.

        b.    <u>Funding</u>.  Upon delivery of a Carve-Out Trigger Notice (as defined in the DIP Credit Agreement), the DIP Lenders shall fund, and the Debtors shall deposit in a segregated account, the amount of $500,000 plus the Carve-Out Expenses and (b) if no Carve-Out Trigger Notice has been delivered, upon the earlier of the (i) payment in full, in cash of the DIP Obligations and (ii) the closing of a sale of all or substantially all of the Debtors' assets, the DIP Lenders shall fund, and the Debtors shall deposit in a segregated account in the amount of $100,000 plus the Carve-Out Expenses plus an additional amount to cover accrued but unused and unpaid vacation of employees in an amount not to exceed $60,000.  Amounts on deposit in such segregated account shall be used solely to satisfy the Carve-Out Expenses and expenses that would have constituted Carve-Out Expenses but for the occurrence of the Termination Date

36

("Post-Termination Expenses"), and the balance in that segregated account specified above shall not be available to pay the principal amount of the DIP Facility or to pay any prepetition or other postpetition obligations until such time as the Carve-Out Expenses and the Post-Termination Expenses shall have been paid in full, notwithstanding any purported or asserted lien, claim or right to such balance.

c.      No Direct Obligation to Pay Professional Fees.  Except for funding as part of the DIP Obligations, the DIP Agent and DIP Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals retained by the Debtors (including ordinary course professionals) or by the Committee (collectively referred to herein as "Case Professionals") incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed (i) to obligate the DIP Agent or the DIP Lenders in any way to pay compensation to or to reimburse expenses of any Case Professional; (ii) to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (iii) to increase the Carve-Out Amount if actual Allowed Professional Fees incurred after occurrence of a Termination Date exceeds the Carve-Out Amount; (iv) as consent to the allowance of any professional fees or expenses of any Case Professionals; or (v) to affect the right of the Prepetition Agents, Prepetition Lenders, DIP Agent or DIP Lenders to object to the allowance and payment of such fees and expenses.

d.      No Waiver.  Nothing herein shall constitute a waiver by the First Lien Agent, the First Lien Lenders the DIP Agent or the DIP Lenders of their rights to object to the fees and expenses of any professional retained by the Debtors or the Committee appointed in the Chapter 11 Cases, all such rights being specifically reserved.

32.      Limitations on the DIP Facility, the DIP Collateral, Cash Collateral and the Carve-Out Amount.  The DIP Facility, the DIP Collateral, Cash Collateral and the Carve-Out Amount may not be used in connection with:  (a) preventing, hindering, or delaying any of the

37

DIP Agent's, the DIP Lenders', the First Lien Agent's or the First Lien Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the Required DIP Lenders; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the Required DIP Lenders; (d) paying D&O insurance policy premiums without the prior consent of the Required DIP Lenders; (e) incurring any indebtedness that is not provided for in the DIP Budget without the prior consent of the Required DIP Lenders, except to the extent permitted under the DIP Loan Documents; (f) objecting or challenging in any way any claims, liens, DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral (including Cash Collateral), held by or on behalf of any of the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Trustee, and the Second Lien Lenders, respectively; (g) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) prosecuting an objection to, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the First Lien Obligations, the First Liens, or any other rights or interests of any of the DIP Agent, the DIP Lenders, the First Lien Agent, or the First Lien Lenders; or (i) taking any action which is contrary, in a manner that is material and adverse to the DIP Agent, the DIP Lenders, the First Lien Agent and/or the First Lien Lenders, to any term or condition set forth in the DIP Loan Documents or this Final Order.

33.     <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.
Nothing in this Final Order or the DIP Loan Documents shall prejudice the rights of the
Committee, or any other party in interest granted standing by the Court (other than the Debtors
and/or their successors), to seek, solely in accordance with the provisions of this paragraph 33, to
initiate an adversary proceeding or contested matter asserting  to challenge the amount, validity,
enforceability, perfection or priority of the First Lien Obligations or the First Liens or to
otherwise assert any claims or causes of action against the First Lien Agent or First Lien Lenders
(a "<u>Challenge</u>").   For the avoidance of doubt, the Committee shall have standing to initiate a
Challenge.   Any Challenge must be asserted no later than:  (a) if by the Committee, sixty (60)
days after April 2, 2015; and (b) if by any other party in interest (if granted standing), seventy-
five (75) days after the entry of the Interim Order (the "<u>Challenge Period</u>").  The Challenge
Period shall not be extended without the written consent of the Required Lenders (as that term is
defined in the First Lien Credit Agreement) as constituted immediately prior to the Petition Date.
Only those parties in interest (including, without limitation, the Committee) that have properly
initiated a Challenge challenging the First Lien Obligations, the First Liens, or any liability of the
First Lien Agent or the First Lien Lenders prior to the expiration of the Challenge Period shall be
permitted to participate in the prosecution of such Challenge.  As to (i) any parties in interest,
including the Committee, who fail to file a Challenge within the Challenge Period, or, if any
such Challenge is filed and overruled or (ii) any and all matters that are not expressly the subject
of a timely Challenge:  (A) any and all such Challenges by any party (including, without
limitation, the Committee, any chapter 11 trustee, and/or any examiner or other estate
representative appointed in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or
other estate representative appointed in any Successor Case), shall be deemed to be forever

waived and barred, (B) all unchallenged matters, findings, Debtors' Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to the First Lien Agent's and each First Lien Lender's claims, liens, and interests shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estate and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any Successor Cases, and (C) any and all claims or causes of action against the Prepetition Agents, First Lien Lender and/or Second Lien Lender relating in any way to the Debtors shall be released by the Debtors' estates, all creditors, interest holders and other parties in interest in this Case and any Successor Cases. The Challenge procedures provided for herein, however, shall not apply to any action by the holders of statutory liens to seek a determination from the Court regarding the validity or priority of the liens of the holders of statutory liens vis-à-vis the liens of the DIP Lenders and the Prepetition Lenders. For the avoidance of doubt, the Committee has standing to initiate an adversary proceeding or contested matter asserting to challenge the amount, validity, enforceability, perfection or priority of the Second Lien Obligations or the Second Liens or to otherwise assert any claims or causes of action against the Second Lien Trustee or Second Lien Lenders (a "Second Lien Challenge"). No deadline exists by which the Committee must bring a Second Lien Challenge.

34. No Third-Party Rights. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

35. Plan; Discharge. In no event shall any plan of reorganization be allowed to alter the terms of repayment that are set forth in the DIP Loan Documents. Nor shall any postpetition indebtedness incurred by virtue of the DIP Loan Documents be discharged upon entry of an

40

order confirming a plan of reorganization pursuant to 11 U.S.C. § 1141(d), except upon the written consent of the DIP Agent and the DIP Lenders.

36. <u>No DIP Lender Control</u>. By consenting to this Final Order and thereafter acting in reliance on it, no DIP Lender shall be deemed to be in control of any Debtor or its operations or to be acting as a "responsible person," "managing agent" or "owner or operator" with respect to the operation or management of the Debtors.

37. <u>Section 506(c) Claims</u>. No costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agent, DIP Lenders, First Lien Agent or First Lien Lenders, or any of their respective claims, the DIP Collateral, or the First Lien Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent, DIP Lenders, First Lien Agent and/or First Lien Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

38. <u>No Marshaling/Applications of Proceeds</u>. The DIP Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the First Lien Collateral, as the case may be, and proceeds shall be received and applied pursuant to the DIP Loan Documents and this Final Order; provided, however, that proceeds of DIP Collateral or other funds received from the Debtors must be applied to the DIP Obligations prior to the First Lien Obligations.

39. <u>Section 552(b)</u>. The First Lien Agent and First Lien Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to

any of the First Lien Agent or First Lien Lenders with respect to proceeds, product, offspring or profits of any of the First Lien Collateral.

40.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver, expressly or implicitly, of the rights of the DIP Agent and the DIP Lenders:  (a) to seek any other or supplemental relief in respect of the Debtors, (b) to request modification of the automatic stay of section 362 of the Bankruptcy Code, (c) to request dismissal of the Chapter 11 Cases or Successor Cases, conversion of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (d) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, or (e) to submit a credit bid in respect of any sale of their respective collateral, whether pursuant to a plan or otherwise.

41.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders to seek relief or otherwise exercise their rights and remedies under this Final Order, the DIP Loan Documents, the First Lien Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, the First Lien Agent and/or the First Lien Lenders.

42.     <u>Binding Effect of Final Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents, the First Lien Lenders, the Second Lien Lenders, all other creditors of the Debtors, the Committee or any other committee appointed under 11 U.S.C. section 1102, including, without limitation, any committee of equity holders, appointed in the Chapter 11 Cases, and all other parties in interest and their

respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Cases, or upon dismissal of the Chapter 11 Cases or Successor Cases.

43.    <u>No Modification of Final Order</u>.  Until and unless the DIP Obligations and the First Lien Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the Required DIP Lenders, (i) any modification, stay, vacatur or amendment to this Final Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases or Successor Cases, equal or superior to the Superpriority Claims or the Adequate Protection Claims, other than the Carve-Out Amount; (b) without prior written consent of the Required DIP Lenders, any order allowing use of Cash Collateral resulting from DIP Collateral or Prepetition Collateral; or (c) without the prior written consent of the Required DIP Lenders, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Loan Documents.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Final Order without the prior written consent, as provided in the foregoing, of the Required DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lenders or First Lien Lenders.

44.     <u>Continuing Effect of Intercreditor Agreement</u>.  The parties to the Intercreditor Agreement shall each continue to be bound by the provisions and restrictions of the Intercreditor Agreement.  Nothing herein eliminates any rights afforded the Second Lien Agent and the Second Lien Lenders under the Intercreditor Agreement; provided however, notwithstanding any provision of the Intercreditor Agreement, the receipt and application of proceeds of collateral in accordance with the DIP Loan Documents (including in regards to the Carve-Out Amount and the other protections afforded the DIP Lien Agent, the DIP Lenders, the First Lien Agent, and the First Lien Lenders) shall be binding on the parties to the Intercreditor Agreement.

45.     <u>Final Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or the Intercreditor Agreement and of this Final Order, the provisions of this Final Order shall govern and control.

46.     <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders granted pursuant to this Final Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until:  (i) in respect of the DIP Facility, all the DIP Obligations, including, without limitation, the Superpriority Claim, pursuant

to the DIP Loan Documents and this Final Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; (ii) in respect of the First Lien Facility, all of the First Lien Obligations pursuant to the First Lien Loan Documents and this Final Order, including, without limitation, the Adequate Protection Claim, have been indefeasibly paid in full in cash; (iii) in respect of the Second Lien Facility, all of the Second Lien Obligations pursuant to the Second Lien Loan Documents and this Final Order have been indefeasibly paid in full in cash; and (iv) in respect of the Carve-Out Amount, all Carve-Out Expenses have been indefeasibly paid in full in cash pursuant to the terms of this Final Order. The terms and provisions concerning the indemnification of the DIP Agent and DIP Lenders contained in the DIP Loan Documents shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Loan Documents and DIP Facility and/or the indefeasible repayment of the DIP Obligations. In addition, the terms and provisions of this Final Order shall continue in full force and effect for the benefit of the Prepetition Agents and Prepetition Lenders notwithstanding the repayment in full of or termination of the Prepetition Obligations.

47. *Nunc Pro Tunc* Effect of this Final Order. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

48. Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

49.    <u>Interpretation; Effectiveness</u>. To the extent that any of the provisions of this Final Order shall conflict with any of the provisions of the First Lien Loan Documents, including without limitation the documents listed on Schedule 1 hereto, or the Second Lien Loan Documents, including without limitation the documents listed on Schedule 2 hereto, this Final Order is deemed to control and shall supersede the conflicting provision(s) in said agreement(s). To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.

50.    <u>Adequate Protection of Junior Liens</u>. Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of a holder of a Junior Lien[6] in the Prepetition Collateral against any decrease in the value of such holder's interest in the Prepetition Collateral, the Debtors hereby grant to the holder of a Junior Lien continuing valid, binding, enforceable and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (the "<u>Junior Lien Adequate Protection Liens</u>").  To the extent a Junior Lien is senior in priority to the Second Liens, the Junior Lien Adequate Protection Lien granted to the holder of such Junior Lien shall be senior in priority to the Second Liens and the Second Lien Adequate Protection Liens; provided however, the Junior Lien Adequate Protection Liens shall be junior in priority to (a) the Carve-Out Amount, (b) the DIP Liens, (c) the Permitted Liens, (d) the First Liens, and (e) the First Lien Adequate Protection Liens.  To the extent a Junior Lien is junior in priority to the Second Liens, the Junior Lien Adequate Protection Lien granted to the holder of such Junior Lien shall be junior in priority to (x) the Second Liens, and (y) the Second Lien Adequate Protection Liens.

---

[6] "<u>Junior Lien</u>" means a valid, non-avoidable, and perfected lien (or that is subsequently perfected as permitted by Section 546(b) of the Bankruptcy Code) in existence as of the Petition Date that is junior in priority to the First Liens or the Second Liens.

51.     Nothing in this Final Order shall impair, prime, or impact the liens, claims, rights, interests, and/or contracts of Shoreline and U.S. Specialty Insurance Company ("USSIC"), if any, to the extent such liens, claims, rights, interests, and/or contracts (including recoupment or setoff) have priority over or are senior to the liens, claims, rights, and interests of the First Lien Lenders.  Neither the DIP Liens, the Superpriority Claim, the Adequate Protection Claim and Liens, nor the Junior Lien Adequate Protection Liens will prime, be superior to, or outrank any liens, claims, rights, interests and contracts, if any, of Shoreline and USSIC to the extent such liens, claims, rights, interests and/or contracts have priority over or are senior to the liens, claims, rights, and interests of the First Lien Lenders. Notwithstanding anything to the contrary in this Final Order, Shoreline and USSIC may dispute the extent or priority of the Prepetition Liens or the DIP Liens as they relate to Shoreline or USSIC.

52.     Notwithstanding anything in this Order to the contrary, the Adequate Protection Claim shall be satisfied first from sources of recovery other than avoidance actions under Chapter 5 of the Bankruptcy Code and their proceeds (except those arising under section 549 of the Bankruptcy Code) (the "Other Recovery Sources").  To the extent any portion of the Adequate Protection Claim remains outstanding after application of proceeds of the Other Recovery Sources, the Adequate Protection Claim shall be satisfied from net recoveries from avoidance actions under Chapter 5 of the Bankruptcy Code (except those arising under section 549 of the Bankruptcy Code which remain part of the Other Recovery Sources) (the "Avoidance Action Recoveries"), provided, however, that one-half of Avoidance Action Recoveries (or $1 million, if less) shall not be used to satisfy the Adequate Protection Claim and will be available to satisfy the claims of other creditors.  For the avoidance of doubt, other than in regards to Diminution in Value of the First Lien Lenders' and First Lien Agents' interests in the Prepetition

47

Collateral, nothing in this Final Order or the Interim Order elevates unsecured deficiency claims of the First Lien Lenders or Second Lien Lenders to administrative expense status.

53.  Notwithstanding anything in the Interim Order, this Final Order, or the DIP Loan Documents to the contrary, (a) the deadline by which the Debtors must obtain entry of the Final Financing Order (as defined in the DIP Loan Documents) is April 9, 2015; (b) the deadline by which the Debtors must obtain entry of the Sales Procedure Order (as defined in the DIP Loan Documents) is April 9, 2015; and (c) the deadline by which the Debtors must obtain entry of an order approving the Proposed Section 363 Sale (as defined in the DIP Loan Documents) is June 19, 2015.

###

**Submitted by:**
Charles A. Beckham, Jr.
HAYNES AND BOONE, LLP
1221 McKinney, Suite 2100
Houston, Texas  77010
Tel: (713) 547-2000
Fax: (713) 547-2600

Stipulated and Agreed:

**HAYNES AND BOONE, LLP**

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.
Texas Bar No. 02016600
Kenric D. Kattner
Texas Bar No. 11108400
Kourtney Lyda
Texas Bar No. 24013330
Kelli M. Stephenson
Texas Bar No. 24070678
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Fax: (713) 547-2600
Email:  charles.beckham@haynesboone.com
Email:  kenric.kattner@haynesboone.com

**PROPOSED COUNSEL TO
DEBTORS-IN-POSSESSION**

**MAYER BROWN LLP**

*/s/ Sean T. Scott*
Sean T. Scott
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

- and -

Charles S. Kelley
Texas State Bar No. 11199580
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
(713) 238-3000 (telephone)
(713) 238-4625 (facsimile)

**COUNSEL FOR
BANK OF MONTREAL**

## Schedule 1

First Lien
Mortgage and Security Documents

1. Amended and Restated Guarantee and Collateral Agreement, dated as of December 22, 2011, by and among Dune Energy, as borrower, and Dune Operating and Dune Properties, as guarantors, in favor of Bank of Montreal, as Administrative Agent.

2. Amended and Restated Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement, dated as of December 21, 2011, from Dune Properties to George Serice, as trustee for the benefit of Bank of Montreal as Administrative Agent.

3. Master Assignment of Note and Liens, dated as of December 22, 2011, by and among Wells Fargo Capital Finance, Inc., as administrative agent for the assigning lender; Wayzata Opportunities Fund II, L.P., as assigning lender; Dune Energy and Dune Properties, as borrowers; Dune Operating, as guarantor; the purchasing lenders; and Bank of Montreal, as Administrative Agent.

4. Assignment of Mortgages (State of Texas), dated as of December 19, 2011, by Wells Fargo Capital Finance, Inc., in favor of Bank of Montreal, as Administrative Agent.

5. Assignment of Mortgages (State of Georgia), dated as of December 19, 2011, by Wells Fargo Capital Finance, Inc., in favor of Bank of Montreal, as Administrative Agent.

6. Related financing statements and other filings reflecting the first-priority security interests in, and liens on, the Collateral.

715471616

## Schedule 2

Second Lien
Mortgage and Security Documents

1. Second Lien Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement, dated as of December 21, 2011 from Dune Properties, Inc. to U.S. Bank National Association, as Indenture Trustee.

2. Collateral Agreement, dated as of December 22, 2011, by Dune Energy, Inc., Dune Operating Company, and Dune Properties, Inc., as grantors, in favor of U.S. Bank National Association, as Collateral Agent.

3. Related financing statements and other filings reflecting the second-priority security interests in, and liens, on, the Collateral.

## **Exhibit A**

DIP Budget

715471616

**Dune Energy, Inc.**
Weekly DIP Budget
Report Date: April 08, 2015
$ Thousands

| | 3/13 | 3/20 | 3/27 | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending:** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| **Week Number:** | | | | | | | | | | |
| **Actual / Forecast:** | Actual | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Total Receipts** | $ 95 | $ 1,577 | $ 40 | $ 102 | $ 10 | $ 10 | $ 1,245 | $ 87 | $ 10 | $ 10 |
| **Disbursements** | | | | | | | | | | |
| Lease Operating Expenses | $ - | $ (267) | $ (227) | $ (502) | $ (29) | $ (121) | $ (69) | $ (539) | $ (115) | $ (193) |
| Severance Taxes - Segregated | (319) | (135) | - | (11) | - | - | (146) | (11) | - | - |
| Royalty / JIB Payments - Segregated | (391) | (228) | - | (32) | - | - | (407) | (31) | - | - |
| Workovers | - | - | - | - | - | - | - | - | - | - |
| Payroll / Payroll Tax / Insurance | (205) | (34) | (10) | (240) | (10) | (276) | (10) | (216) | (10) | (216) |
| Rent / Office Expenses | - | (48) | - | (90) | - | - | - | (90) | - | - |
| **Subtotal: Opg / Non-Opg Disbursements** | (915) | (713) | (237) | (876) | (39) | (397) | (632) | (887) | (125) | (409) |
| **Operating Cash Flow** | (821) | 865 | (197) | (773) | (29) | (387) | 612 | (799) | (115) | (399) |
| Debtor Professional Fees | $ - | $ - | $ - | $ (40) | $ - | $ - | $ - | $ (604) | $ - | $ - |
| Secured Lender Professional Fees | (20) | (136) | - | (473) | - | - | - | (206) | - | - |
| Unsecured Creditors Committee Professionals | - | - | - | - | - | - | - | (23) | - | - |
| Other Restructuring Fees | (100) | - | (15) | (13) | - | - | - | (28) | - | - |
| **Subtotal: Restructuring Disbursements** | (120) | (136) | (15) | (526) | - | - | - | (861) | - | - |
| **Net Cash Flow** | (941) | 729 | (212) | (1,300) | (29) | (387) | 612 | (1,660) | (115) | (399) |
| **Beginning Operating Cash Balance** | $ 171 | $ 2,045 | $ 2,774 | $ 2,562 | 1,262 | 1,234 | 846 | $ 1,458 | $ 298 | $ 433 |
| Net Cash Flow | (941) | 729 | (212) | (1,300) | (29) | (387) | 612 | (1,660) | (115) | (399) |
| DIP Financing Draw | 3,000 | - | - | - | - | - | - | 500 | 250 | 500 |
| Segregated Cash Call Activity | (185) | - | - | - | - | - | - | - | - | - |
| **Ending Operating Cash Balance** | 2,045 | 2,774 | 2,562 | 1,262 | 1,234 | 846 | 1,458 | 298 | 433 | 534 |
| **Total Post Petition Borrowings** | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,500 | $ 3,750 | $ 4,250 |
| **Accounts Payable** | $ 198 | $ 396 | $ 396 | $ 361 | $ 525 | $ 690 | $ 815 | $ 771 | $ 850 | $ 930 |
| **Debtor Professional Fee Accrual** | | | | | | | | | | |
| Haynes & Boone (1) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) |
| Deloitte CRG (1) | (65) | (65) | (65) | (65) | (65) | (45) | (45) | (45) | (45) | (45) |
| Prime Clerk - Claims Agent (1) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) |
| Debtor Professional Fee Reduction | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **Subtotal: Debtors Subject to Reduction** | $ (148) | $ (148) | $ (148) | $ (148) | $ (148) | $ (128) | $ (128) | $ (128) | $ (128) | $ (128) |
| Chief Restructuring Officer | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) |
| Parkman Whaling - Retainer / Monthly | - | - | - | - | - | - | - | (50) | - | - |
| Ordinary Course Professionals | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) |
| **Total Debtor Professional Fee Accrual** | $ (171) | $ (171) | $ (171) | $ (171) | $ (171) | $ (151) | $ (151) | $ (201) | $ (151) | $ (151) |
| **UCC Professional Fee Accrual** | | | | | | | | | | |
| Unsecured Creditors Committee Professionals | $ - | $ - | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) |

**Note**: (1) For purposes of the Final Order and the obligations and protections of the DIP Lenders therein, including without limitation Paragraphs 3 and 31, the Carve-Out Amount, and the reserve against Commitment, the "Debtor Professional Fee Reduction" line entry that appears in the DIP Budget is and shall be deemed to be a reduction (whether before or after allocation) for the budgeted line-item professional fees of Haynes & Boone, Deloitte CRG, and Prime Clerk-Claims Agent (together, the "Impacted Debtors' Professionals"), and such amount shall be included to reduce the computation of Carve-Out Expenses with respect to the Impacted Debtors' Professionals in paragraph 31(a)(iii) of the Final Order (and correspondingly, the reserve against Commitment in paragraph 3 of the Final Order). The Debtors' CRO, to the extent necessary, shall allocate the amount appearing each month in the Debtor Professional Fee Reduction by the seventeenth (17th) of the following month to or among the particular Impacted Debtors' Professionals for purposes of the Final Order, and the CRO shall concurrently provide the DIP Agent, through FTI, written notice of such allocation which shall have the effect of modifying the DIP Budget with respect to those Impacted Debtors' Professionals.

**Dune Energy, Inc.**
Weekly DIP Budget
Report Date: April 08, 2015
$ Thousands

| Week Ending: | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | | Total 18 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|
| Week Number: | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | | |
| Actual / Forecast: | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | | Forecast |
| **Total Receipts** | $ 1,267 | $ 10 | $ 79 | $ 10 | $ 40 | 1,433 | $ 62 | $ 10 | $ | 6,096 |
| **Disbursements** | | | | | | | | | | |
| Lease Operating Expenses | $ (155) | $ (640) | $ (316) | $ (87) | $ (164) | $ (317) | $ (423) | $ (129) | $ | (4,293) |
| Severance Taxes - Segregated | (133) | - | (10) | - | - | (151) | (11) | - | | (927) |
| Royalty / JIB Payments - Segregated | (369) | - | (28) | - | - | (420) | (32) | - | | (1,937) |
| Workovers | - | (127) | - | - | - | - | - | - | | (127) |
| Payroll / Payroll Tax / Insurance | (10) | (130) | (216) | (10) | (216) | (10) | (216) | (129) | | (2,166) |
| Rent / Office Expenses | - | - | (90) | - | - | - | (90) | - | | (408) |
| **Subtotal: Opg / Non-Opg Disbursements** | (666) | (897) | (660) | (97) | (381) | (898) | (772) | (258) | | (9,859) |
| **Operating Cash Flow** | 601 | (887) | (582) | (87) | (341) | 535 | (711) | (248) | | (3,763) |
| Debtor Professional Fees | $ - | $ (878) | $ - | $ - | $ - | $ (666) | $ - | $ (746) | $ | (2,934) |
| Secured Lender Professional Fees | - | (206) | - | - | - | (206) | - | (154) | | (1,400) |
| Unsecured Creditors Committee Professionals | - | (113) | - | - | - | (113) | - | (113) | | (360) |
| Other Restructuring Fees | - | - | (30) | - | - | (13) | (36) | (400) | | (635) |
| **Subtotal: Restructuring Disbursements** | - | (1,196) | (30) | - | - | (997) | (36) | (1,413) | | (5,330) |
| **Net Cash Flow** | 601 | (2,083) | (612) | (87) | (341) | (462) | (747) | (1,660) | | (9,093) |
| **Beginning Operating Cash Balance** | $ 534 | $ 1,135 | $ 367 | $ 255 | $ 418 | $ 328 | $ 365 | $ 368 | | 171 |
| Net Cash Flow | 601 | (2,083) | (612) | (87) | (341) | (462) | (747) | (1,660) | | (9,093) |
| DIP Financing Draw | - | 1,250 | 500 | 250 | 250 | 500 | 750 | 2,250 | | 10,000 |
| Segregated Cash Call Activity | - | 66 | - | - | - | - | - | - | | (120) |
| **Ending Operating Cash Balance** | 1,135 | 367 | 255 | 418 | 328 | 365 | 368 | 958 | | 958 |
| **Total Post Petition Borrowings** | $ 4,250 | $ 5,500 | $ 6,000 | $ 6,250 | $ 6,500 | $ 7,000 | $ 7,750 | $ 10,000 | | 10,000 |
| **Accounts Payable** | $ 969 | $ 581 | $ 688 | $ 795 | $ 902 | $ 778 | $ 836 | $ 958 | | 958 |
| **Debtor Professional Fee Accrual** | | | | | | | | | | |
| Haynes & Boone (1) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ (81) | $ | (1,454) |
| Deloitte CRG (1) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | | (910) |
| Prime Clerk - Claims Agent (1) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | (12) | | (214) |
| Debtor Professional Fee Reduction | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | | 175 |
| **Subtotal: Debtors Subject to Reduction** | $ (128) | $ (128) | $ (128) | $ (128) | $ (128) | $ (128) | $ (128) | $ (128) | $ | (2,403) |
| Chief Restructuring Officer | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | | (378) |
| Parkman Whaling - Retainer / Monthly | - | - | (50) | - | - | - | (25) | - | | (125) |
| Ordinary Course Professionals | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | | (29) |
| **Total Debtor Professional Fee Accrual** | $ (151) | $ (151) | $ (201) | $ (151) | $ (151) | $ (151) | $ (176) | $ (151) | $ | (2,934) |
| **UCC Professional Fee Accrual** | | | | | | | | | | |
| Unsecured Creditors Committee Professionals | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) | $ (23) | $ | (360) |

Note: (1) For purposes of the Final Order and the obligations and protections of the DIP Lenders therein, including without limitation Paragraphs 3 and 31, the Carve-Out Amount, and the reserve against Commitment, the "Debtor Professional Fee Reduction" line entry that appears in the DIP Budget is and shall be deemed to be a reduction (whether before or after allocation) for the budgeted line-item professional fees of Haynes & Boone, Deloitte CRG, and Prime Clerk-Claims Agent (together, the "Impacted Debtors' Professionals"), and such amount shall be included to reduce the computation of Carve-Out Expenses with respect to the Impacted Debtors' Professionals in paragraph 31(a)(iii) of the Final Order (and correspondingly, the reserve against Commitment in paragraph 3 of the Final Order). The Debtors' CRO, to the extent necessary, shall allocate the amount appearing each month in the Debtor Professional Fee Reduction by the seventeenth (17th) of the following month to or among the particular Impacted Debtors' Professionals for purposes of the Final Order, and the CRO shall concurrently provide the DIP Agent, through FTI, written notice of such allocation which shall have the effect of modifying the DIP Budget with respect to those Impacted Debtors' Professionals.